Eugene D. MESSERSCHMIDT

v.

The UNITED STATES.

No. 642–89C.

United States Court of Federal Claims.

July 30, 1993.

Eugene D. Messerschmidt, pro se.

Robert F. Altherr, Jr., Washington, DC, with whom was Stuart M. Gerson, Asst. Atty. Gen., for defendant. John J. Fargo and William C. Bergmann, Washington, DC, of counsel.

## OPINION

YOCK, Judge.

In this *pro se* patent infringement suit, Mr. Eugene D. Messerschmidt (Messerschmidt), seeks compensation under 28 U.S.C. § 1498 (1988) from the United States for the unauthorized use of U.S. Patent No. 4,134,560 (the '560 patent), entitled "Helicopter Control Device." The plaintiff's patent describes a mechanical helicopter control system which enables a helicopter pilot to control all flight functions (pitch, roll, heave, and yaw) with one hand. The plaintiff contends that the United States and contractors of the United States have infringed the '560 patent by the development of computer-aided four-axis helicopter control systems.

On November 28, 1989, the plaintiff commenced this action. On July 20, 1990, this Court bifurcated the liability and damages phases and ordered completion of discovery by January 20, 1991. Nevertheless, because of the defendant's entry of a protective order and the plaintiff's attempts to seek appointment of counsel, this Court allowed the continuation of discovery until February 10, 1992. On September 17, 1991, the plaintiff filed a summary judgment motion requesting an infringement finding and, on January 15, 1992, the defendant filed its motion in opposition to the plaintiff's motion and its cross-motion for summary judgment which alleges noninfringement and patent invalidity. Although the plaintiff has recently requested an oral hearing in this matter, such an oral hearing is deemed unnecessary in view of the extensive briefs and documentation attached hereto.

After a thorough reading of the parties' briefs, affidavits, and other submitted documents, this Court declares claims one, two, and three of the '560 patent invalid for anticipation pursuant to 35 U.S.C. § 102 (1988) and furthermore finds all (five) of the claims of the patent-in-suit invalid for obviousness pursuant to 35 U.S.C. § 103

(1988) and for indefiniteness of claims pursuant to 35 U.S.C. § 112 (1988). In the alternative, this Court finds that the '560 patent has not been infringed, literally or under the doctrine of equivalents, either by the United States or by contractors at its direction pursuant to 28 U.S.C. § 1498. Therefore, this Court denies the plaintiff's motion for summary judgment and grants the defendant's cross-motion for summary judgment.

*Background*

On September 19, 1977, the plaintiff filed an application for a United States patent for a helicopter controller system which purportedly combined the four conventional helicopter controls (*i.e.*, pitch, roll, heave, and yaw) into a single device. The invention claimed a unitary controller for manipulating longitudinal cyclic pitch (pitch) and lateral cyclic pitch (roll), which allows a pilot to choose the desired direction of horizontal motion, collective pitch (heave or collective), which allows altitude control, and rudder (yaw), which serves as an anti-torque control. On January 16, 1979, the United States Patent and Trademark Office (PTO) issued U.S. Patent No. 4,134,560 for plaintiff's "Helicopter Control Device."

I. The Invention

The claims of the '560 patent disclose the following invention:

1. In a control system for a helicopter having:

 (i) a collective pitch control mechanism for changing the pitch angle of the rotor blades;

 (ii) a throttle control;

 (iii) a tail rotor control for changing the pitch of the tail rotor blades; and

 (iv) a cyclic pitch control mechanism for changing the tilt of the rotor disc;

an improved control comprising:

 (a) a first control means pivotally mounted for pivotal movement in at least two directions, said first control means being operatively connected to said cyclic pitch control;

 (b) second control means moveable relative to said first control means and operatively connected to said collective pitch control mechanism; and

 (c) locking means for selectively engaging or disengaging said first and second control means whereby said first and second control means can be locked in unitary engagement and said first and second control means moved in one pivotal direction to change the cyclic pitch in the longitudinal axis and moved in the other pivotal direction to change the cyclic pitch in the lateral helicopter axis and whereby said first and second levers can be disengaged and said second control means can be moved relative to said first control means to control collective pitch and rotated to operate the tail rotor control.

2. The control system of claim 1 further including means associated with said second control means for adjusting said throttle.

3. The control system of claim 1 wherein said first control means comprises a hollow tube and said second control means comprises a shaft slidably disposed within said tube.

4. The control system of claim 3 wherein said shaft includes a horizontal handle portion.

5. The control system of claim 4 including means for selectively adjusting the position of said handle portion.

U.S. Patent 4,134,560, column 4, line 50 through column 6, line 11. Figure 1 of the '560 patent illustrates the above described helicopter control device (hereinafter controller) as follows:

FIG-1

U.S. Patent 4,134,560, figure 1. As indicated above, the claimed and illustrated controller discloses a means for commanding pitch, roll, heave, and yaw. To accomplish these maneuvering functions, the '560 patent discloses a controller comprising a first and second control means, with a locking means for selectively engaging and disengaging the two control means, whereby the two control means allow manipulation of pitch and roll when locked and allow manipulation of heave and yaw when unlocked. In plain terms, when the locking means engage (or lock), the control means control both pitch and roll; when the locking means disengage (or unlock), the control means control heave and yaw. The device purports to function as shown:

U.S. Patent 4,134,560, figure 1 (figure shown in part, alterations added). As both parties agree, pitch, roll, heave, and yaw comprise the conventional helicopter con-

trols for manipulation of a helicopter among the four axes. Yet, since the inception of the helicopter, helicopter control system designers have faced severe difficulties in combining these four control functions into a single integrated controller mechanism (i.e., a four-axis controller) because of a phenomenon called "cross-coupling." The cross-coupling among axes describes the inadvertent introduction of changes in the manipulation of one axis as the result of an intended control change to another axis; for example, when a helicopter pilot moves from one azimuth to another, such as a change in pitch accompanied by a concomitant change in heave, these two simultaneous control changes resulted in the adverse coupling of the disparate controller mechanisms, or a cross-coupling of controls.

In an attempt to remedy the occurrence of cross-coupling in integrated helicopter controllers, the plaintiff utilized a locking device as a brake or inhibitor of this undesirable coupling of controls in a multi-axis controller. In effect, this brake (or lock) allowed selective use of the two control means disclosed in the '560 patent. However, in contrast to the assertions of the plaintiff, the invention recites no means for a single integrated controller mechanism for the command of simultaneous four-axis control. As claim 1 of the '560 patent reads, the first and second control means enable two-axis control when locked, and another two-axis when unlocked, yet at no time enable four-axis control without engaging and disengaging the locking device. Nevertheless, by application of the locking means in conjunction with the heretofore described two control means, the plaintiff argues that the '560 patent comprises a collective four-axis helicopter control system.

## II. The Dispute

As with many matters in patent law, the instant dispute traces to the time of incep-

tion for the patent-in-suit. As a result, this Court reviews the prosecution history and other background of the '560 patent to locate the true points of contention in this arduous *pro se* proceeding.

To procure the patent-in-suit, on June 23, 1977, the plaintiff consulted with Mr. Greg Nelson, the attorney of record for the initial stage of the patent prosecution for the '560 patent. According to the plaintiff, Mr. Nelson drafted the claims of the '560 patent and served as the plaintiff's patent representative throughout the majority of the prosecution proceedings. However, prior to the issuance of the patent, and in order to diminish costs, the plaintiff revoked Nelson's power of attorney on December 6, 1978. One month later, on January 16, 1979, the PTO issued the '560 patent.

After the issuance of the '560 patent, the plaintiff attempted to market the invention. He submitted numerous unsolicited proposals for his helicopter control system to various manufacturers and military avionic officials. Despite great effort in marketing the helicopter controller, the plaintiff experienced no success. In the early 1980's, however, the plaintiff allegedly discovered several newspaper and magazine articles which led him to believe that some helicopter manufacturers, under contracts with the United States, had applied the same control system as, and therefore infringed upon, the '560 patent. Yet, even to the date of the instant motion in this suit, the plaintiff has admitted that his only knowledge of such alleged infringement resulted from the various manufacturer's press releases and newspaper and magazine articles. Messerschmidt Deposition, at B59.

Despite the indefinite evidence, but believing that his patent had been infringed, the plaintiff consulted another patent attorney, Mr. Jordan Meschkow, to consider patent infringement proceedings against the alleged infringers. Mr. Meschkow, however, purportedly informed the plaintiff that the patent-at-issue was invalid for a lack of antecedent in claim 1 of the '560 patent. Indeed, as issued, the '560 patent contained a *non sequitur* by referring to "said first and second levers" in the first claim, at column 5, line 7, but containing no antecedent. As a result, the plaintiff then returned the patent to the alleged drafting attorney, Mr. Greg Nelson, who purportedly assured him of the validity of the patent. Nevertheless, apparently on Mr. Meschkow's advice, the plaintiff sought a "certificate of correction" from the PTO. *See* 35 U.S.C. § 254 (1988) (providing for a certificate of correction when a mistake in a patent results from the fault of the PTO); 35 U.S.C. § 255 (1988) (providing for a certificate of correction not from the fault of the PTO, such as cases of a clerical or typographical nature or in cases of minor character). The PTO, however, denied the request. On October 19, 1989, the PTO informed the plaintiff: "Relief is by way of re-issue not Certificate of Correction. Moreover, request is not in proper form. The corrections requested are not clearly set forth in the request and no basis is given for the request." Letter from Mary W. Allen, Supervisor, Decisions & Certificates of Correction Branch, PTO to Eugene D. Messerschmidt (October 19, 1989). Thus, discovering that the '560 patent had to be reissued and not corrected, the plaintiff decided to forgo the reissuance process. Therefore, despite knowledge of the apparent invalidity of the patent, the plaintiff nevertheless pursued administrative claims against the United States for improper use and/or manufacture of the teachings of the '560 patent.

In fact, even prior to the PTO's denial of correction for the '560 patent, the plaintiff had already filed an administrative claim on August 2, 1988, against the United States Army (Army) and against the National Aeronautics and Space Administration (NASA), claiming that the Army and NASA had infringed upon the '560 patent. In the administrative claims, moreover, the

plaintiff had submitted an adulterated copy of the '560 patent on which the lack of antecedent had been removed and the claim had been artificially "corrected."[1] On February 1, 1989, NASA denied the plaintiff's claim because of the lack of a locking means in the NASA helicopter control system and the basic differences between the plaintiff's mechanical-based system and NASA's electrical-based (*i.e.,* computer-aided) system. On February 13, 1989, the Army also denied the plaintiff's claim because the Army had not yet developed a four-axis helicopter control system.

Following the rejection of the administrative claims by the Army and NASA, on November 28, 1989, the plaintiff filed a complaint with this Court. In the two page complaint, the plaintiff summarily stated a claim against the United States for patent infringement, claiming that the following Government-sponsored research and development programs improperly utilized the teachings of the '560 patent: (1) allegedly based on an article in AVIATION WEEK & SPACE TECH., Jan. 14, 1985, at 45, infringement by American Airlines Training Corp. and The Franklin Institute in developing an Advanced Cab and Visual System (ACAVS) for flight simulators; (2) based on *ADOCS—A Fiber Optic Flight Control System for the Future,* CHINOOK NEWS, Winter 1981, at 3, infringement by Boeing Vertol Co. (Boeing Vertol) in developing the Advanced Digital/Optical Control System (ADOCS); (3) based on *'Star Wars' Choppers: A Roto–Craft Revolution,* INT'L COMBAT ARMS, Sept.1985, at 11 and allegedly on AVIATION WEEK & SPACE TECH., Jan. 16, 1984, at 18, infringement by Bell Helicopter, Textron, Inc. (Bell Helicopter), Boeing Vertol, IBM Federal Systems Division, McDonnell Douglas Helicopter Co. (McDonnell Douglas Helicopter), and Sikorsky Aircraft Division (Sikorsky Aircraft) in developing the Advanced Rotorcraft Technology Integration (ARTI); (4) allegedly based on an article in the ARIZONA REPUBLIC, July 14 and July 15, 1988, infringement by the teams competing for the Light Helicopter, Experimental (LHX) program, consisting of the Boeing Company, Inc. (Boeing) and Sikorsky Aircraft (collectively, the First Team) and Bell Helicopter, McDonnell Aircraft Co. (McDonnell Aircraft), and McDonnell Douglas Helicopter (collectively, the Super Team); (5) allegedly based on an article in BOEING TRANSITIONS, Spring 1985, at 5, infringement by Boeing Vertol in developing the Chinook flying simulator for NASA at the Ames Research Laboratory in Moffett Field, California; (6) allegedly based on either Canadair Ltd. or Canadair Challenger Inc. and Texas Instruments, Inc. (TI) press releases, infringement by TI in developing rotary wing remotely piloted vehicles (RPV) and other RPVs; and (7) allegedly based on an article in AVIATION WEEK & SPACE TECH., Jan. 14, 1985, at 45, infringement in the development of new controls in conjunction with the ACAVS program at NASA's Ames Research Laboratory in Moffett Field, California.

1. At deposition, the plaintiff admitted the deception:

A. * * * I took another photocopy from another line and pasted it up over the other one and sent this copy into the, with my administrative claim figuring by the time they got through either approving or disapproving, allowing my administrative claim, my correction would come from the Patent Office.

But, oh, what a mess that was. So by the time, as I say, by the time I got the letter, this had already been rejected by the Army and NASA, so I didn't even bother changing it.

Q. But you knew when you submitted this administrative claim to the Department of the Army and NASA that the patent and the enclosure and the argument that you submitted did not reflect the actual language of your patent as issued?

A. Right, yes.

* * * * * *

Q. Well, let me ask you: Why did you go to the trouble of Xeroxing the line which you inserted from another place in the patent and pasting it onto this, to the Column 5 and then copying it. Why didn't you just write in the correction?

A. Oh, I thought it would look neater this way, you know, and it would be less noticeable. I thought they won't catch it.

Messerschmidt Deposition, at B103–04. To explain these actions of misrepresentation (if not fraudulent), the plaintiff stated that, as he had already requested correction of the patent, and fully anticipated such, the fictitious version of the patent merely represented what "would be" issued after correction by the PTO. *Id.* at 104–05.

For some of the above recited claims of infringement, the plaintiff cites newspaper and magazine articles as evidence of infringement but fails to provide copies of these documents to this Court. In this Court's consideration of the instant cross-motions for summary judgment, therefore, these deficiencies certainly detract from the plaintiff's motion. Moreover, even for the documents that the plaintiff presents to this Court, the plaintiff's interpretation seems somewhat spurious. With regard to the first of seven bases for the claims of infringement, the plaintiff cites a magazine article regarding flight simulators but provides this Court with an article regarding the U.S. Army's light scout/attack/utility helicopters. *See Technology Gains Expected to Yield LHX Size, Weight, Cost Reductions,* AVIATION WEEK & SPACE TECH., Jan. 14, 1985, at 47–57. In addition, the article refers merely to an "intended" design: "Three-axis or four-axis side-stick controller *appears* likely." *Id.* at 55 (emphasis added). With regard to the second basis for the claim, the plaintiff also cites an article which refers to a "proposed" helicopter control system. *See ADOCS—A Fiber Optic Flight Control System for the Future,* CHINOOK NEWS, Winter 1981, at 3 ("As part of the ADOCS program, optical position transducers *are being developed.* These electrically passive devices convert the four-axis sidearm controller and actuator position signals into optical pulse-trains.") (emphasis added). With regard to the fourth basis for the claim, the plaintiff again cites an article which refers only to "projected" helicopter programs. As for claims four through seven, the plaintiff

provides this Court with no documentation to support the claims made in the complaint or in the motion for summary judgment.

On May 29, 1990, the defendant filed its answer and, except for plaintiff's claims of a valid patent and infringement, admitted the relevant facts as presented by the plaintiff. Following the filing of a joint preliminary status report of the parties, this Court bifurcated the case into liability and damage phases on July 20, 1990. In the succeeding months, the parties engaged in various discovery and procedural battles, including plaintiff's Motion to Compel Production of August 6, 1990, defendant's Motion for the Entry of a Protective Order of September 21, 1990, plaintiff's Motion to Request a List of Expert Witnesses of January 25, 1991, and plaintiff's Motions for Court Appointment of Attorney of May 3, 1991 and June 7, 1991.[2]

On September 17, 1991, the plaintiff filed the instant twenty-eight page motion for summary judgment. The plaintiff spends the first four pages of his motion asserting that the Government is barred by the statute of limitations contained in 28 U.S.C. § 2501 (1988) from asserting the invalidity of the plaintiff's patent.[3] The plaintiff here apparently (and erroneously) believes that the statute applies to the Government's invalidity claim and not to the plaintiff's patent infringement money claim against the United States Government. Having misinterpreted 28 U.S.C. § 2501, the plaintiff then dedicates the next eighteen pages of his motion to the basis for and amount of compensation he should receive in royalty and interest damages for

2. This Court denied the plaintiff's Motions for Court Appointment of Attorney. First, because the United States Court of Federal Claims is not a court of the United States (*i.e.,* an Article III court), this Court concluded that it was not technically authorized to exercise the functions of 28 U.S.C. § 1915 (1988), which provides for the appointment of counsel. Second, even if this Court maintains such authority, the plaintiff had not presented the exceptional circumstances that would require the appointment of counsel. *See Messerschmidt v. United States,* No. 642–89C (Cl.Ct. July 29, 1991).

3. Pursuant to 28 U.S.C. § 2501, "[e]very claim of which the United States [Court of Federal

Claims] has jurisdiction shall be barred unless the petition thereon is filed within six years after such claim first accrues." Section 2501 is jurisdictional and relates to the time period within which a plaintiff may assert a claim against the United States in the Court of Federal Claims. *Lewis v. United States,* 27 Fed.Cl. 104, 106–07 (1992). This jurisdictional statement has no relation to the defendant's defenses, for an affirmative defense is only waived by the failure to brief or argue such to the judicial decisional body. *Miguel v. Department of Army,* 727 F.2d 1081, 1084 (Fed.Cir.1984); *Grover v. United States,* 200 Ct.Cl. 337, 354, 1973 WL 21332 (1973).

the alleged infringement. As noted earlier herein, in this Court's July 20, 1990 Order, this Court bifurcated liability and damages. Thus, the plaintiff's motion should have solely regarded (and this decision only considers) liability: questions of damage are not addressed until and unless liability is found. In the final seven pages of the motion, the plaintiff demands settlement, or a favorable disposition at summary judgment, since "defendant has failed to prove that the helicopter control systems used or manufactured by or for the United States do not perform substantially the same function in substantially the same way to achieve substantially the same result as the '560 patent, * * *." Plaintiff's Motion for Summary Judgment, at 25–26. Apparently, the plaintiff's primary argument of infringement relies upon the doctrine of equivalents, or infringement by function/way/result. *Graver Tank & Mfg. Co. v. Linde Air Products Co.*, 339 U.S. 605, 608, 70 S.Ct. 854, 856, 94 L.Ed. 1097 (1950). However, the plaintiff mistakes the burden; for the plaintiff, and not the defendant, has the burden of proving patent infringement. *Lemelson v. United States*, 752 F.2d 1538, 1547 (Fed.Cir.1985); *Chesterfield v. United States*, 141 Ct.Cl. 838, 845, 159 F.Supp. 371, 375 (1958); *Dow Chemical Co. v. United States*, 20 Cl.Ct. 623, 642 (1990).

III. The Claims and Defenses

Uniformly throughout the plaintiff's pleadings, the plaintiff makes bald assertions with little or no evidence to support the positions. This practice is particularly evident in the plaintiff's claims of infringement. The plaintiff simply states that several helicopter control systems comprise four-axis controllers and, because the '560 patent claims the only successful four-axis controller .ever discovered, that these accused controllers infringe the '560 patent. Despite these conclusory statements of infringement, this Court discerns the plaintiff's base allegations of literal infringement and infringement under the doctrine of equivalents from the pleadings.

To understand the plaintiff's claims of literal infringement, this Court finds some discussion in the Plaintiff's Response. Therein, although not referring to literal infringement by name, the plaintiff declares that the claims of the '560 patent cover the corresponding function (but not structure) of the four-axis controllers developed by contractors of the United States, specifically the ADOCS, ARTI, and LHX/LH/Comanche helicopter control systems. To evidence such infringement, the plaintiff presents several claim charts to demonstrate how these accused controllers purportedly read on the claims of the '560 patent. *See* Plaintiff's Response, at 11–14 (citing infringement of the '560 patent by the ADOCS controller); *id.* at 3 (citing infringement of the '560 patent by the ARTI controller); *id.* at 35–36 (citing infringement of the '560 patent by the Comanche controller). Again, this Court only "assumes" that the plaintiff intends these claim charts as proof of literal infringement, because the plaintiff fails to make any such claims clear. In fact, the plaintiff probably intends the claim charts for the Comanche controller as proof of infringement under the doctrine of equivalents because of notations of "equivalent" on the claim chart. *Id.* at 35. Yet, the means-plus-function nature of the '560 patent requires not only corresponding "function" but also corresponding or equivalent "structure" for literal infringement or infringement under the doctrine of equivalents. *See Pennwalt Corp. v. Durand-Wayland, Inc.*, 833 F.2d 931, 934 (Fed.Cir. 1987) ("[A court] must find equivalent *structure* as well as *identity* of claimed *function* for that structure."), *cert. denied*, 485 U.S. 961, 108 S.Ct. 1226, 99 L.Ed.2d 426 (1988). Thus, perhaps unbeknownst to the plaintiff, these claim charts seem to identify a claim both of literal infringement as well as infringement under the doctrine of equivalents.

While the plaintiff's grounds for infringement under the doctrine of equivalents are scarce at best, this Court discerns the essential allegations of infringement under the doctrine of equivalents from the plaintiff's eighteen page description of the

compensatory basis for his claim. The assertions of infringement in this description rely primarily upon the helicopter controller design allegedly utilized by the most recent helicopter development program, or the Comanche program. Initially the "Light Helicopter Experimental" (LHX) program, two teams competed in the later renamed "Light Helicopter" (LH) program to develop a new helicopter design, including a new helicopter control system. The winner of this competition subsequently gained the name, the "Comanche" helicopter. Notably, the allegations of infringement by the LHX/LH/Comanche controllers seem to represent the bulwark of the plaintiff's claims of infringement in the instant proceeding.

Based on magazine articles which described the three-plus-one helicopter control configuration in the LH developer program by McDonnell Douglas and Bell Helicopter (the Superteam) and the four-plus-one helicopter control configuration in the LH developer program by the Boeing and Sikorsky Aircraft (the First Team), the plaintiff contends that the controllers of these systems and any other computer-aided helicopter control system which integrates the four conventional flight functions (*i.e.*, pitch, roll, heave, and yaw), infringe upon the '560 patent. *See* David S. Harvey, *Inside The Superteam's Advanced Cockpit Evaluator*, ROTOR & WING INT'L, Jan. 1991, at 68–70; *Flying the First Team's LH Simulator*, ROTOR & WING INT'L, Mar. 1991, at 17–19. As the United States awarded the LH contract, now called the Comanche program, to Boeing and Sikorsky Aircraft (the First Team), the plaintiff further asserts that the two patents on which the First Team relied in developing a computer-aided helicopter control system, U.S. Patent Nos. 4,420,808 and 4,696,445, also infringe the '560 patent. To illustrate the scope of infringement, the plaintiff presents three conceptualizations of the accused devices, attempting to meet the requirements of the tripartite test for infringement under the doctrine of equivalents by showing "substantial" equivalents for the function, way, and result of the controller disclosed in the patent-in-suit

(but not for the structure). *See, e.g., Atlas Powder Co. v. E.I. Du Pont de Nemours & Co.*, 750 F.2d 1569, 1579 (Fed.Cir.1984); *de Graffenried v. United States*, 20 Cl.Ct. 458, 481 (1990); *Deuterium Corp. v. United States*, 16 Cl.Ct. 454, 460 (1989).

First, the plaintiff claims that the devices disclosed in the references to the LHX/LH/Comanche programs "function" in a substantially equivalent manner as the controller disclosed in the '560 patent. Specifically, with regard to the three-plus-one controller of the Superteam and the four-plus-one controller of the First Team in the LH developer programs, the plaintiff makes a sweeping statement of common function. The plaintiff alleges: "[The] controls interact through a computer so that *all* flight functions can be and are controlled with the right-side controller. * * * These actions are accomplished as a result of the computer operating the control actuators, and hence the control means, relative to each other as required in claim 1(c) of the '560 patent." Plaintiff's Motion for Summary Judgment, at 11–12. Thus, relying strictly on commonality of function, and ignoring any differences of structure, the plaintiff states: "Defendant continues to deny that these are infringing uses solely because they are electrical controls and plaintiff's '560 patent is 'mechanical', [sic] but defendant fails to show that his controls don't perform substantially the same function in substantially the same way to achieve substantially the same result as the '560 patent." Plaintiff's Motion for Summary Judgment, at 13. Therefore, the plaintiff argues that the electrical function of the computer-aided controllers parallel, or serve as substantial equivalents to, the mechanical-based "function" disclosed in the '560 patent, despite any differences of structure. In other words, the plaintiff alleges "equivalent function."

Second, in the plaintiff's "Proposed Findings of Uncontroverted Fact," the plaintiff further defines his proposed basis of infringement, arguing that the accused controllers operate in the same "way" as the controller in the '560 patent. Notably, the plaintiff ignores commonality of structure

and proffers merely an argument of equivalent "way" of performing the functions of the '560 patent. To demonstrate such, the plaintiff asserts: "The '560 patent encompasses mechanical, electrical, optical or any other helicopter control system as provided in claim 1(a) and (b) that control means be *operatively* connected to the control means." Proposed Findings of Uncontroverted Fact (Plaintiff's), at 1. In the plaintiff's "Statement of Genuine Issues," the plaintiff then defines this "operative connection." Primarily, the plaintiff parallels the master on/off switch of the respective helicopter design to a locking means. As an alternative, the plaintiff further parallels the "mode select switch" of the ADOCS controller, which enables pilot-operated selection of secondary controller functions, to a locking means. Based on these two switches, the plaintiff argues that the helicopter controls of the ADOCS program, the ARTI program, and the LHX/LH/Comanche program act in the same way as, and thus infringe upon, the claims of the '560 patent. In other words, the plaintiff alleges "equivalent way."

Third, the plaintiff asserts infringement based on the alleged "result" in operation of the claimed controller in comparison to the accused controllers. This allegation relies on the operative abilities of the Advanced Digital/Optical Control System (ADOCS) controller by Boeing Vertol, as disclosed in a helicopter control design study by NASA's Ames Research Center for the Aeromechanics Laboratory, U.S. Army Research and Technology Laboratories (AVRADCOM). *See* 1 Ames Research Center, National Aeronautics and Space Administration, Development of ADOCS Controllers and Control Laws 7, 58, 61 (1984) ("ADOCS Study"). Citing the application of a four-axis controller in the ADOCS demonstrator, the plaintiff infers that the longitudinal, lateral, and directional control law mode switching of the ADOCS controller matches the claims of the '560 patent and that infringement occurs. *See id.* at 58 ("To achieve the desirable low speed and forward flight handling qualities without pilot selection, the control laws required automatic switching during

transition * * *."). Based on the plaintiff's perceived commonality of function in the ADOCS controller with that of the '560 patent, the plaintiff presents the following analogy as to the claims of the patent-in-suit: "In the [ADOCS] process, the aircraft was actually being controlled by a computer which caused the controlled surfaces to be actuated irrespective of pilot input thereby causing the first control means (cyclic control) to be moved relative to the second control means (collective control) and thereby infringe * * * the '560 patent." Proposed Findings of Uncontroverted Fact (Plaintiff's), at 5. In effect, by the above description, this Court recognizes an understanding on the part of the plaintiff that *any* embodiment of a four-axis controller which functions similar to, but not necessarily portrays the function of or contains the structure of, the plaintiff's invention infringes one or more of the claims of the '560 patent. In fact, the plaintiff confirms this understanding of a patent of infinite scope. *See* Proposed Findings of Uncontroverted Fact (Plaintiff's), at 1 ("There is no restriction in the claims that this patent is valid only in a flying machine."). In other words, albeit in a perhaps grandiose fashion, the plaintiff alleges "equivalent result."

On January 17, 1992, the defendant filed its Opposition to Plaintiff's Motion for Summary Judgment and Cross–Motion for Summary Judgment. The defendant therein argues that the '560 patent is invalid and, in the alternative, rejects either plaintiff's claim of literal infringement or infringement under the doctrine of equivalents. As for invalidity, the defendant asks that this Court find the '560 patent invalid for anticipation pursuant to 35 U.S.C. § 102, invalid for obviousness pursuant to 35 U.S.C. § 103, and invalid for indefiniteness of claims pursuant to 35 U.S.C. § 112, ¶ 2. However, should this Court find any of the claims of the '560 patent valid, the defendant argues, in the alternative, that based on the singularity of function as emphasized by the locking means disclosed in each claim of the patent-in-suit and the dissimilarity in structure between the me-

**14**

chanical-based patent-in-suit and the computer-aided design of the accused controllers, neither literal infringement nor infringement under the doctrine of equivalents occurs.

For the reasons cited by the defendant, as referenced above and discussed in detail below, this Court agrees that certain claims of the plaintiff's patent fail for invalidity based on anticipation under 35 U.S.C. § 102 and that all of the plaintiff's claims fail for obviousness under 35 U.S.C. § 103 and for indefiniteness of claims under 35 U.S.C. § 112. Moreover, this Court agrees that neither the United States nor contractors of the United States have infringed the plaintiff's patent. Thus, for the foregoing reasons, this Court denies plaintiff's motion for summary judgment and grants defendant's cross-motion for summary judgment.

*Discussion*

I. Standards for Summary Judgment

■ Summary judgment is appropriate only when a court determines that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. Fed.R.Civ.P. 56(c). The Rules of the United States Court of Federal Claims (RCFC) parallel Rule 56(c) of the Federal Rules and require summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgement as a matter of law." RCFC 56(c). As RCFC 56(c) closely resembles Rule 56(c) of the Federal Rules, findings pursuant to Rule 56(c) are persuasive in interpreting RCFC 56(c). *Imperial Van Lines Int'l, Inc. v. United States*, 821 F.2d 634, 637 (Fed.Cir. 1987); *Alaska American Lumber Co. v. United States*, 25 Cl.Ct. 518, 525 n. 5 (1992); *Lichtefeld–Massaro, Inc. v. United States*, 17 Cl.Ct. 67, 70 (1989). Thus, "Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). Summary judgment is appropriate here if the Government carries the burden of showing that (1) there is no genuine issue of material fact and that (2) it is entitled to judgment as a matter of law. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157, 90 S.Ct. 1598, 1608, 26 L.Ed.2d 142 (1970); *Rust Comms. Group, Inc. v. United States*, 20 Cl.Ct. 392, 394 (1990); *Lima Surgical Assoc., Inc. Voluntary Employees' Beneficiary Ass'n Plan Trust v. United States*, 20 Cl.Ct. 674, 679 (1990), *aff'd*, 944 F.2d 885 (Fed.Cir.1991); *Hercules, Inc. v. United States*, 25 Cl.Ct. 616, 620 (1992).

■ When making a summary judgment determination, a court must consider the existence of a genuine issue as to any material fact. *Celotex*, 477 U.S. at 322–23, 106 S.Ct. at 2552–53. "[T]he dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). While the movant bears the initial burden of showing the absence of all genuine issues of material fact. *Avia Group Int'l, Inc. v. L.A. Gear Cal., Inc.*, 853 F.2d 1557, 1561 (Fed.Cir. 1988), "the burden on the moving party may be discharged by 'showing'—that is, pointing out to the [ ] court—that there is an absence of evidence to support the nonmoving party's case." *Celotex*, 477 U.S. at 325, 106 S.Ct. at 2554. Once the movant discharges this burden, the burden falls on the nonmovant, *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87, 106 S.Ct. 1348, 1355–56, 89 L.Ed.2d 538 (1986), to demonstrate "specific facts showing that there is a genuine issue for trial." RCFC 56(f). Such evidence must be viewed in a light most favorable to the nonmovant. *Adickes*, 398 U.S. at 147, 90 S.Ct. at 1602; *Whittaker Corp. v. UNR Indus., Inc.*, 911 F.2d 709, 713 (Fed.Cir. 1990); *Circle K Corp. v. United States*, 23 Cl.Ct. 665, 669 (1991).

■ Moreover, "[s]ummary judgment is as appropriate in a patent case as in any other." *Barmag Barmer Maschinenfabrik AG v. Murata Mach., Ltd.*, 731 F.2d 831, 835 (Fed.Cir.1984). *See also Becton Dickinson & Co. v. C.R. Bard, Inc.*, 922 F.2d 792, 795 (Fed.Cir.1990) ("As in other cases, the grant of summary judgment under Fed.R.Civ.P. 56, is appropriate in a patent case where no genuine issue of material fact exists and the movant is entitled to judgment as a matter of law.") (footnote omitted); *see, e.g., C.R. Bard, Inc. v. Advanced Cardiovascular Sys., Inc.*, 911 F.2d 670, 672 (Fed.Cir.1990); *Johnston v. IVAC Corp.*, 885 F.2d 1574, 1576 (Fed.Cir. 1989); *Avia Group*, 853 F.2d at 1561. As the Claims Court recently recognized, however, the court must accord special attention to summary judgment in patent cases:

> While these traditional standards of RUSCC [subsequently RCFC] 56(b) are fully applicable to patent suits, *Howes v. Medical Components, Inc.*, 814 F.2d 638, 643 (Fed.Cir.1987); *SRI Int'l v. Matsushita Elec. Corp. of Am.*, 775 F.2d 1107, 1116 (Fed.Cir.1985), the Federal Circuit has cautioned that summary judgment on the issue of infringement must be approached with care. *Palumbo v. Don-Joy Co.*, 762 F.2d 969, 974 (Fed.Cir.1985). Indeed, because the ultimate determination of infringement (in contrast to the initial interpretation of the claim) is itself a fact issue, this court must approach a motion for summary judgement with care proportioned to the likelihood of its being appropriate. *Chemical Eng'g Corp. v. Essef Indus., Inc.*, 795 F.2d 1565, 1571 (Fed.Cir.1986); *SRI Int'l*, 775 F.2d at 1116.

> Despite the intense factual nature of the infringement inquiry, summary judgment is appropriate where comparison of a properly interpreted claim with an uncontested description of the accused device or process reflects the absence of a genuine issue of material fact. *Chemical Eng'g*, 795 F.2d at 1571; *Porter v. Farmers Supply Serv. Inc.*, 790 F.2d 882, 884 (Fed.Cir.1986); *Palumbo*, 762 F.2d at 973.

*Deuterium Corp. v. United States*, 16 Cl. Ct. 454, 458–59 (1989). *See also D.M.I., Inc. v. Deere & Co.*, 755 F.2d 1570, 1573 (Fed.Cir.1985) ("[A] motion for summary judgment of infringement or noninfringement should be approached with a care proportioned to the likelihood of its being inappropriate."). Nevertheless, if no genuine issue of material fact is present and the movant is entitled to judgement as a matter of law, summary judgement is also appropriate even though patent infringement, either literal or under the doctrine of equivalents, is a question of fact. *Brenner v. United States*, 773 F.2d 306, 307 (Fed. Cir.1985).

In the instant case, as the parties seek cross-motions for summary judgment, this Court finds an absence of any dispute over matters of material fact by stipulation where neither party challenges such. Thus, in the factual circumstances here present, this Court finds no issue of material fact, because "where both parties have filed dispositive motions, and neither has challenged nor denied the material facts relied upon by the other, the trial court may properly enter judgment on the issue of law, based upon the material facts contained in the motions." *Heinemann v. United States*, 796 F.2d 451, 456 (Fed.Cir. 1986), *cert. denied*, 480 U.S. 930, 107 S.Ct. 1565, 94 L.Ed.2d 758 (1987).

When making a summary judgment determination, however, a court must also consider whether the movant is entitled to a judgment as a matter of law. *Celotex*, 477 U.S. at 322–23, 106 S.Ct. at 2552–53. Resultingly, this Court considers the two patent issues at bar.

## II. Validity

The law appears in flux whether this Court (a trial court) need consider validity if noninfringement exists. *Compare Gargoyles, Inc. v. United States*, 26 Cl.Ct. 1367, 1369 (1992) ("This court need consider the [patent] validity arguments only if infringement is found.") (citing *Morton Int'l, Inc. v. Cardinal Chem. Co.*, 959 F.2d 948 (Fed.Cir.1992), *vacated*, —— U.S. ——, 113 S.Ct. 1967, 124 L.Ed.2d 1 (1993)) *with Pa-*

*cific Technica Corp. v. United States,* 11 Cl.Ct. 393, 405 (1986) ("Patent disputes in the United States Claims Court require the court to make determinations on both validity and infringement, regardless of the conclusion reached on either validity or infringement.") (citing *Simmons Fastener Corp. v. Illinois Tool Works, Inc.,* 739 F.2d 1573, 1576 (Fed.Cir.1984), *cert. denied,* 471 U.S. 1065, 105 S.Ct. 2138, 85 L.Ed.2d 496 (1985)).

While the United States Court of Claims allowed the trial commissioners to avoid a lengthy validity analyses upon a finding of noninfringement, *Barrett v. United States,* 186 Ct.Cl. 210, 224, 405 F.2d 502, 510 (1968) ("Since there is no infringement, it is unnecessary to decide validity."); *Autogiro Co. v. United States,* 181 Ct.Cl. 55, 91, 384 F.2d 391, 415 (1967) ("Only on claims found infringed is it necessary to reach a decision on validity."), the United States Supreme Court, in dicta, has referred to validity, not infringement, as the matter of greatest importance. *Sinclair & Carroll Co. v. Interchemical Corp.,* 325 U.S. 327, 330, 65 S.Ct. 1143, 1145, 89 L.Ed. 1644 (1945). *See also Altvater v. Freeman,* 319 U.S. 359, 363, 63 S.Ct. 1115, 1117, 87 L.Ed. 1450 (1943) ("Though the decision of non-infringement disposes of the bill and answer, it does not dispose of the counterclaim which raises the question of validity."). Following this rationale of the Court of Claims, the Federal Circuit had developed a practice of vacating validity findings upon affirmance of noninfringement, citing the rationale that a court need not consider validity if noninfringement exists. *See, e.g., Vieau v. Japax, Inc.,* 823 F.2d 1510, 1517 (Fed.Cir.1987); *Orthokinetics, Inc. v. Safety Travel Chairs, Inc.,* 806 F.2d 1565, 1571 (Fed.Cir.1986). This practice seems to have moved to the trial courts as well. *See Gargoyles, Inc. v. United States,* 26 Cl.Ct. at 1369 (rendering the validity issue as extraneous upon a finding of noninfringement); *Unette Corp. v. Unit Pack Co.,* 226

U.S.P.Q. 715, 717, 1985 WL 5989 (D.N.J. 1985) (rendering the validity issue as moot upon a finding of noninfringement), *aff'd,* 785 F.2d 1026 (Fed.Cir.1986).

In *Cardinal Chem. Co. v. Morton Int'l, Inc.,* — U.S. ——, 113 S.Ct. 1967, 124 L.Ed.2d 1 (1993), however, the Supreme Court overturned the practice by the Federal Circuit of vacating validity findings following rulings of noninfringement. Similarly, the Court also reiterated the public interest in resolving questions of patent validity. The Court emphasized:

> [O]ur prior cases have identified a strong public interest in the finality of judgments in patent litigation. In *Sinclair & Carroll Co. v. Interchemical Corp.,* 325 U.S. 327, 65 S.Ct. 1143, 89 L.Ed. 1644 (1945), we approved of the District Court's decision to consider the question of validity even though it had found that a patent had not been infringed. Criticizing the contrary approach taken by other courts, we stated that "of the two questions, validity has the greater public importance, *Cover v. Schwartz,* 133 F.2d 541 [ (CA2 1943) ], and the District Court in this case followed what will usually be the better practice by inquiring fully into the validity of this patent." *Id.,* 325 U.S., at 330, 65 S.Ct., at 1145.

*Id.* — U.S. at ——, 113 S.Ct. at 1977. Conversely, the Court also stressed the limited nature of the ruling, reviewing the appellate practice but not any trial-level conventions of finding a validity determination moot upon noninfringement. *See id.* — U.S. at ——, 113 S.Ct. at 1974 ("[T]he issue before us, therefore[,] concerns the jurisdiction of an intermediate appellate court—not the jurisdiction of either a trial court or this Court."). Resultingly, this Court reads the Supreme Court opinion as without regard to the jurisdictional boundaries of the trial courts.

■ While this Court recognizes some confusion on this disputed point,[4] the par-

---

**4.** In contrast to the mootness of the validity of a patent following a noninfringement finding at the Federal Circuit, the issue considered here regards solely whether a court should review validity at the trial level upon a finding of

noninfringement. Former Chief Judge Howard T. Markey of the Federal Circuit, in Howard T. Markey, *On Simplifying Patent Trials,* 116 F.R.D. 369, 370 (1987), considered the role of

ticular facts of the instant case provide this Court with the opportunity and perhaps even obligation to decide validity. In *Leesona Corp. v. United States*, 208 Ct.Cl. 871, 530 F.2d 896 (1976), *cert. denied*, 444 U.S. 991, 100 S.Ct. 522, 62 L.Ed.2d 420 (1979), the Court of Claims stated:

> While the better practice is to treat both the validity and infringement issues, *Sinclair Co. v. Interchemical Corp.*, 325 U.S. 327 [65 S.Ct. 1143, 89 L.Ed. 1644] (1945), particularly in view of the public interest in the validity issue, *Ditto, Inc. v. Minnesota Mining and Manufacturing Co.*, 336 F.2d 67 (8th Cir.1964), it is not always necessary to do so. *Dresser Industries, Inc. v. United States*, 193 Ct.Cl. 140, 432 F.2d 787 (1970). Where, as here, noninfringement is clear *and invalidity is not plainly evident*, it is appropriate to treat only the infringement issue. *Lockwood v. Langendorf United Bakeries, Inc.*, 324 F.2d 82 (9th Cir.1963).

*Id.* at 887 n. 9, 530 F.2d at 906 n. 9 (emphasis added). The crucible of deciding validity *at the trial level*, therefore, appears to hinge on whether the defendant presents sufficient evidence to render as "plainly evident" the invalidity of the patent-in-suit. *Vieau*, 823 F.2d at 1521 ("Furthermore, the validity issue in this case is not one in which invalidity is plainly evident."); *Nestier Corp. v. Menasha Corp.–Lewisystems Div.*, 739 F.2d 1576, 1581 (Fed.Cir.1984) ("Here, the [ ] patent was judged to have been not infringed * * *; to then adjudge the patent valid would be to decide an unnecessary question * * *.").

Therefore, as this Court finds invalidity "plainly evident" in the '560 patent as demonstrated below, this Court considers the present circumstances sufficiently compelling to proceed with the validity analysis, regardless of the presence or absence of infringement.

### A. Presumption of Validity

■ The most fundamental presumption in patent law is the validity of an issued patent. 35 U.S.C. § 282 (1988). Thus, absent evidence to the contrary, a court presumes not only the utility, 35 U.S.C. § 101, novelty, 35 U.S.C. § 102, and nonobviousness of a patent, 35 U.S.C. § 103, but also that the patent adequately reveals the enablement, properly provides a written description, and discloses the best mode, 35 U.S.C. § 112, ¶ 1, and contains requisite definitiveness of claims, 35 U.S.C. § 112, ¶ 2. In this case, the defendant strives to rebut this statutory presumption favoring

trial courts in this regard. Judge Markey recognized:

> When a patentee sues for infringement, it is the alleged *infringement* that gives rise to the patentee's cause of action. Absent other claims, infringement is the sole injury and basis for a claim to damages and an injunction. Without infringement, there is no case or controversy on the validity defense, and a patentee that has not carried its burden of proving infringement has no right or reason to remain in the trial court. If infringement be not proven, there is nothing at that point to defend against and no reason for a defendant's attempting to prove an invalidity defense. * * * Courts have no roving commission to destroy every invalid patent. Assuming the patent would have been proven invalid, a trial required for its destruction, after a finding of no infringement and thus in the absence of a case or controversy, is not justified, by considerations of public policy or otherwise.

*Id.* at 377, 377 n. 15. Then, anticipating the counter-argument of possible reversal of the trial court opinion by the Federal Circuit as well as the danger of duplicitous trials based on invalid patents, Judge Markey responded:

> It is certainly *possible* that a judgment based on a finding of noninfringement *might* be reversed on appeal, but, under the expectation posited here of the trial judge's thorough conviction, after either a bench or jury trial, the difficulty in overturning a jury finding and subsequent denial of a Rule 50(b) motion, and Rule 52(a)'s effect on a trial judge's finding of noninfringement after a bench trial, such reversals would be rare. Procedures and practices should be designated to fit the likely, not the rare.

*Id.* at 380–81. While this Court realizes that *Morton Int'l* clearly fails to follow this reasoning, in the realm of trial court jurisdiction only, this Court likewise finds no renunciation thereof. *See Morton Int'l*, ——— U.S. at ——— n. 17, 113 S.Ct. at 1974 n. 17 (recognizing the discretion of trial courts in the exercise of jurisdiction over validity determinations).

validity,[5] arguing that the '560 patent fails as invalid by anticipation pursuant to 35 U.S.C. § 102, as invalid for obviousness pursuant to 35 U.S.C. § 103, and as invalid for indefiniteness of claims pursuant to 35 U.S.C. § 112, ¶ 2. In doing so, the defendant faces the challenge of proving the assertions of invalidity by clear and convincing evidence. *American Hoist & Derrick Co. v. Sowa & Sons, Inc.*, 725 F.2d 1350, 1358–59 (Fed.Cir.), *cert. denied*, 469 U.S. 821, 105 S.Ct. 95, 83 L.Ed.2d 41 (1984); *Raytheon Co. v. Roper Corp.*, 724 F.2d 951, 960 (Fed.Cir.1983), *cert. denied*, 469 U.S. 835, 105 S.Ct. 127, 83 L.Ed.2d 69 (1984); *SSIH Equipment S.A. v. ITC*, 718 F.2d 365, 375 (Fed.Cir.1983).

B. Validity under 35 U.S.C. §§ 101–03

■ If an inventor discovers a process, machine, manufacture, or composition of matter,[6] the inventor may seek a patent for any of these four pigeonholes of patent-eligible subject matter. 35 U.S.C. § 101. In contrast to patent-eligibility for such difficult items such as computer software, *Diamond v. Diehr*, 450 U.S. 175, 101 S.Ct. 1048, 67 L.Ed.2d 155 (1981) (granting patent-eligibility for a computer program of an industrial process), methods of doing business. *Paine, Webber, Jackson & Curtis, Inc. v. Merrill Lynch, Pierce, Fenner, & Smith, Inc.*, 564 F.Supp. 1358 (D.Del.1983) (granting patent-eligibility for a cash management system), living beings. *Funk Bros. Seed Co. v. Kalo Inoculant Co.*, 333 U.S. 127, 68 S.Ct. 440, 92 L.Ed. 588 (1948) (rejecting patent-eligibility for naturally occurring bacteria), or for manufactured living beings. *Diamond v. Chakrabarty*, 447 U.S. 303, 100 S.Ct. 2204, 65 L.Ed.2d 144 (1980) (granting patent-eligibility for genetically-engineered bacteria), the patent-eligibility of a mechanical device for a helicopter controller represents anything but a questionable area of the patent law. Thus, assuming patent-eligible subject matter for the claimed invention, as this Court does, the patent code requires three conditions of

5. At this point, this Court references another type of presumption, or the presumption in favor of, or deference granted to, the findings of the PTO. *American Hoist & Derrick Co. v. Sowa & Sons, Inc.*, 725 F.2d 1350, 1358–59 (Fed.Cir.), *cert. denied*, 469 U.S. 821, 105 S.Ct. 95, 83 L.Ed.2d 41 (1984). Yet, as here, where the party challenging the validity of the patent presents prior art not considered by the PTO in the issuance of the patent-in-suit, any presumption or deference to the findings of the PTO ends. The Federal Circuit explained this dichotomy as follows:

When an attacker, in sustaining the burden imposed by § 282, produces prior art or other evidence *not* considered in the PTO, there is, however, *no reason to defer* to the PTO so far as *its* effect on validity is concerned. * * * When an attacker simply goes over the same ground travelled by the PTO, part of the *burden* is to show that the PTO was wrong in its decision to grant the patent. When new evidence touching validity of the patent not considered by the PTO is relied on, the tribunal considering it is not faced with having to *disagree* with the PTO or with *deferring* to its judgment or with taking its expertise into account.

*Id.* at 1359–60. In the case at bar, therefore, the numerous periodical prior art references as well as an important unconsidered prior patent empower this Court to look beyond the findings of the PTO. *See In re Etter*, 756 F.2d 852, 861 (Fed.Cir.) ("Our precedent holds that the presumption of validity is not weakened or destroyed during litigation by presentation of more relevant art not considered by the PTO, but may be more easily overcome if such art is presented."), *cert. denied*, 474 U.S. 828, 106 S.Ct. 88, 88 L.Ed.2d 72 (1985). Ironically, most of these prior art references appeared first in the pleadings of the plaintiff, but strangely, apparently never found their way to the examiner's desk during the patent prosecution proceedings.

6. These forms of patent-eligible subject matter, as described at 35 U.S.C. § 101, include the range of "utility" inventions. These inventions comprise:

[M]achine, process, manufacture, or composition of matter. A "machine" may be defined as a mechanism with moving parts, for example, a soft drink machine. A "process" is a series of steps that achieve an end result; for example, the steps of picking the grapes, removing the stems and leaves, crushing the grapes, storing and fermenting the juice for a period of time result in making wine. A "manufacture" is an article of manufacture, such as a pair of eyeglasses. A "composition of matter" is usually a chemical compound. Additionally, the patent law provides for protection of "designs" under 35 U.S.C. § 171 and for asexually reproduced plants under 35 U.S.C. § 161.

RAPHAEL V. LUPO & DONNA M. TANGUAY, WHAT CORPORATE AND GENERAL PRACTITIONERS SHOULD KNOW ABOUT INTELLECTUAL PROPERTY LITIGATION 8 (1991) (footnote omitted).

patentability: the usefulness (or utility) of the invention, 35 U.S.C. § 101; the novelty of the invention, 35 U.S.C. § 102; and that the invention not comprise an obviousness innovation upon a prior invention, 35 U.S.C. § 103. *See In re Bergy*, 596 F.2d 952, 960 (C.C.P.A.1979) (Rich, J.) (describing the three doors "which must be opened on the difficult path to patentability"), *vacated on other grounds, Diamond v. Chakrabarty*, 444 U.S. 1028, 100 S.Ct. 700, 62 L.Ed.2d 666 (1980).

### 1. Utility

■ Professor Merges recognizes three forms of utility in reviewing the utility (or usefulness) requirement: general utility, "whether an invention is operable or capable of any use," specific utility, "whether the invention works to solve the problem it is designed to solve," and beneficial utility, "whether the intended purpose of the invention has some minimum social benefit, or whether it is completely harmful or deleterious." ROBERT PATRICK MERGES, PATENT LAW AND POLICY 147 (1992) [hereinafter MERGES]. Any invention more than " 'a mere curiosity, a scientific process exciting wonder yet not producing physical results, or [a] frivolous or trifling article or operation not aiding in the progress nor increasing the possession of the human race' " satisfies general utility. *Id.* (quoting 1 WILLIAM C. ROBINSON, THE LAW OF PATENTS FOR USEFUL INVENTIONS 463 (1890)). In other words, anything that does something constitutes general utility.

■ Specific utility, however, requires a more strenuous analytical standard by applying the doctrine of practical utility. *See Brenner v. Manson*, 383 U.S. 519, 534–35, 86 S.Ct. 1033, 1041–42, 16 L.Ed.2d 69 (1966) (recognizing utility, in the first Supreme Court decision to review a decision of the Court of Customs and Patent Appeals, only upon development of the subject matter to the point of a "specific benefit"); *but see Ex parte Cheesebrough*, 1869 Comm'n Dec. 18, 19 (1869) (citing a test of utility whereby any nonharmful invention is useful). In *In re Nelson*, 470 F.2d 643 (C.C.P.A.1972), the Court of Customs and Patent Appeals

(CCPA) affirmed a process patent which proved useful to scientific research but resulted in no ultimate production of a product. Subsequently, in *Manson*, the Supreme Court implicitly reversed *Nelson* and affirmed a stricter standard of "practical utility" by requiring a specific assertion of utility. *Manson*, 383 U.S. at 535, 86 S.Ct. at 1042. In view of *Manson*, therefore, the doctrine of practical utility comprises the foremost consideration of utility pursuant to 35 U.S.C. § 102. *See In re Kirk*, 54 C.C.P.A. 1119, 1130, 376 F.2d 936, 946 (1967) (noting how *Manson* mandated the overruling of *Nelson* ).

■ Finally, beneficial utility implicates the social benefit or detriment of the invention. *Compare Reliance Novelty Co. v. Dworzek*, 80 F. 902, 903 (C.C.D.Cal.1897)) ("It is a general principle, based upon public policy, that the patent laws of the United States do not authorize the issue of a patent for an invention which is injurious to the morals, health, or good order of society."); *Bedford v. Hunt*, 3 Fed.Cas. 37, 37 (No. 1217) (C.C.D.Mass.1817) ("By useful invention, in the statute, is meant such a one as may be applied to some beneficial use in society, in contradistinction to an invention, which is injurious to the morals, the health, or the good order of society.") *with Whistler Corp. v. Autotronics, Inc.*, 14 U.S.P.Q.2d 1885, 1886, 1988 WL 212501 (W.D.Tex.1988) (finding utility in a radar signal detector, even though the device aids those who violate the law). Despite the antiquated reliance of beneficial utility upon moralistic use, the modern understanding contemplates a more humanistic approach of usefulness. *But see In re Nelson*, 47 C.C.P.A. 1031, 1040, 280 F.2d 172, 178 (1960) (citing *Reliance Novelty Corp. v. Dworzek*, 80 F. 902 (N.D.Cal. 1897)).

As general utility appears evident and beneficial utility seems obvious in the patent-in-issue, the final inquiry remains whether the '560 patent discloses some specific utility. As both plaintiff and defendant acknowledge the usefulness and application of four-axis helicopter controllers which, by means of a locking mechanism

inhibit cross-coupling, this Court concurs and, pursuant to the doctrine of practical utility, deems the invention claimed by the '560 patent as useful.

## 2. Novelty

■ Just as the patent law requires the utility of an invention, the law likewise requires that an invention do something new (or novel). Section 101 of title 35 of the United States Code cites this novelty requirement, but 35 U.S.C. § 102 actually describes the statutory prerequisite for novelty. *See* 35 U.S.C. § 102(a) (comprising the "first-to-invent" system). The novelty requirement of section 102(a) guarantees patent protection to inventors who invent first, as distinguished from the European and Japanese systems which reward inventors who file first (a "first-to-file" system), provided that no knowledge or use of the invention exists by others domestically or no patent or disclosure by printed publication of the invention has previously occurred anywhere. *Id.* The statutory bar of section 102(b), moreover, assures patent-eligibility for an applicant who files a patent application within one year of any such domestic use or sale or otherwise patent or printed disclosure of the subject matter claimed in the application. *Id.* § 102(b). Therefore, the novelty requirement of section 102(a) requires invention within the United States before anticipation by prior art or reference—thus, the date of invention controls for novelty; and, except for international patent rights, the statutory bar of section 102(b) provides a grace period of one year from any prior art or reference to the date of filing—thus, one year prior to the filing date controls for the statutory bar. As for international patent rights, once an inventor publishes a description of a new invention in the United States, the first-to-invent system ensures the inventor's rights for a one year grace period: because the European and Japanese utilize a first-to-file system, however, such a publication would forfeit virtually all international patent rights. MERGES, at 164–66.

While novelty constitutes the second condition of patentability, the defense of "lack of novelty" (or anticipation) comprises one of the classic defenses to a suit for patent infringement. Moreover, while novelty, 35 U.S.C. § 102(a), and the statutory bar, 35 U.S.C. § 102(b), describe differing matters of patentability, anticipation sometimes incorporates both issues. *Decca, Ltd. v. United States*, 190 Ct.Cl. 454, 499, 420 F.2d 1010, 1028, *cert. denied*, 400 U.S. 865, 91 S.Ct. 102, 27 L.Ed.2d 104 (1970); *In re Foster*, 52 C.C.P.A. 1808, 1815, 343 F.2d 980, 986 (1965), *cert. denied*, 383 U.S. 966, 86 S.Ct. 1270, 16 L.Ed.2d 307 (1966). Thus, when an invention becomes known or used domestically, 35 U.S.C. § 102(a), or used or sold domestically, 35 U.S.C. § 102(b), or patented or described in a printed publication anywhere, 35 U.S.C. § 102(a–b), section 102(a) as well as section 102(b) becomes relevant in the anticipation analysis. *See In re Schoenwald*, 964 F.2d 1122, 1123 (Fed.Cir.1992) (finding anticipation under 35 U.S.C. § 102(b) for a "printed publication"); *Alco Standard Corp. v. Tennessee Valley Authority*, 808 F.2d 1490, 1496 (Fed.Cir.1986) (finding anticipation under 35 U.S.C. § 102(a) for a "printed publication"), *cert. dismissed*, 483 U.S. 1052, 108 S.Ct. 26, 97 L.Ed.2d 815 (1987). Nevertheless, anticipation under section 102(a) generally comprises a separate analysis from the statutory bars of section 102(b) in that the bases of a statutory bar encompasses a wider range of interpretation. *See* DONALD S. CHISUM, 2 PATENTS: A TREATISE ON THE LAW OF PATENTABILITY, VALIDITY, AND INFRINGEMENT § 6.02[3], at 6–28 through –29 (1993) ("[U]nder the prevailing view, the word 'invention' is given a different and broader interpretation in Section 102(b) due to the differences between the policies of the two sections.").

■ Here, the issue deals solely with section 102(a). Under this section, once a party claims lack of novelty, a court determines anticipation by two analyses, including (1) the Every Element Test, *Lewmar Marine, Inc. v. Barient, Inc.*, 827 F.2d 744, 747 (Fed.Cir.1987), *cert. denied*, 484 U.S. 1007, 108 S.Ct. 702, 98 L.Ed.2d 653 (1988),

and (2) the Enablement Standard,[7] *Paperless Accounting, Inc. v. Bay Area Rapid Transit Sys.*, 804 F.2d 659, 665 (Fed.Cir. 1986), *cert. denied*, 480 U.S. 933, 107 S.Ct. 1573, 94 L.Ed.2d 764 (1987). The Every Element Test for anticipation requires the presence of each and every element of a claimed invention in a single prior art disclosure. *Dow Chemical Co. v. American Cyanamid Co.*, 816 F.2d 617, 624 (Fed. Cir.), *cert. denied*, 484 U.S. 849, 108 S.Ct. 149, 98 L.Ed.2d 105 (1987); *W.L. Gore & Assocs., Inc. v. Garlock, Inc.*, 721 F.2d 1540, 1554 (Fed.Cir.1983), *cert. denied*, 469 U.S. 851, 105 S.Ct. 172, 83 L.Ed.2d 107 (1984). The focus of this test involves the presence of a "single" prior art reference. *See Scripps Clinic & Research Foundation v. Genentech, Inc.*, 927 F.2d 1565, 1576 (Fed.Cir.1991) ("Invalidity for anticipation requires that all of the elements and limitations of the claim are found within a *single* prior art reference.") (emphasis added); *Verdegaal Bros., Inc. v. Union Oil Co.*, 814 F.2d 628, 631 (Fed.Cir.) ("A claim is anticipated only if each and every element as set forth in the claim is found, either expressly or inherently described, in a *single* prior art reference.") (emphasis added), *cert. denied*, 484 U.S. 827, 108 S.Ct. 95, 98 L.Ed.2d 56 (1987); *Structural Rubber Prods. Co. v. Park Rubber Co.*, 749 F.2d 707, 715 (Fed.Cir.1984) ("This Court has repeatedly stated that the defense of lack of novelty (*i.e.*, 'anticipation') can only be established by a *single* prior art reference which discloses each and every element of the claimed invention.") (emphasis added); *RCA Corp. v. Applied Digital Data Sys., Inc.*, 730 F.2d 1440, 1444 (Fed. Cir.) ("Anticipation is established only when a *single* prior art reference discloses, expressly or under principles of inherency, each and every element of a claimed invention.") (emphasis added), *cert. dismissed sub. nom.*, *Hazeltine Corp. v. RCA Corp., Inc.*, 468 U.S. 1228, 105 S.Ct. 32, 82 L.Ed.2d 923 (1984). Indeed, if no single prior art reference anticipates each and every claim,

but a combination thereof possibly does, the proper inquiry is obviousness, not lack of novelty. *Connell v. Sears, Roebuck & Co.*, 722 F.2d 1542, 1548 (Fed.Cir.1983).

While the Every Element Test contemplates a strict requirement for anticipation, *but see RCA Corp.*, 730 F.2d at 1449 (Kashiwa, J., dissenting) (favoring application of the "equivalency" test for anticipation as applied by the Court of Claims), the Enablement Standard serves as a further limitation, *Chester v. Miller*, 906 F.2d 1574, 1577 (Fed.Cir.1990); *Paperless Accounting*, 804 F.2d at 665. In contrast to the requirement of enablement of 35 U.S.C. § 112, ¶ 1, the basis for this standard originates in the description requirement of § 102(b). *In re Donohue*, 766 F.2d 531, 533 n. 7 (Fed.Cir.1985). Based on the "described in a printed publication" language of 35 U.S.C. § 102(b), the Federal Circuit has ruled: "It is well settled that prior art under 35 U.S.C. § 102(v) [sic, § 102(b) ] must sufficiently describe the claimed invention to have placed the public in possession of it. Such possession is effected if one of ordinary skill in the art could have combined the publication's description of the invention with his own knowledge to make the claimed invention." *Id.* at 533 (citations omitted, footnote omitted). Thus, under the Enablement Standard for anticipation, a reference may meet the Every Element Test and still fail as anticipation, unless:

> the description and drawings contain and exhibit a substantial representation of the patented improvement, in such full, clear, and exact terms as to enable any person skilled in the art or science to which it appertains, to make, construct, and practice the invention to the same practical extent as they would be enabled to do if the information was derived from a prior patent.

*Seymour v. Osborne*, 78 U.S. (11 Wall.) 516, 555, 20 L.Ed. 33 (1871). "Accordingly,

---

**7.** While considered a component of the Enablement Standard, the genus/species relationship may evoke a third analysis of enablement. *See In re Vogel*, 422 F.2d 438, 442 (C.C.P.A.1970) (contrasting the genus, meat, with the species, beef and pork). The relationship describes how a prior art reference to a species anticipates a later claim that includes the genus, yet a prior art reference to a genus anticipates no species which discloses a novel invention.

even if the claimed invention is disclosed in a printed publication, that disclosure will not suffice as prior art if it was not enabling." *In re Donohue,* 766 F.2d at 533. *Compare Titanium Metals Corp. v. Banner,* 778 F.2d 775, 778 (Fed.Cir.1985) (deeming data points on a graph in a Russian metallurgy publication as sufficiently enabling for anticipation) *with Application of Le Grice,* 49 C.C.P.A. 1124, 1128, 301 F.2d 929, 931 (1962) (rejecting the design of a rose in a catalogue as not enabling and thus not anticipation).

In the present case, the defendant claims invalidity of the '560 patent based on anticipation. As such, the defendant claims the anticipation of each and every element of the claims of the patent-in-suit. To show anticipation, the defendant refers to a prior art reference of the United States Army Air Mobility Research and Development Laboratory (USAAMRDL). *See* 3 Heavy Lift Helicopter (HLH) Flight Control System, USAAMRDL, USAAMRDL–TR–77–40C (September 1977) (hereinafter HLH System). Therein, the USAAMRDL report discloses two helicopter controllers, the HLH finger/ball LCC "prototype" controller and the HLH thumb/grip "mockup" controller. The defendant alleges that these two controllers, as disclosed by this single prior art reference, anticipate each and every claim of the '560 patent. In addition, the defendant also relies upon the assertions of the plaintiff to support the argument of invalidity by anticipation. Specifically, the defendant points out how the plaintiff misconstrues the patent law to require infringement of every claim of a patent, as opposed to every element of a claim. Under this mistaken belief, the plaintiff submits claim charts to distinguish the claims of the patent (and not the elements of the claims) from the prior art, so as to disprove anticipation of the '560 patent. In doing so, the plaintiff unintentionally demonstrates the anticipation of certain claims of the patent-in-suit.

 Referencing the HLH finger/ball LCC "prototype" controller, the plaintiff presents the following claim chart as evidence to disprove anticipation:

| U.S. Patent No. 4,134,560 | HLH Finger/Ball LCC "Prototype" Controller |
|---|---|
| Claim 1 | Elements Present: |

1. In a control system for a helicopter having:

 (i) a collective pitch control mechanism for changing the pitch angle of the rotor blades; (i) Yes

 (ii) a throttle control; (ii) Yes

 (iii) a tail rotor control for changing the pitch of the tail rotor blades; and (iii) Yes

 (iv) a cyclic pitch control mechanism for changing the tilt of the rotor disc; (iv) Yes

an improved control comprising:

 (a) a first control means pivotally mounted for pivotal movement in at least two directions, said first control means being operatively connected to said cyclic pitch control; (a) Yes. A–53, A–56.

 (b) second control means moveable relative to said first control means and operatively connected to said collective pitch control mechanism; and (b) Yes. A–53, A–56.

 (c) locking means for selectively engaging or disengaging said first and second control means (c) Yes. A–55.

 whereby said first and second control means can be locked in unitary engagement and said first and second control means moved in one pivotal direction to change the cyclic pitch in the longitudinal axis and moved in the other pivotal direction to change the cyclic pitch in the lateral helicopter axis and

<table>
<tr><td>U.S. Patent No. 4,134,560</td><td>HLH Finger/Ball LCC "Prototype" Controller</td></tr>
</table>

| U.S. Patent No. 4,134,560 | HLH Finger/Ball LCC "Prototype" Controller |
|---|---|
| **Claim 1** | Elements Present: |
| whereby said first and second levers can be disengaged and | Yes. A–55. |
| said second control means can be moved relative to said first control means to control collective pitch and rotated to operate the tail rotor control. | Yes. A–53, A–56. |
| **Claim 2** | |
| 2. The control system of claim 1 further including means associated with said second control means for adjusting said throttle. | 2. Yes. A–54. |
| **Claim 3** | |
| 3. The control system of claim 1 wherein said first control means comprises a hollow tube and said second control means comprises a shaft slidably disposed within said tube. | 3. Yes. A–56. |
| **Claim 4** | |
| 4. The control system of claim 3 wherein said shaft includes a horizontal handle portion. | 4. No. A–56. |
| **Claim 5** | |
| 5. The control system of claim 4 including means for selectively adjusting the position of said handle portion. | 5. Yes. A–56. |

Plaintiff's Response, at A–49 through –50 (citation omitted). By the above claim chart, the plaintiff thus (albeit unintentionally) admits anticipation of claims one, two and three of the '560 patent. Additionally, as the defendant points out, a printed description of this finger/ball controller appeared in the January 1976 edition of AMERICAN HELICOPTER magazine, some eighteen months prior to the plaintiff's date of conception of June 24, 1977, and twenty-one months prior to plaintiff's filing date of September 19, 1977. As the plaintiff never reduced the invention to practice, the date of invention defers to the date of filing for the patent application, or September 19, 1977. *Barmag Barmer Maschinenfabrik AG v. Murata Mach., Ltd.,* 731 F.2d 831, 838 (Fed.Cir.1984); *Shurie v. Richmond,* 699 F.2d 1156, 1159 (Fed.Cir.1983). *See also UMC Elecs. Co. v. United States,* 816 F.2d 647, 656 (Fed.Cir.1987) (requiring no reduction to practice for patentability), *cert. denied,* 484 U.S. 1025, 108 S.Ct. 148, 98 L.Ed.2d 761 (1988). As such, this single prior art reference, as admitted by the plaintiff, disclosed each and every element of claims one through three of the '560 patent at least one and one-half years prior to the plaintiff's constructive date of invention. Pursuant to these admissions by the plaintiff, furthermore, this Court need not enter into questions of whether the cited prior art constituted an enabling reference. Thus, pursuant to this reference, as well as to plaintiff's admissions by the preceding claim chart, the defendant submits clear and convincing evidence of anticipation of claims one through three of the patent-in-suit.

Referencing the HLH thumb/grip "mockup" controller, which appears on the same page of the USAAMRDL report as the HLH finger/ball LCC "prototype" controller, covering the period July 1971 to July 1975, the defendant also argues that the two HLH controllers, when viewed in combination, anticipate each and every claim of the '560 patent. In fact, the plaintiff again admits anticipation of all but one claim:

U.S. Patent No. 4,134,560

HLH Thumb/Grip "Mockup" Controller

Elements Present:

Claim 1

1. In a control system for a helicopter having:

 (i) a collective pitch control mechanism for changing the pitch angle of the rotor blades; (i) Yes

 (ii) a throttle control; (ii) Yes

 (iii) a tail rotor control for changing the pitch of the tail rotor blades; and (iii) Yes

 (iv) a cyclic pitch control mechanism for changing the tilt of the rotor disc; (iv) Yes

an improved control comprising:

 (a) a first control means pivotally mounted for pivotal movement in at least two directions, said first control means being control; (a) Yes. A–53, A–56.

 (b) second control means moveable relative to said first control means and operatively connected to said collective pitch control mechanism; and (b) Yes. A–53, A–56.

 (c) locking means for selectively engaging or disengaging said first and second control means (c) Yes. A–55.

 whereby said first and second control means can be locked in unitary engagement and said first and second control means moved in one pivotal direction to change the cyclic pitch in the longitudinal axis and moved in the other pivotal direction to change the cyclic pitch in the lateral helicopter axis and Yes. A–55.

 whereby said first and second levers can be disengaged and Yes. A–55.

 said second control means can be moved relative to said first control means to control collective pitch and rotated to operate the tail rotor control. Yes. A–53, A–56.

Claim 2

2. The control system of claim 1 further including means associated with said second control means for adjusting said throttle. 2. Yes. A–54.

Claim 3

3. The control system of claim 1 wherein said first control means comprises a hollow tube and said second control means comprises a shaft slidably disposed within said tube. 3. No. A–56.

Claim 4

4. The control system of claim 3 wherein said shaft includes a horizontal handle portion. 4. Yes. A–56.

Claim 5

5. The control system of claim 4 including means for selectively adjusting the position of said handle portion. 5. Yes. A–56

---

Plaintiff's Response, at A–51 through –52 (citation omitted). In contrast to clauses one through three, however, where a 1976 magazine article disclosed (and thus corroborated) the elements thereof, the USAAMRDL report, as dated September 1977, does not precede the date of filing for the '560 patent. Therefore, even though the plaintiff admits anticipation with reference to the thumb/grip LCC "mockup" controller, the defendant presents no evidence (as corroboration) that the information disclosed by the USAAMRDL report was "generally available" prior to the Septem-

ber 1977 date of publication (or public disclosure). As a common rule of anticipation, "[a] document, to serve as a 'printed publication', [sic] must be generally available," *Northern Telecom, Inc. v. Datapoint Corp.*, 908 F.2d 931, 936 (Fed.Cir.), *cert. denied*, 498 U.S. 920, 111 S.Ct. 296, 112 L.Ed.2d 250 (1990), and "distribution to government agencies and personnel alone may not constitute publication," *Garrett Corp. v. United States*, 190 Ct.Cl. 858, 865, 422 F.2d 874, 878, *cert. denied*, 400 U.S. 951, 91 S.Ct. 242, 27 L.Ed.2d 257 (1970). In addition, the date of receipt which appears on the plaintiff's copy shows a date of March 13, 1978, almost six months after the plaintiff had filed an application for the '560 patent.

Therefore, without a reference which properly constitutes prior art for purposes of anticipation of each and every claim of the '560 patent, the defendant's reliance upon the USAAMRDL report is misplaced. Furthermore, the report discloses no reference to a horizontal handle portion, as required by claims four and five. Although defendant seeks to compare the elements of the thumb/grip controller in conjunction with the finger/ball controller to prove anticipation of claims four and five, and even though plaintiff admits, by reference to the claim charts, anticipation of claims four and five by the thumb/grip controller, the defendant may not prove anticipation by reference to more than a single prior art disclosure. As a result, the defendant fails to submit clear and convincing evidence of anticipation of claims four and five of the patent-in-suit.

With regard to the Every Element Test, therefore, this Court finds that defendant presents this Court with no "single reference" which discloses all the elements of all the claims of the '560 patent. Nevertheless, as defendant correctly points out, anticipation renders claims (not necessarily patents) invalid. Thus, because the January 1976 issue of *American Helicopter* disclosed every element of the first, second, and third claims of the patent-in-suit, as plaintiff even admits, these claims of the '560 patent remain anticipated under 35 U.S.C. § 102(a) by the prior art.

### 3. Nonobviousness

Nonobviousness comprises, perhaps, the most important condition of patentability by measuring the "technical accomplishment" reflected in an invention: "[t]he theory is that even if an invention is new and useful, it does not deserve a patent if it represents merely a trivial step forward in the art." MERGES, at 379. As a result, at least since *Hotchkiss v. Greenwood*, 52 U.S. (11 How.) 248, 13 L.Ed. 683 (1851), courts have denied patentability to inventions which lack some measurable degree of skill, ingenuity, or inventiveness. MERGES, at 379 The Patent Act of 1952, however, instituted a more formal structure to the obviousness determination at 35 U.S.C. § 103. *Id.* at 379–80. Section 103 of title 35 of the United States Code provides:

A patent may not be obtained though the invention is not identically disclosed or described as set forth in section 102 of this title, if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains.

35 U.S.C. § 103. *See Dann v. Johnston*, 425 U.S. 219, 225–26, 96 S.Ct. 1393, 1396–97, 47 L.Ed.2d 692 (1976) ("[I]t was only in 1952 that Congress, in the interest of 'uniformity and definiteness,' articulated the requirement in a statute, framing it as a requirement of 'nonobviousness.'"). Then in 1966, the United States Supreme Court provided exegesis for a definitive jurisprudential standard of nonobviousness, as recited in *Graham v. John Deere Co.*, 383 U.S. 1, 86 S.Ct. 684, 15 L.Ed.2d 545 (1966). *See generally* Edmund W. Kitch, Graham v. John Deere Co.: *New Standards for Patents*, 1966 SUP.CT.REV. 293, 296 (1966) (setting forth one of the foremost pieces of legal scholarship on the nonobviousness standard pursuant to *Graham v. John Deere Co.*).

In *Graham v. John Deere Co.*, the Supreme Court cited three factual conditions of nonobviousness, or four including sec-

ondary considerations, which the Court referenced as the "indicia of obviousness," encompassing the inquiries made by a court in determining the obviousness or nonobviousness of the claims of a patent. *Graham v. John Deere Co.* 383 U.S. at 17, 86 S.Ct. at 693. These three/four inquiries include:

▮ the scope and content of the prior art are to be determined; [2] differences between the prior art and the claims at issue are to be ascertained; [3] and the level of ordinary skill in the pertinent art resolved. Against this background, the obviousness or nonobviousness of the subject matter is determined. Such [4] secondary considerations as commercial success, long felt but unsolved needs, failure of others, etc., might be utilized to give light to the circumstances surrounding the origin of the subject matter sought to be patented.

*Id.* at 17–18, 86 S.Ct. at 693–94. As the "fourth inquiry" states, the nonobviousness analysis incorporates secondary considerations, provided a nexus exists between the secondary considerations and the patented device. *Demaco Corp. v. F. Von Langsdorff Licensing, Ltd.*, 851 F.2d 1387, 1392 (Fed.Cir.), *cert. denied*, 488 U.S. 956, 109 S.Ct. 395, 102 L.Ed.2d 383 (1988); *Pentec, Inc. v. Graphic Controls Corp.*, 776 F.2d 309, 315 (Fed.Cir.1985). *See, e.g., Sakraida v. Ag Pro, Inc.*, 425 U.S. 273, 278, 96 S.Ct. 1532, 1535, 47 L.Ed.2d 784 (1976) (considering commercial success); *Great Atl. & Pac. Tea Co. v. Supermarket Equip. Corp.*, 340 U.S. 147, 153, 71 S.Ct. 127, 130, 95 L.Ed. 162 (1950) (considering long felt but unsolved needs); *Eibel Process Co. v. Minnesota & Ontario Paper Co.*, 261 U.S. 45, 55, 43 S.Ct. 322, 325, 67 L.Ed. 523 (1923) (considering failure of others). As of late, however, the Federal Circuit has adopted these indicia of nonobviousness as a required fourth inquiry of the section 103 analysis. *W.L. Gore & Assocs., Inc. v. Garlock, Inc.*, 721 F.2d 1540, 1555 (Fed.Cir.1983), *cert. denied*, 469 U.S. 851, 105 S.Ct. 172, 83 L.Ed.2d 107 (1984). Following this mandate, the Federal Circuit has referred to these secondary considerations as the "objective evidence of nonob-

viousness." *Greenwood v. Hattori Seiko Co.*, 900 F.2d 238, 241 (Fed.Cir.1990).

▮ Following the overwhelming consensus of case law on the nonobviousness determination, this Court considers the four indicia of nonobviousness in turn in ascertaining the obviousness or nonobviousness of the claims of the '560 patent. As this Court has already declared claims one, two, and three of the '560 patent as anticipated under 35 U.S.C. § 102, the issue remains whether the prior art references submitted by the defendant as well as by the plaintiff render claims four and five of the '560 patent as invalid due to obviousness pursuant to 35 U.S.C. § 103. In making the nonobviousness analysis, this Court looks to each claim of the patent-in-suit in ascertaining the obviousness or nonobviousness of the invention claimed in the '560 patent (*i.e.*, assuming, *arguendo*, novelty of claims one, two, and three). Regardless of the outcome, of course, claims one, two, and three remain invalid by anticipation pursuant to section 102, and for that matter, nonobviousness pursuant to section 103. *See Connell v. Sears, Roebuck & Co.*, 722 F.2d 1542, 1548 (Fed.Cir.1983) ("Though it is never necessary to so hold, a disclosure that anticipates under § 102 also renders the claim invalid under § 103, for 'anticipation is the epitome of obviousness,' * * * .").

### a. Scope and Content of the Prior Art

▮ As the first indicia of nonobviousness, a court must review the scope and content of the prior art in comparison to the claims of the patent-in-suit. Under the *Graham v. John Deere Co.* standard, in order of precedence, a court first makes a factual inquiry into determining the obviousness or nonobviousness of a claimed invention by considering the scope and content of the prior art. *Graham v. John Deere Co.*, 383 U.S. at 17, 86 S.Ct. at 693. *See also Pentec, Inc. v. Graphic Controls Corp.*, 776 F.2d 309, 313 (Fed.Cir.1985) ("[T]he factual inquiry into the scope and content of the prior art [is] the initial step in determining the obviousness of a claimed invention.").

In *In re Winslow*, 53 C.C.P.A. 1574, 365 F.2d 1017 (1966), Judge Rich recited the standard for considering the scope and content of the prior art: "We think the proper way to apply the 103 obviousness test to a case like this is to first picture the inventor as working in his shop with the prior art references—which he is presumed to know—hanging on the walls around him." *Id.* at 1578, 365 F.2d at 1020. *But see Kimberly–Clark Corp. v. Johnson & Johnson*, 745 F.2d 1437, 1446 (Fed.Cir. 1984) (Rich, J.) (describing a more contemporary understanding of *who* should know of the prior art). Referred to by Merges as the "Winslow Tableau," MERGES, at 445, or by the courts as the "Superperson in the Art" standard,[8] *Winslow* creates a presumption that a person of ordinary skill in the art possesses knowledge of all prior art references in the particular art. *E.W.P. Corp. v. Reliance Universal, Inc.*, 755 F.2d 898, 906–07 (Fed.Cir.), *cert. denied*, 474 U.S. 843, 106 S.Ct. 131, 88 L.Ed.2d 108 (1985). Although the visual imagery of the *Winslow* inventor standing in a shop or laboratory with pieces of prior art hanging on the walls gained an "unfortunate popularity with the judiciary," the basis of the presumption remains. *Standard Oil Co. v. American Cyanamid Co.*, 774 F.2d 448, 454 (Fed.Cir.1985). *Cf. In re Antle*, 58 C.C.P.A. 1382, 1387, 444 F.2d 1168, 1171 (1971) (" 'Section 103 requires us to presume full knowledge by the inventor of the *prior* art *in the field of his endeavor*' * * *, but it does not require us to presume full knowledge by the inventor of prior art *outside* the field of his endeavor, i.e., of 'non-analogous' art.") (quoting *In re Winslow*, 53 C.C.P.A. 1574, 1578, 365 F.2d 1017, 1020 (1966)).

Here, the defendant argues that the plaintiff's invention requires a finding of nonobviousness pursuant to the Winslow Tableau. Specifically, as the prior art for helicopter control systems contained controllers with friction devices, which utilized a brake (or lock) to inhibit cross-coupling, the defendant argues that the plaintiff's invention fails for nonobviousness. Indeed, for the same arguments presented by the defendant for anticipation regarding the HLH finger/ball LCC "prototype" controller and HLH thumb/grip "mockup" controller, or an argument based on the combination of prior art references, the defendant here also contends that the helicopter controllers contained in the 1977 USAAMRDL report render the claims of the '560 patent obvious and unpatentable.

Dissimilar to anticipation under 35 U.S.C. § 102(a), however, the nonobviousness determination allows combination of prior art references to prove obviousness, provided "something [exists] in the prior art as a whole to suggest the desirability, and thus the obviousness, of making the combination." *Lindemann Maschinenfabrik GmbH v. American Hoist & Derrick Co.*, 730 F.2d 1452, 1462 (Fed.Cir.1984). *See also In re Gorman*, 933 F.2d 982, 986 (Fed.Cir.1991) (stating that "[w]hen it is necessary to select elements of various

---

**8.** What level of expertise must a person of ordinary skill in a particular art possess? Consider the following:

[A person of ordinary skill in a particular art] is not an ordinary person. He is superhuman, a sort of monster created first by the courts to invalidate patents which by any rational measure of creativity satisfy the skill beyond the ordinary mechanic in the business test. He is the mythical character who is not only endowed with the complete retention of all prior public uses, printed publications, and disclosures in prior patents, both in this country and elsewhere, but has the power to know about all these prior art devices and disclosures instantaneously upon their issuance in patents or disclosures in printed publications or uses in the United States. Thus, he has read all the printed publications in the art to which the invention pertains in all the libraries of the world and he has read all the patents in all the countries of the world, and he has done so immediately upon their issuance. Indeed, he is so perceptive that he also knows all the disclosures in pending U.S. applications which are still secret, provided such applications later issue as patents to their respective inventors or assignees. Paradoxically, this superperson with his super memory promptly forgets the disclosure in applications which fail to issue as U.S. patents.

James B. Gambrell & John H. Dodge, II, *Ordinary Skill in the Art—An Enemy of the Inventor or a Friend of the People, in* NONOBVIOUSNESS—THE ULTIMATE CONDITION OF PATENTABILITY 5:301, 5:319–20 (John F. Witherspoon ed., 1980) (footnotes omitted).

teachings in order to form the claimed invention, we ascertain whether there is any suggestion or motivation in the prior art to make the selection made by the applicant"): *In re Geiger,* 815 F.2d 686, 688 (Fed.Cir. 1987) (requiring for obviousness by combination of prior art references, "some teaching, suggestion or incentive supporting the combination"); *Interconnect Planning Corp. v. Feil,* 774 F.2d 1132, 1143 (Fed.Cir. 1985) (requiring a "suggestion in the prior art that the components be combined as they were"). Therefore, if the defendant seeks to prove the obviousness of the claims of the '560 patent, the USAAMRDL report, or some other prior art reference, must teach the same combination as applied by the plaintiff, *In re Laskowski,* 871 F.2d 115, 117 (Fed.Cir.1989), or if some combination of prior art references would suggest the invention at issue, such combination must exist as cognizable to a person of ordinary skill in the art. *Carella v. Starlight Archery & Pro Line Co.,* 804 F.2d 135, 140 (Fed.Cir.1986). *See generally* 7 ERNEST BAINBRIDGE LIPSCOMB III, WALKER ON PATENTS § 26:5, at 439 (3d ed. 1988) ("The true question of obviousness is whether at the time the invention was made would it have been obvious to those of ordinary skill in the art to make that combination.").

For the present analysis pursuant to section 103, the defendant cites two additional prior art references, as disclosed in Tactical Aircraft Guidance System (TAGS) Advanced Development Program, USAAMRDL–TR–71–57 (Feb.1972) (hereinafter TAGS), and in United States Patent No. 2,486,059 (hereinafter the Pentecost patent), dated October 25, 1949. As both of these references disclose a braking device to inhibit cross-coupling among axes in a helicopter controller, the defendant argues that either of these references renders the '560 patent obvious individually, or in the alternative, that the combination of these prior art references render the helicopter control system utilized by the plaintiff in the '560 patent obvious and unpatentable as to a person of ordinary skill in the art.

First, to demonstrate the obviousness of the four-axis controller described by the patent-in-suit, the defendant cites the Pentecost patent as a prior art reference to all of the claims of the '560 patent. Indeed, in contrast to the plaintiff's assertions of originality, the Pentecost patent comprised one of the first United States patents to combine the conventional helicopter controls into a single apparatus. This patent, invented by Horace T. Pentecost, claimed a helicopter controller mechanism for a radically new concept in helicopter design technology. This design is illustrated as follows:

FIG. 1

U.S. Patent 2,486,059, figure 1. With an initial military-oriented purpose of developing a small helicopter engine with a pair of twelve foot rotors carried upon the pilot's back, the prototype for the helicopter disclosed in the Pentecost patent comprised a back-strap model which weighed a mere 88 lbs. and which, when attached to the pilot's trunk and legs, supported a 200 lb. load at a top speed of 80 mph with a service ceiling of 12,000 feet. In contrast, the Pentecost patent disclosed a controller for a larger personal civilian helicopter, known as a "Hoppi–Copter." M. Berry, *Flying PEGASUS: The Modern Version*, AMERICAN HELICOPTER, March 1946, at 24.

The Hoppi–Copter, a helicopter with a two cylinder engine connected to two sixteen foot rotors, included a body of open-air tubular framework with simply a seat and landing gear, weighing a mere 175 lbs. and supporting 250 lbs. at a top speed of 90 mph and a service ceiling of 12,000 feet. Barkley K. Barclay, *Motorcycle of the Sky*, AMERICAN HELICOPTER, November 1947, at 18–19. In addition to the no-nonsense design of the Hoppi–Copter, the craft included a uniquely simple helicopter control mechanism. The controller is described as follows:

The ball-bearing mounted mechanism which carries the rotors has been so constructed that all directional flight movements are achieved with a single control. This takes the form of a metal "stick" similar to that on a conventional plane, except that it is inverted, with the lower end resting within easy reach of the pilot's hand. The stick is pushed down to descend, up to ascend, forward to fly forward, back to fly backward and so on. Twisting the stick to the right or left will achieve circular flight about the ship's vertical axis.

How movements of the control stick effect corresponding changes in flight direction will be readily understood by anyone having even a reading acquaintance with helicopted [sic] design. Verti-

cal movements of the stick effect collective changes in blade pitch, causing the ship to rise or descend. An upward push increases the pitch of all blades in an equal degree. If sufficient engine power is applied at the same time, the ship will rise vertically. Conversely, a downward pull on the stick decreases the pitch equally, allowing the ship to descend. Hovering is accomplished when the pilot achieves a proper balance between collective pitch and engine throttle setting.

Horizontal movements of the stick in any direction radial to the central or neutral position cause a downward tilt to occur to one side of a swash, or wobble, mounted ball-bearing which encircles the vertical rotor shaft just below the rotors. The latter are attached to the wobble bearing by short metal rods which act as levers to increase the blade pitch on one side of each revolution circle and decrease it on the other side. This cyclic pitch change causes the rotor blades to gradually assume the same angle of tilt from the horizontal as the wobble bearing. The ship always moves toward the lower edge of its tilted tip plane path.

Twisting the stick to right or left changes the position of an eccentrically mounted ring in the pitch control linkage. This effects a greater pitch change in the blades of one rotor than in its opposite member, causing the ship to turn about its vertical axis. Usually referred to as differential pitch change, this maneuver has about the same result on flight control of the ship as circling a canoe by paddling on one side of the boat.

While this description of flight movements has described the achievement of vertical and horizontal flight separately, in actual practice a combination of both would probably be used for all but the last few feet of landing and take-off, because of the added safety factor inherent in any glide angle, as contrasted to vertical movement.

*Id.* at 19, 27–28. In sum, the Pentecost patent, as described above, claimed a helicopter controller which commanded the four conventional helicopter controls. Spe-cifically, the Pentecost patent claimed a unitary controller for manipulating longitudinal and lateral cyclic pitch (pitch and roll), collective pitch (heave or collective), and rudder (yaw). Thus, as disclosed in a 1949 patent as well as in a 1947 magazine article, the Pentecost patent, and not the Messerschmidt patent, first claimed a four-axis controller.

Second, to demonstrate the obviousness of the means for preventing cross-coupling in the '560 patent, the defendant references not only the Pentecost patent but also the TAGS technical report. Indeed, the TAGS report, in the basic summary, specifically asserts the goal of developing a four-axis controller. TAGS, at 173. The report stated: "The objectives of the TAGS Advanced Development Program include the implementation of an advanced sidearm-mounted controller to provide flight control commands to the four axes of the Advanced Flight Control Concept (AFCC) controlled vehicle." *Id.* In the description of the TAGS controller, the report further describes a single four-axis controller with a locking means for selectively engaging and disengaging pitch and roll in one position and heave and yaw in another position. TAGS, at 176. Under the heading "AV-LABS Controller Axial Freedom" and "Brake and Clutches," the TAGS report described:

An engineering development model (CA–M) was built having a vertical stick grip, four axes equipped with springs and hydraulic damping, provision for triplex transducers, and motorized trim drive on its X-axis. An improved model (CA–1) was then constructed to eliminate the difficulties encountered with the preliminary hydraulic damping system. *An electromagnetic brake was applied to the Z–axis to reduce cross-coupling with the X–axis.*

\* \* \* \* \* \*

Brake functions are required to hold an axis of the controller in position. Clutch functions are required to allow the trimming of a force null position or to release spring forces for hands-off flying.

Function switches provided on the control grip must be used to operate the brakes and clutches and to transfer control from one controller to another and possibly to operate the Radio/ICS.

TAGS, at 177, 188 (emphasis added). In other words, the TAGS controller, which the TAGS technical report disclosed at least seven years before plaintiff's effective date of invention, functions exactly the same as claim 1 of the '560 patent. At deposition, moreover, the plaintiff admitted the obviousness of each and every element of claim one of the '560 patent in light of the TAGS controller. Messerschmidt Deposition, at B–202 through –06.

Thus, armed with these prior art references, and having determined the obviousness of claim one of the patent-in-suit, this Court moves to the second indicia of the nonobviousness determination. In so doing, this Court ascertains whether any item of prior art renders the other claims obvi-ous or whether any combination of items from the heretofore referenced prior art, pursuant to the Winslow Tableau, suggests the modifications made by claims two through five of the '560 patent to the controller disclosed by the Pentecost patent and the TAGS technical report.

### b. Differences between the Prior Art and the Claims at Issue

As the second indicia of nonobviousness, a court must ascertain the differences between the prior art and the claims of the patent-in-suit. As the plaintiff has submitted claim charts to this Court which admit explicit prior art reference for each and every element of almost every claim of the '560 patent, few dissimilarities exist by which to distinguish between the prior art and the claims at issue. Specifically, these admissions by the plaintiff evidence the nonobviousness of claims one and two of the '560 patent. The plaintiff's own claim chart demonstrates such:

| U.S. Patent No. 4,134,560 | TAGS Controller |
|---|---|
| Claim 1 | Elements Present: |

1. In a control system for a helicopter having:
 - (i) a collective pitch control mechanism for changing the pitch angle of the rotor blades; (i) Yes
 - (ii) a throttle control; (ii) Yes
 - (iii) a tail rotor control for changing the pitch of the tail rotor blades; and (iii) Yes
 - (iv) a cyclic pitch control mechanism for changing the tilt of the rotor disc; (iv) Yes

an improved control comprising:
 - (a) a first control means pivotally mounted for pivotal movement in at least two directions, said first control means being operatively connected to said cyclic pitch control; (a) Yes. A–81 to A–89.
 - (b) second control means moveable relative to said first control means and operatively connected to said collective pitch control mechanism; and (b) Yes. A–81 to A–89.
 - (c) locking means for selectively engaging or disengaging said first and second control means (c) Yes. A–112, line 25.

 whereby said first and second control means can be locked in unitary engagement and said first and second control means moved in one pivotal direction to change the cyclic pitch in the longitudinal axis and moved in the other pivotal direction to change the cyclic pitch in the lateral helicopter axis and Yes. A–112, line 25.

 whereby said first and second levers can be disengaged and Yes. A–112, line 25.

**32**

| U.S. Patent No. 4,134,560 | TAGS Controller Elements Present: |
|---|---|
| **Claim 1** | |
| said second control means can be moved relative to said first control means to control collective pitch and rotated to operate the tail rotor control. | Yes. A–81. |
| **Claim 2** | |
| 2. The control system of claim 1 further including means associated with said second control means for adjusting said throttle. | 2. Yes. A–117, line 17. |
| **Claim 3** | |
| 3. The control system of claim 1 wherein said first control means comprises a hollow tube and said second control means comprises a shaft slidably disposed within said tube. | 3. No. A–81. |
| **Claim 4** | |
| 4. The control system of claim 3 wherein said shaft includes a horizontal handle portion. | 4. Yes. AV–0 only. A–85. |
| **Claim 5** | |
| 5. The control system of claim 4 including means for selectively adjusting the position of said handle portion. | 5. Yes. CA–T model only, A–102. All other models: No, A–90, ¶ 10.2.2. |

———

Plaintiff's Response, at A–79 through –80 (footnote omitted). As for claims three through five, the claim chart demonstrates the only difference as the tubing structure whereby the first and second control means of the '560 patent interconnect. Because this structure apparently constitutes the sole difference between the heretofore cited prior art and the claims at issue, the question arises whether this structure comprises an obvious modification of a prior art invention, a question which leads to the third indicia of the nonobviousness determination. Thus, in order to determine the obviousness of this modification in light of the combination of prior art references, this Court must understand the problems of the prior art and how those with ordinary skill in helicopter technology addressed these dilemmas.

### c. Level of Ordinary Skill in the Pertinent Art

■ As the third indicia of nonobviousness, a court must review the level of ordinary skill in the art at issue. In doing so, a court may consider the following factors in determining the ordinary skill of a particular art: (1) the educational level of the inventor; (2) types of problems encountered in the art; (3) rapidity with which innovations are made; (4) sophistication of the technology; (5) the educational level of active workers in the field; and (6) prior art solutions to those problems. *Environmental Designs, Ltd. v. Union Oil Co.*, 713 F.2d 693, 696 (Fed.Cir.1983), *cert. denied*, 464 U.S. 1043, 104 S.Ct. 709, 79 L.Ed.2d 173 (1984); *ITT Corp. v. United States*, 10 Cl. Ct. 321, 331 (1986). "Not all such factors may be present in every case, and one or more of these or other factors may predominate in a particular case." *Environmental Designs*, 713 F.2d at 696–97. Nevertheless, by reference to these six factors, this Court may ascertain the level of skill of a person of ordinary skill in the art of helicopter control system technology.

### i. Educational Level of the Inventor

After completion of high school, the plaintiff attended college for two years, studying business administration and economics. Messerschmidt Deposition, at B11. The plaintiff admits, however, that he has pursued no formal education in science or engineering and has no experience in the field of helicopters. *Id.* In fact, the plain-

tiff's sole insight into helicopter technology results from a long-standing hobby, strictly involving the reading of newspapers, magazines, and other helicopter-related periodicals. *Id.* Yet, the educational level of the inventor seems a mere factual trifle, because the level of skill of the inventor remains largely irrelevant to ascertaining the educational standard of a person of ordinary skill in a particular art, unless of course the inventor possesses that level of education or skill by which a court may ascertain what constitutes "ordinary." *See Standard Oil Co. v. American Cyanamid Co.*, 774 F.2d 448, 454 (Fed.Cir.1985) (rejecting consideration of the level of skill of the inventor in favor of the ordinary level of skill of persons in the art); *see also Newell Cos. v. Kenney Mfg. Co.*, 864 F.2d 757, 784 (Fed.Cir.1988) (applying only five factors, absent consideration of the educational level of the inventor, to determine ordinary skill in a particular art), *cert. denied*, 493 U.S. 814, 110 S.Ct. 62, 107 L.Ed.2d 30 (1989); *Bausch & Lomb, Inc. v. Barnes–Hind/Hydrocurve, Inc.*, 796 F.2d 443, 449–50 (Fed.Cir.1986) (rendering consideration of the educational level of the inventor as inconclusive), *cert. denied*, 484 U.S. 823, 108 S.Ct. 85, 98 L.Ed.2d 47 (1987).

### ii. Type of Problems Encountered in the Art

As discussed in the beginning of this opinion, the primary problem involved with the development of four-axis controllers involves pilot-induced cross-coupling. This problem dates to the initial discovery of helicopters during the 1940's, as specifically disclosed by the Pentecost patent and the report describing the TAGS controller. These prior art references, dating several years prior to the plaintiff's patent, contained remedies for the problem of cross-coupling by the introduction of a friction device to brake or lock certain axes during movement between the individual axis. In developing the invention disclosed in the patent-in-suit, the plaintiff likewise faced this difficulty and remedied the problem by utilization of a similar locking device to inhibit cross-coupling. In addition, the plaintiff admits to knowledge of these prior art references, which albeit only when viewed in combination, contain the same essential elements as the '560 patent. Thus, the plaintiff solved a common problem in the art of helicopter controller design by means of a solution already known and obvious in the art (as described in detail below). The plaintiff admitted as much at deposition. Messerschmidt Deposition, at B193–209.

### iii. Rapidity with Which Innovations are Made

As early as 1949, the Pentecost patent first demonstrated the utilization of braking mechanisms in four-axis controllers to diminish cross-coupling. Then again in 1972, as disclosed in the TAGS technical report, the TAGS controller also utilized a braking device to inhibit cross-coupling. Not until the capability of computer-aided controllers arose, however, did the use of four-axis controllers become feasible in helicopter technology. The plaintiff's patent claims contain no reference to computer-aided technology even though appearing years after the introduction of these prior art solutions. Thus, while the other controller designs of this period relied almost exclusively on computer-aided controller function, the controller disclosed by the '560 patent describes a purely mechanical function. For this reason, the invention disclosed by the patent-in-suit comprises neither a "pioneer invention" nor a "slight improvement" on the art of computer-aided helicopter controllers in light of the prior art recited herein. *See Eibel Process Co. v. Minnesota & Ontario Paper Co.*, 261 U.S. 45, 63, 43 S.Ct. 322, 328, 67 L.Ed. 523 (1923) (contrasting the disparate treatment of "genuine discoveries" and "slight improvements"). For this reason, the focus here remains the effect of the plaintiff's seemingly obvious mechanical-based controller on the art of helicopter control system technology.

### iv. Sophistication of the Technology

As described by the heretofore mentioned prior art solutions to the types of problems encountered in the art of helicopter control system technology, all military

and commercial attempts to construct a mechanical-based four-axis controller failed because of the complications and dangers of cross-coupling. Only with the advent and development of computer-aided controllers, however, did the technology generate sufficient capability to produce successful four-axis controllers. Even these designs, however, contrast distinctly from the earlier mechanical-based models in that the new designs enable simultaneous changes among axes, and at no time, inhibited the control on any particular axis. It appears, therefore, that the invention claimed by the '560 patent not only fails to provide novel solutions for the problems encountered by the art, and possibly even to recite a functional invention, but did not even meet the minimum standards of the technology for the art. This understanding of the inherent deficiencies in the '560 patent becomes clear upon review of the educational level (level of skill) of workers in the art and the methods applied by those workers in combating the problems encountered in the art of helicopter control system technology.

### v. Educational Level of Active Workers in the Field

In determining the ordinary level of skill in the field of helicopter control system technology, the defendant presents this Court with the affidavits of seven experts in the field. Indeed, "[r]eference to the educational background and experience of those actively involved in the art is proper in determining the level of skill." *Vandenberg v. Dairy Equip. Co.*, 740 F.2d 1560, 1566 (Fed.Cir.1984). *See Jacobson Bros., Inc. v. United States*, 206 Ct.Cl. 518, 528, 512 F.2d 1065, 1071 (1975) ("[T]he educational background of those actively working in the field [is] among the factors which will ofttimes aid in developing a picture of what is the level of skill of the ordinary person in an art."). As such, the educational level of these experts persuasively shows that one skilled in the art of helicopter control system technology holds a Bachelor of Science degree in either Aeronautical, Aerospace, or Mechanical Engineering. *See* Tomaine Affidavit, at 6 ("At the time that Messerschmidt filed his patent application in 1977, the ordinary skilled worker in the field of helicopter controls was an engineer with a bachelor of science degree in either aeronautical, aerospace or mechanical engineering * * *."); *see, e.g.,* Glusman Affidavit, at 1; Landis Affidavit, at 1; Lappos Affidavit, at 1; Maciolek Affidavit, at 1; Osder Affidavit, at 1; Emery Affidavit, at 1; Tomaine Affidavit, at 1. With this standard, therefore, this Court considers whether the function and structure of the invention disclosed in the '560 patent would háve been obvious to a person skilled in the art of helicopter control system technology holding a Bachelor of Science degree in either Aeronautical, Aerospace, or Mechanical Engineering.

### vi. Prior Art Solutions to Those Problems

As disclosed by the Pentecost patent and the TAGS technical report, described above, at least two specific prior art references demonstrated the solution to pilot-induced cross-coupling as the utilization of a friction device to brake or lock controls during control changes among axes. To explain the history of this problem in the art, the rationale of the unsuccessful (mechanical) and successful (computer-aided) designs for the solution thereto, and the grounds for eventual rejection of mechanical-based controllers as a four-axis helicopter controller, the defendant submits the affidavits of seven experts in the field of helicopter control system technology. These experts agree that mechanical-based four-axis controllers have been uniformly rejected by persons of ordinary skill in the art in favor of computer-aided "fly through" or "fly-by-wire" controllers. *See, e.g.,* Glusman Affidavit, at 4–5; Landis Affidavit, at 3–5; Lappos Affidavit, at 3–4; Maciolek Affidavit, at 3–5; Osder Affidavit, at 3–4; Emery Affidavit, at 2–3; Tomaine Affidavit, at 3–8.

Therefore, in the present case, in light of the technology applied by those in the art of helicopter control system technology, the question regards whether those of ordinary skill in this particular art would deem obvious the single point of structural dis-

tinction recited by the plaintiff in the claim chart to the TAGS controller. Specifically, as for claims three through five of the '560 patent, the plaintiff argues that the only difference between the TAGS controller and the controller disclosed by the '560 patent is the tubing structure whereby the first and second control means interconnect. As persuasive analysis toward an answer to the question whether this structure comprises an obvious modification of a prior art invention, this Court refers to the highly persuasive analysis contained in the affidavit of Mr. Robert L. Tomaine. Therein, by reference to a claim chart of the Pentecost patent, Mr. Tomaine finds a prior art reference for each and every element of every claim of the '560 patent. Mr. Tomaine set forth the following chart:

| Messerschmidt U.S. Patent No. 4,134,560 | Pentecost U.S. Patent No. 2,486,059 |
|---|---|
| Claim 1 | Elements Present: |
| 1. In a control system for a helicopter having: | |
| (i) a collective pitch control mechanism for changing the pitch angle of the rotor blades; | Col. 1, lines 15–17 |
| (ii) a throttle control; | Col. 1, lines 26–27 |
| (iii) a tail rotor control for changing the pitch of the tail rotor blades; and | Col. 1, lines 31–36 |
| (iv) a cyclic pitch control mechanism for changing the tilt of the rotor disc; | Col. 1, lines 28–33 |
| an improved control comprising: | |
| (a) a first control means pivotally mounted for pivotal movement in at least two directions, said first control means being operatively connected to said cyclic pitch control; | Col. 1, lines 28–33 Col. 5, lines 29–39 |
| (b) second control means moveable relative to said first control means and operatively connected to said collective pitch control mechanism; and | Col. 1, lines 15–36 Col. 4, lines 2–11 |
| (c) locking means for selectively engaging or disengaging said first and second control means whereby said first and second control means can be locked in unitary engagement and said first and second control means moved in one pivotal direction to change the cyclic pitch in the longitudinal axis and moved in the other pivotal direction to change the cyclic pitch in the lateral helicopter axis and | Col. 4, lines 65–75 |
| whereby said first and second levers can be disengaged and said second control means can be moved relative to said first control means to control collective pitch and rotated to operate the tail rotor control. | Col. 1, lines 32–36 Col. 4, lines 2–11 Col. 6, lines 48–62 Col. 8, lines 22–28 TAGS, pp. 176, 477 & 478 |
| Claim 2 | |
| 2. The control system of claim 1 further including means associated with said second control means for adjusting said throttle. | Pentecost, Col. 1, lines 26–27 |
| Claim 3 | |
| 3. The control system of claim 1 wherein said first control means comprises a hollow tube and said second control means comprises a shaft slidably disposed within said tube. | Pentecost, Col. 6, lines 48–51 Figure 3, Handle 74 and Sleeve 146 |

| Messerschmidt<br>U.S. Patent No. 4,134,560 | Pentecost<br>U.S. Patent No. 2,486,059 |
|---|---|
| Claim 4 | Elements Present: |
| 4. The control system of claim 3 wherein said shaft includes a horizontal handle portion. | TAGS, pp. 177, 477, Fig. 70, T Hand Grip |
| Claim 5 | |
| 5. The control system of claim 4 including means for selectively adjusting the position of said handle portion. | TAGS, pp. 182, 183, Figure 74 |

Tomaine Affidavit, Exhibit B (footnotes omitted). Based on the above recited claim chart, Mr. Tomaine provides the following analysis:

I have compared the claims of the Messerschmidt patent to the helicopter controls described in the Pentecost patent. Every limitation of Messerschmidt's claim 1, except locking the yaw axis, is expressly taught by the Pentecost patent. The Pentecost control handle is pivotally mounted and moves forward and back, right and left, to control longitudinal and lateral cyclic pitch. The handle moves up and down to control collective pitch and is rotated to control yaw. The Pentecost patent also teaches the use of a friction device to lock the collective pitch in place once it has been set in the system. Attached as Exhibit B is a claim chart that shows where each corresponding limitation required of the Messerschmidt claims is taught in the Pentecost patent. The Pentecost patent specifically teaches the use of a friction device to lock out control changes to an axis. Pilot induced cross-coupling, i.e., the inadvertent introduction of changes in the control of one axis as the result of an intended control change to another axis, has been known to be a problem of multi-axis controllers for many years. Pentecost's use of a friction device as a brake to prevent pilot-induced cross-coupling into the collective pitch axis teaches a potential solution to the pilot induced cross-coupling problem that Messerschmidt claims.

Id. at 5–6. As for the locking of the yaw, furthermore, Mr. Tomaine references the TAGS technical report. See TAGS, at 176. Mr. Tomaine explained:

As indicated at page 176 of that report, the AVLABS four-axis controller which is depicted in Figure 70 on page 177, had brakes on the H (yaw axis) and Z (collective pitch axis). Page 188 of that report states that the brakes are required to hold an axis of the controller in position. As this illustrates, by at least 1972, it was known that brakes could be applied to the collective and yaw axes of a multi-axis controller to hold both axes in position, just as Pentecost had taught with respect to the collective axis years earlier.

Id. at 6–7. In view of the above, when the two prior art references cited herein (i.e., the Pentecost patent and the TAGS controller) are viewed in combination, Mr. Tomaine concluded that "all of Messerschmidt's claims would have been obvious in 1977 based on the level of skill in the field of helicopter controls at that time in view of the teachings of the Pentecost patent." Id. at 7. Mr. Tomaine concluded:

In view of this knowledge [of the prior art] and the level of skill of the ordinary workers in the field of helicopter controls as of 1977, the subject matter of Messerschmidt's claim 1, is a modification of the helicopter control described in the Pentecost patent which would have been obvious to one of one of ordinary skill in the art as of 1977.

Claims 2–5 of the Messerschmidt patent are only minor modifications to the claim 1 helicopter control. Each additional limitation of these claims is described in the Pentecost patent itself, or the TAGs report * * *, as indicated in the claim chart at Exhibit B. The subject matter of these claims, like claim 1, would also have been obvious in 1977 to the worker of ordinary skill in the field of helicopter controls.

*Id.* Therefore, when viewed as a whole, Mr. Tomaine discovers that the Pentecost patent and the TAGS technical report render every claim of the '560 patent obvious.

Even assuming, *arguendo*, that Mr. Tomaine was incorrect, an assumption which this Court expressly rejects, the evidence still renders an obviousness determination contrary to the position proffered by the plaintiff. For example, turning to the specific question whether the prior art renders claim three (and thus four and five) of the '560 patent obvious, this Court focuses on Mr. Tomaine's claim chart references for claim three. There, Mr. Tomaine finds prior art for claim three in the following description from the specification of the Pentecost patent: "Referring to Figure 3, control handle 74 is shown free to rotate about its longitudinal axis in sleeve fitting 146 which also holds it in proper operating position." U.S. Patent No. 2,486,059, column 6, lines 48–51. Figure 3 of the Pentecost patent illustrates this structure as follows:

FIG_ 3

U.S. Patent No. 2,486,059, figure 3. To compare the above recited description with the '560 patent, the specification of the Messerschmidt patent reads as follows: "[T]he control stick of the present invention consists of a vertical hollow control tube 5 and a control shaft or level 4 which is disposed within tube 5 and is movable relative to tube 5." U.S. Patent No. 4,134,-560, column 3, lines 13–16. Figure 1 of the '560 patent, as depicted earlier in this opinion, illustrates this structure of the '560 patent. At first blush, therefore, these references appear to disclose the same function as well as structure. Nevertheless, the plaintiff argues the contrary. However, the plaintiff presents no basis to distinguish these claims. Indeed, the only reference that this Court finds on this point by the plaintiff appears in the plaintiff's deposition testimony. Therein, the following exchange occurred:

Q. And if I can refer you to Pentecost's patent at Column 1, Lines 26 to 27, talks about a twisting hand throttle mounted thereon.

A. Yes.

Q. Now, the combination of that reference with what you have already said is disclosed with respect to Claim 1, and Claim 2 also talked about the Pentecost patent?

A. Yes.

Q. Now I would like you to look at Claim 3.

A. Yes.

Q. And referring you back once again to what is it, Figure 3, and in particular the Handle 74, Sleeve 146, and the references that I pointed out to you before when you looked at those, that particular figure, is Claim 3 taught by the Pentecost patent?

A. No. Handle 74 is not slidably disposed, it is rotatably disposed only relative to any other control means. And in addition the locking mechanism, if we could go back to Claim 1 for a moment, the lock mechanism appears for collective only and does not in any way affect yaw control. Because yaw is separate and is not included in the locking means of the Pentecost patent.

Q. Okay, those two differences.

Now, you say that with respect to Claim 3 that the handle was not slidably disposed. Are you saying that the handle will not move up and down in the sleeve?

A. That is true.

Q. Now, referring you back to Column 4, Lines 2 through 11, to control collective the handle has to move up and down, is that correct?

A. Yes.

Q. And the handle was mounted in the sleeve, is that correct?

A. Sleeve 146. Yes, it appears that they have to move vertically in unison.

Messerschmidt Deposition, at B199–200. Thus, as the plaintiff's testimony demonstrates, the plaintiff first attempts and then concedes a losing argument. The plaintiff first attempts to differentiate the inventions by emphasizing the slidability, distinguished from the rotatability, of the structure disclosed in claim three, yet after a challenge on the point, the plaintiff concedes the opposite. If the deposition testimony were to stand alone, such would not only show obviousness but also anticipation; however, subsequent to the plaintiff's deposition, the plaintiff reconsidered his position, finding differences in some element of each claim of the '560 patent. *See* Plaintiff's Response (Claim Chart to the Pentecost Patent), at A–68 through –69. In view of the similarity between these two structures and particularly the above recited admissions by the plaintiff, this Court finds the conclusion inescapable that the Pentecost patent and the TAGS technical report gave sufficient references, including to the tubing structure of claim three, to render all the claims of the '560 patent obvious.

#### d. The Objective Indicia of Nonobviousness

Despite the clear and convincing evidence of obviousness for the '560 patent, the plaintiff claims nonobviousness based on commercial success, long felt but unsolved needs, and failure of others. Although this Court recognizes the mandate of considering objective evidence of nonobviousness in validity proceedings pursuant to 35 U.S.C. § 103, the plaintiff carries the initial burden of demonstrating a sufficient relationship (or nexus) between the objective evidence and the patented invention. *See Demaco Corp. v. F. von Langsdorff Licensing Ltd.*, 851 F.2d 1387, 1392 (Fed. Cir.1988) ("In meeting its burden of proof, the patentee in the first instance bears the burden of coming forward with evidence sufficient to constitute a prima facie case of the requisite nexus."). Here, the plaintiff provides no such "sufficient evidence." In contrast, but in conformity with the plaintiff's practice of making bald assertions without evidentiary foundation, the plaintiff presents no evidence of any of these secondary considerations. Even among plaintiff's plethora of articles, the plaintiff has failed to present a single document which shows adoption of the teachings of the '560 patent, and thus commercial success or resolution of long felt but unsolved needs. As for failure of others, the affidavits of defendant's experts and the other documentary evidence demonstrate that the development of a successful mechanical-based four-axis controller continues to evade helicopter engineers.

 Therefore, in light of the prior art solutions to cross-coupling disclosed in the heretofore mentioned prior art references, and based upon the affidavits of the defendant's experts as to the obviousness of plaintiff's invention, and in view of the lack of evidence to the contrary by the plaintiff as well as the plaintiff's own admissions of obviousness, this Court concludes that all of the claims of the invention disclosed by the '560 patent would have been obvious to those persons possessing ordinary skill in the art of helicopter control system technology.

#### C. Validity under 35 U.S.C. § 112, ¶ 2 (Definiteness of Claims)

 Section 112 of title 35 of the United States Code strives to ensure adequate disclosure of the technology behind the inventor's patent through the specification and the claims of the patent. MERGES, at 513. This requirement guarantees that the public receives the full benefit of the patent, after the expiration of the patent term. *In re Davies*, 475 F.2d 667, 671 (C.C.P.A. 1973). Divisible into four requirements, the first two paragraphs of section 112 recite the statutory mandate for the contents of the specification:

> The specification shall contain [1] a written description of the invention, and of the manner and process of making and using it, in such full, clear, concise, and exact terms as [2] to enable any person skilled in the art to which it pertains, or with which it is most nearly connected, to make and use the same, and [3] shall set forth the best mode contemplated by the inventor of carrying out his invention.

> The specification shall conclude with [4] one or more claims particularly pointing out and distinctly claiming the subject matter which the applicant regards as his invention.

35 U.S.C. § 112, ¶¶ 1–2. In short, these requirements demand that the specification disclose: (1) a written *description*, or that "the inventor must actually describe what she claims"; [9] (2) enablement, or that "the

9. Albeit similar in form to the enablement requirement, "the 'written description' requirement most often comes into play where claims not presented in the application when filed are presented thereafter," *Vas–Cath, Inc. v. Mahurkar*, 935 F.2d 1555, 1560 (Fed.Cir.1991), whereby "patent applicants often seek the benefit of the filing date of an earlier-filed foreign or United States application under 35 U.S.C. § 119 or 35 U.S.C. § 120, respectively, for claims of a later-filed application." *Id.* For example, if an inventor seeks to add new claims to a patent by means of a continuation-in-part, the specification, as originally filed, must provide literal support for the subject matter of the new claims. *Kennecott Corp. v. Kyocera Int'l, Inc.*, 835 F.2d 1419, 1421–22, (Fed.Cir.1987), *cert. denied*, 486 U.S. 1008, 108 S.Ct. 1735, 100 L.Ed.2d

inventor * * * describe her invention clearly enough so that one skilled in her art can understand it well enough to make and use it"; (3) best mode, or that "an inventor must tell the public the best mode she knows for practicing the claimed invention"; and (4) definiteness of claims, or that "an inventor must, under ¶ 2, claim [the invention] in such a way that those who follow her can easily discern the boundaries of her legal right." MERGES, at 516–17. Divisible by the paragraphs, paragraph one of section 112 applies only to the disclosure portion of the specification, whereas paragraph two pertains solely to the claims. *Standard Oil Co. v. American Cyanamid Co.*, 774 F.2d 448, 453 (Fed. Cir.1985). In the case at bar, the defendant argues in favor of an invalidity finding based solely on the second paragraph of section 112, and thus, this Court constrains its analysis to the definitiveness of claims contained within the '560 patent.

In *Permutit Co. v. Graver Corp.*, 284 U.S. 52, 52 S.Ct. 53, 76 L.Ed. 163 (1931), the Supreme Court set forth the rationale behind 35 U.S.C. § 112, ¶ 2 as follows:

> *The statute requires the patentee* not only to explain the principle of his apparatus and to describe it in such terms that any person skilled in the art to which it appertains may construct and use it after the expiration of the patent, but also *to inform the public during the life of the patent of the limits of the monopoly asserted, so that it may be known which features may be safely used or manufactured without a license and which may not.*

*Id.* 284 U.S. at 60, 52 S.Ct. at 55 (emphasis added). Definiteness in claims results, therefore, in certainty involving the patentee's property rights, *General Elec. Co. v. Wabash Appliance Corp.*, 304 U.S. 364, 373–74, 58 S.Ct. 899, 903–04, 82 L.Ed. 1402 (1938), thus in determining the metes and bounds of the patent, *In re Venezia*, 530 F.2d 956, 958 (C.C.P.A.1976). Primarily, however, the definiteness of claims require-

ment ensures fair warning to the public of what constitutes infringement. *United Carbon Co. v. Binney & Smith Co.*, 317 U.S. 228, 236, 63 S.Ct. 165, 169, 87 L.Ed. 232 (1942). In making this determination, moreover, "[a] decision on whether a claim is invalid under § 112, 2d ¶, requires a determination of whether those skilled in the art would understand what is claimed when the claim is read in light of the specification." *Orthokinetics, Inc. v. Safety Travel Chairs, Inc.*, 806 F.2d 1565, 1576 (Fed.Cir.1986). Following this standard for a section 112, paragraph 2, analysis, this Court considers the claims of the '560 patent.

As grounds for the assertions of indefiniteness and subsequent invalidity of the '560 patent, the defendant cites the general rule that a lack of antecedent basis "could" render a claim invalid under 35 U.S.C. § 112, ¶ 2. *In re Altenpohl*, 500 F.2d 1151, 1156 (C.C.P.A.1974). As previously recited in the factual section of this Opinion, the '560 patent contains a *non sequitur* by referring to "said first and second levers" at column 5, line 7 of claim one but containing no antecedent. In addition, the defendant also recites the rules of the PTO as mandating an invalidity finding. Indeed, the Rules of the United States Patent Office, as defined in the Manual of Patent Examining Procedure (MPEP), require the rejection of a vague or indefinite patent claim. M.P.E.P. ¶ 706.03. Furthermore, at ¶ 706.03(d), the MPEP provides an example of a vague or indefinite claim: "[A]nother way in which a claim can be indefinite is where a *non sequitur* occurs. For example, a claim is inferential and therefore indefinite when it recites 'said lever' and there was no earlier reference or *no antecedent* in the claim to a lever." *Id.* ¶ 706.03(d). *See generally* ROBERT C. FARBER, LANDIS ON MECHANICS OF PATENT CLAIM DRAFTING § 23, at 51 (3d ed. 1990) (hereinafter LANDIS ON CLAIM DRAFTING) ("When referring back to an element, it must be perfectly clear which element. The claim must be consistent within it-

198 (1988). Thus, the written description requirement arises only where an inventor seeks

to add claims to a previously filed patent.

self."). At first blush, therefore, the resolution of this issue seems clear.

However, the Federal Circuit has explained that claims rendered initially indefinite for lack of antecedent basis may nevertheless remain definite when read in light of the specifications. *See Shatterproof Glass Corp. v. Libbey–Owens Ford Co.*, 758 F.2d 613, 624 (Fed.Cir.1985) (noting that "[t]he amount of detail required to be included in claims depends on the particular invention and the prior art, and is not to be viewed in the abstract but in conjunction with whether the specification is in compliance with the first paragraph of section 112."), *cert. denied*, 474 U.S. 976, 106 S.Ct. 340, 88 L.Ed.2d 326 (1985); *Georgia–Pac. Corp. v. United States Plywood Corp.*, 258 F.2d 124, 136 (2d Cir.), *cert. denied*, 358 U.S. 884, 79 S.Ct. 124, 3 L.Ed.2d 112 (1958) (finding "if * * * read in light of the specifications, [the claims] reasonably apprise those skilled in the art both of the utilization and scope of the invention, and if the language is as precise as the subject matter permits, the courts can demand no more"). For example, in *Slimfold Mfg. Co. v. Kinkead Indus., Inc.*, 810 F.2d 1113, 1116 (Fed.Cir.1987), the Federal Circuit deemed a patent with a lack of antecedent valid when read in light of the specifications. In *Slimfold*, the examiner had rejected the patentee's reissue application based on the absence of an antecedent to the claim term "collar." *Id.* at 1114. The Federal Circuit, finding only a single collar in the specification, and then only in a single location, reversed the examiner's rejection because of the obvious intention of the patent drafter when considered in light of the specification. *Id.* at 1117. The court held: "[t]he missing antecedent clause, the absence of which was not observed either by the examiner of the original patent or by [defendant] in its reissue protest documents, did not fail to 'inform the public during the life of the [ ] patent of the limits of monopoly asserted.'" *Id.* (quoting *Permutit Co. v. Graver Corp.*, 284 U.S. 52, 60, 52 S.Ct. 53, 55, 76 L.Ed. 163 (1931)) (footnote omitted). Under the facts of the case at bar, however, *Slimfold* presents no useful analogy. In contrast with *Slimfold*, which contained a specification which disclosed a single "collar," *Slimfold*, 810 F.2d at 1114, the specification of the '560 patent refers to no less than seven levers. *See* U.S. Patent No. 4,134,560, at column 2, lines 65–66; column 3, lines 1–3, 15, 26–28, 31–33, 51–59; column 4, lines 6–8, 17–20, A4, A5 (disclosing "lever 2," "lever 4," "lever 14," "lever 13," "lever 30," "lever 11," and "lever 8"). Furthermore, as this Court reads the specification of the '560 patent, a clear point of confusion arises whether the "first and second levers" cited in claim 1 even serve as the equivalent to the "first and second control means."

In the plaintiff's letter to the PTO requesting a "certificate of correction," the plaintiff suggested that the reference to "said first and second levers" in claim one actually should have stated "said first and second control means." As the defendant points out, however, had both the first and second control means comprised levers, this petition could have constituted a valid (albeit improper) request. However, the specification never refers to the first control means as a lever, only as a tube. U.S. Patent No. 4,134,560 at column 2, lines 45–52; column 3, lines 16, 32; column 4, lines 5, 15. In addition, the specification refers to the second control means as both a shaft and a lever. *Id.* at column 2, lines 43–44; column 3, lines 15, 53. Moreover, the fact that a reading of the phrase, "said first and second levers," could encompass the function of both "control lever 2" and "control lever 4," as plaintiff admitted at deposition, further complicates interpretation of the claim and resolution of this point of claim indefiniteness. Messerschmidt Deposition, at B115. Thus, by admitting to the conflict between the claim and specifications without explanation, the plaintiff obviates the likelihood of a typographical error. *See Sargent–Welch Scientific Co. v. J/B Indus., Inc.*, 496 F.Supp. 972, 978 (N.D.Ill. 1980) (deeming obvious typographical error in use of word "motor" in lieu of proper word "rotor" meaningless as written but, with reference to the specifications, ascertainable). Here, reference to the specifica-

tion renders the instant point of indefiniteness less, not more, ascertainable and thus obviates a remedy based on "obvious error."

 To view this point of confusion between claim one and the specification, consider the following excerpt from the specification of the '560 patent:

A control lever 2 is secured on handle 48 adjacent to grip 1 and can be actuated without moving the hand from the grip. A flexible cable 35 connects the lever 2 to locking device 3, having friction calipers 36 or detents which oppositely engage shaft 4 to secure shaft 4 and tube 5 for unitary operation. When lever 2 is depressed, locking device 3 is disengaged allowing control tube 5 and control lever 4 to move independently for yaw and altitude control as will be explained.

\* \* \* \* \* \*

The present invention will be more completely understood from the following description of the operation of the control lever and the corresponding control changes effected by the lever. Collective pitch is controlled by depressing lever 2 which disengages locking device 3 and by applying vertical pressure to handgrip 1, moves shaft 4 or lever 4 vertically.

U.S. Patent 4,134,560, column 3, line 26 to column 3, line 34; column 3, line 47 to column 3, line 53. Thus, while at first glance the use of "levers" for "control means" appears a simple mistake, upon reference to the specification, the extent of the ambiguity (or ambiguities) becomes clear. For, as the plaintiff admits, the specification reads so as to infer not adjustment of the "control means" but of "control lever two" and "control lever four." Messerschmidt Deposition, at B113–15. Furthermore, two of the defendant's technical experts concur that the citation to "levers" in claim one may be interpreted as a "control means" or as "lever 2" and "lever 4." Glusman Affidavit, at 3; Landis Affidavit, at 3–4. In short, therefore, neither the claims nor the specification of the '560 patent contain the requisite defi-

niteness of claims or enablement as required by the first and second paragraphs of section 112.

Therefore, in view of this Court's reading of claim one and of the specification of the patent-in-suit, as well as the plaintiff's statements and admissions regarding their interpretation, this Court finds no alternative but to find all of the claims of the '560 patent invalid for indefiniteness pursuant to 35 U.S.C. § 112, ¶ 2.

As a final summary of this Court's validity determinations, this Court finds plaintiff's claims one, two, and three invalid for anticipation pursuant to 35 U.S.C. § 102 and finds all five of the plaintiff's claims in the patent-in-suit invalid for obviousness pursuant to 35 U.S.C. § 103 and for indefiniteness of claims pursuant to 35 U.S.C. § 112, ¶ 2.

III. Standards for Infringement

Section 271 of title 35 of the United States Code defines the present statutory standards of infringement. Section 271(a) describes "direct infringement" as follows: "Except as otherwise provided in this title, whoever without authority makes, uses or sells any patented invention, within the United States during the term of the patent therefor, infringes the patent." 35 U.S.C. § 271(a). While subsections 271(b) through 271(h) describe related infringement standards, the plaintiff's jurisdictional basis before this Court rests not on section 271, but with 28 U.S.C. § 1498.

 In contrast to section 271, where a patentee frequently maintains a choice of suits (*e.g.*, against the manufacturer under section 271(a) for direct infringement, against the wholesaler under section 271(b) for inducement, or against the retailer under 271(c) for contributory infringement), 28 U.S.C. § 1498 provides but a single source of recovery as against the United States. Therefore, pursuant to 28 U.S.C. § 1498, unauthorized use or manufacture of any patented invention by the United States or its contractors gives rise to an exclusive right of action against the United States in this Court. *See generally* Richard J. McGrath, *The Unauthorized Use of*

*Patents by the United States Government or Its Contractors,* 18 A.I.P.L.A. Q.J. 349 (1991); Barry L. Springer, *Patent Practice in the United States Court of Claims* (1968) (unpublished LL.M. thesis, George Washington University (Washington, D.C.)) (on file with the Government Contracts Program Library, George Washington University). The section provides:

> Whenever an invention described in and covered by a patent of the United States is used or manufactured by or for the United States without license of the owner thereof or lawful right to use or manufacture the same, the owner's remedy shall be by action against the United States in the United States [Court of Federal Claims] for the recovery of his reasonable and entire compensation for such use and manufacture.

28 U.S.C. § 1498(a). Although section 1498(a) refers to "reasonable and entire compensation," and not infringement as such, the legal standards for ascertaining a section 1498 action parallel but are not identical to the standards of infringement under 35 U.S.C. § 271. *Motorola, Inc. v. United States,* 729 F.2d 765, 768 (Fed.Cir. 1984). "Accordingly, [the Court of Federal Claims] uses 'infringement' as a familiar term accurately describing the central and relevant requirements of § 1498." *Deuterium Corp. v. United States,* 16 Cl.Ct. 454, 459 n. 3 (1989). Therefore, for purposes of the instant claims of "direct infringement," or more properly for purposes of this compulsory, nonexclusive license analysis in eminent domain, this Court forthwith recites only the standards of infringement and standards for section 1498 violations as synonymous. *Motorola,* 729 F.2d at 768; *cf. id.* at 768 n. 3 (noting the differences between 35 U.S.C. § 271 and 28 U.S.C. § 1498).

■ In *Autogiro Co. v. United States,* 181 Ct.Cl. 55, 68, 384 F.2d 391, 401 (1967), the Court of Claims defined the classic infringement analysis: "[T]he determination of patent infringement is a two-step process. First, the meaning of the claims in issue must be determined by a study of all relevant patent documents. Secondly, the claims must be read on the accused structures." In *Deuterium Corp.,* the Claims Court expanded upon this traditional approach with regard to a claim for compensation under 28 U.S.C. § 1498:

> The inquiry for patent infringement requires a two-step analysis. In the first step—claim interpretation—the court must define the patented process or, in other words, ascertain the scope of the claims. In the second step—the ultimate determination of infringement—the court must decide whether the claims cover the accused process. *Moleculon Res. Corp. v. CBS, Inc.,* 793 F.2d 1261, 1269–70 (Fed.Cir.1986), *cert. denied,* 479 U.S. 1030, 107 S.Ct. 875, 93 L.Ed.2d 829 (1987); *Mannesmann Demag Corp. v. Engineered Metal Prods. Co.,* 793 F.2d 1279, 1282 (Fed.Cir.1986); *Palumbo,* 762 F.2d at 974; *Lemelson v. United States,* 14 Cl.Ct. 318, 322 (1988). Thus, the infringement inquiry poses two distinct questions: first, what is patented, and second, has what is patented been used by the Government. *Fromson v. Advance Offset Plate, Inc.,* 720 F.2d 1565, 1569 (Fed.Cir.1983); *SSIH Equip. S.A. v. ITC,* 718 F.2d 365, 376 (Fed.Cir.1983).

> Claim interpretation, the first step in infringement analysis, necessarily precedes a determination of whether an accused process has infringed the claims. *Moeller v. Ionetics, Inc.,* 794 F.2d 653, 656 (Fed.Cir.1986); *Lemelson v. United States,* 752 F.2d 1538, 1549 (Fed.Cir. 1985). The property right bestowed by the patent is, after all, measured by the scope of the claims. *A.B. Dick Co. v. Burroughs Corp.,* 713 F.2d 700, 702 (Fed.Cir.1983), *cert. denied,* 464 U.S. 1042, 104 S.Ct. 707, 79 L.Ed.2d 171 (1984). The patent claims both distinguish the process from prior art and define the breadth of protection afforded by the patent. Thus, a claim enables potential users of a process to distinguish what infringes from what does not. *W.L. Gore & Assoc., Inc. v. Garlock, Inc.,* 721 F.2d 1540, 1557 (Fed.Cir.1983), *cert. denied,* 469 U.S. 851, 105 S.Ct. 172, 83 L.Ed.2d 107 (1984). The claims also

measure the invention or process. *SRI Int'l*, 775 F.2d at 1121.

\* \* \* \* \* \*

The second step of infringement analysis—the ultimate determination of infringement—requires the court to decide whether the accused process literally embodies every element of the properly interpreted claim. *Mannesmann*, 793 F.2d at 1282; *Stewart–Warner Corp. v. City of Pontiac*, 767 F.2d 1563, 1568 (Fed.Cir.1985). When determining literal infringement, the court is essentially deciding whether the accused process is the same invention defined by the claims. The mere addition of a component, *Loctite [Corp. v. Ultra Seal, Ltd.,]* 781 F.2d 861 [Fed.Cir.1985]; or ingredient, *Atlas Powder Co. v. E.I. du Pont De Nemours*, 750 F.2d 1569 (Fed.Cir.1984); *Bio–Rad Laboratories, Inc. v. Nicolet Instr. Corp.*, 739 F.2d 604, 614 (Fed.Cir.), *cert. denied*, 469 U.S. 1038, 105 S.Ct. 516, 83 L.Ed.2d 405 (1984), however, will not bar a finding of literal infringement, unless the added feature produces a radically different system. *Data Line Corp. v. Micro Technologies, Inc.*, 813 F.2d 1196 (Fed.Cir.1987). The determination of whether the claim "reads on" the accused process is a question of fact. *Atlas Powder*, 750 F.2d at 1569.

Although failing to employ every literal detail of a claimed invention, an accused process may still infringe the patent if the processes are substantially equivalent. The classic doctrine of equivalents asks whether the accused process "performs substantially the same function in substantially the same way to obtain the same result" as the patent claim. *Graver Tank & Mfg. Co. v. Linde Air Prods. Co.*, 339 U.S. 605, 608, 70 S.Ct. 854, 856, 94 L.Ed. 1097 (1950). This test for equivalence is an equitable doctrine. *Pennwalt*, 833 F.2d at 935; *Hughes Aircraft Co. v. United States*, 717 F.2d 1351, 1361 (Fed.Cir.

1983). The test for equivalence prevents unscrupulous copyists from evading the law by making unimportant and insubstantial changes in the patent. *Yarway Corp. v. Eur–Control USA Inc.*, 775 F.2d 268, 275 (Fed.Cir.1985).

*Deuterium Corp.*, 16 Cl.Ct. at 459–61 (footnotes omitted). Thus, this Court follows this two-step analysis, first interpreting the claims of the patent-at-issue and then reading the claims on the accused controllers.[10] *Symbol Technologies, Inc. v. Opticon, Inc.*, 935 F.2d 1569, 1574 (Fed.Cir. 1991); *Caterpillar Tractor Co. v. Berco, S.P.A.*, 714 F.2d 1110, 1114 (Fed.Cir.1983). Thus, in the first of these two analyses, this Court must consider the three parts of the patent: the claim or claims at issue, the specifications and drawings, and the prosection history. *Autogiro*, 384 F.2d at 401; *Loctite Corp. v. Ultraseal, Ltd.*, 781 F.2d 861, 867 (Fed.Cir.1985).

### A. Claim Interpretation

■ As a question of law, *Windsurfing Int'l, Inc. v. AMF, Inc.*, 782 F.2d 995, 1000 (Fed.Cir.), *cert. denied*, 477 U.S. 905, 106 S.Ct. 3275, 91 L.Ed.2d 565 (1986); *McGill, Inc. v. John Zink Co.*, 736 F.2d 666, 671, *cert. denied*, 469 U.S. 1037, 105 S.Ct. 514, 83 L.Ed.2d 404 (1984), claim interpretation is especially amenable to summary judgment because a disagreement over claim terms does not necessarily create a genuine issue of fact. *Intellicall, Inc. v. Phonometrics, Inc.*, 952 F.2d 1384, 1387 (Fed.Cir. 1992); *Johnston v. IVAC Corp.*, 885 F.2d 1574, 1579–80 (Fed.Cir.1989).

### 1. Claim Interpretation—Claim at Issue

■ The '560 patent contains five claims: claim 1 comprises an independent apparatus claim and claims 2 through 5 remain dependent therefrom. *See* LANDIS ON CLAIM DRAFTING § 11, at 18 ("An independent claim stands alone, includes all its necessary limitations, and is not dependent

---

**10.** A fine distinction exists between the "interpretation" and "construction" of a patent claim. A court first interprets a claim, with the aid of the specification, drawings, and prosecution history, to give meaning to the words and symbols, and then a court constructs (or construes) a claim by comparison to the accused device in order to ascertain the legal operation. *See* MERGES, at 656 (distinguishing interpretation and construction of a patent).

upon and does not include limitations from any other claim to make it complete."); *id.* § 11, at 19 ("A dependent claim incorporates by reference everything in the parent claim, and adds some further statements, limitations or restrictions."). Thus, as a dependent claim cannot be infringed unless the accused device is also covered by the related independent claim, *London v. Carson Pirie Scott & Co.,* 946 F.2d 1534, 1539 (Fed.Cir.1991), the plaintiff must show infringement only of claim one, or the defendant must show noninfringement thereof, to prevail in the present summary judgment proceeding. *See Wahpeton Canvas Co. v. Frontier, Inc.,* 870 F.2d 1546, 1553 n. 9 (Fed.Cir.1989) ("It is axiomatic that dependent claims cannot be found infringed unless the claims from which they depend have been found to have been infringed.").

As such, claim one of the '560 patent comprises the focal point of the infringement analysis. Claim one reads:

In a control system for a helicopter having:

(i) a collective pitch control mechanism for changing the pitch angle of the rotor blades;

(ii) a throttle control;

(iii) a tail rotor control for changing the pitch of the tail rotor blades; and

(iv) a cyclic pitch control mechanism for changing the tilt of the rotor disc;

an improved control comprising:

(a) a first control means pivotally mounted for pivotal movement in at least two directions, said first control means being operatively connected to said cyclic pitch control;

(b) second control means moveable relative to said first control means and operatively connected to said collective pitch control mechanism; and

(c) locking means for selectively engaging or disengaging said first and second control means whereby said first and second control means can be locked in unitary engagement and said first and second control means moved in one pivotal direction to change the cyclic pitch in the longitudinal axis and moved in the other pivotal direction to change the cyclic pitch in the lateral helicopter axis and whereby said first and second levers can be disengaged and said second control means can be moved relative to said first control means to control collective pitch and rotated to operate the tail rotor control.

U.S. Patent 4,134,560, column 4, line 50 through column 5, line 12. By application of the above disclosed locking means in conjunction with the two control means, the plaintiff argues that the '560 patent comprises a collective four-axis helicopter control system. In effect, however, this brake (or lock) allows only selective use of the two control means (described as control means one and two) recited in the '560 patent. As claim 1 of the '560 patent reads, the first and second control means enable two-axis control when locked, and another two-axis when unlocked, yet at no time enable four-axis control without engaging or disengaging the locking device. This Court finds, therefore, that the language of claim one makes unambiguous reference to a single distinct element of the claimed invention: a dual two-axis controller which, when used in combination with a locking device, enables four-axis control. Therefore, the '560 patent describes not a collective four-axis helicopter control system but a dual two-axis controller.

When a patent defines a claim in clear language, this Court need not enter into speculative interpretations. *Unique Concepts, Inc. v. Brown,* 939 F.2d 1558, 1563 (Fed.Cir.1991). Under normal circumstances, or if this case were not pursued by a *pro se* claimant, this Court would end the interpretative phase of this patent dispute at this point, finding neither literal infringement nor infringement under the doctrine of equivalents because of the functional and structural differences between the claims of the patent-in-suit and the accused controllers. Indeed, the accused controllers contain neither locking devices nor equivalents thereof, and the accused

controllers contrast structurally from the invention disclosed in the means-plus-function claims of the '560 patent. However, granting broader latitude to the frequently undiscernible allegations of the instant *pro se* plaintiff, this Court will continue on and conduct a full infringement analysis. Moreover, as the plaintiff confuses the means of patent protection for the patent-in-suit, this Court also reviews the other sources of claim interpretation to fully examine the scope of the plaintiff's claim, and thereby, explicitly define the boundaries of the '560 patent. In so doing, this Court establishes that the threshold questions in the instant infringement analysis comprise whether the accused controllers entail *corresponding function* as that of the '560 patent, or whether the '560 patent encompasses helicopter controllers other than those with a locking device, and whether the accused controllers entail *corresponding structure* as that of the '560 patent, or whether the mechanical-based controller of the '560 patent encompasses computer-aided controllers.

Although the plaintiff asserts infringement on several planes, all of the plaintiff's arguments rely strictly on a corresponding function analysis and completely reject and thus ignore the issue of corresponding structure. As this Court explains below, this failure on the part of the plaintiff results from a mistaken understanding of the means-plus-function claim technique. Nevertheless, the plaintiff asserts the following arguments regarding corresponding function. As an initial matter, the plaintiff argues that the accused devices literally infringe the claims of the '560 patent with proof as shown on his claim charts. Taking the position that the ADOCS controller literally infringes the patent-in-suit, the plaintiff argues that all other controllers developed by contractors of the United States relied on this controller and therefore infringe. Then, as an alternative position, the plaintiff presents various levels of analogy to support infringement under the doctrine of equivalents. First, the plaintiff claims that the four-axis control capability of the accused devices "function" in an equivalent manner as the invention disclosed in the '560 patent; next, the plaintiff claims that the on/off buttons of the accused controllers (and the mode selection switch of the Comanche controller) parallel the "way" of operation of the '560 patent; finally, irrespective of the means of manipulation (mechanical or electrical), the plaintiff simply claims that the accused controllers all eventually "result" in the same or equivalent function as the '560 patent. In contrast, the defendant argues that the accused controllers differ not only in structure, by utilizing computer-aided and not mechanical-based operation, but also contain no locking means, nor equivalent locking means, that require engaging or disengaging any device to enable access to the four conventional helicopter controls, and therefore also differ in function.

Thus, as the arguments of both parties demonstrate, except for the question of corresponding structure pursuant to the means-plus-function claims of the '560 patent, the primary point of dispute of the instant infringement determination regarding the '560 patent involves the locking means by which the '560 patent purportedly enables a four-axis controller to function.

### 2. Claim Interpretation— Prosecution History

In claim interpretation, the statements made during the prosecution history serve an important and relevant role. *Loctite Corp. v. Ultraseal Ltd.*, 781 F.2d 861, 867 (Fed.Cir.1985). *See E.I. Du Pont de Nemours & Co. v. Phillips Petroleum Co.*, 849 F.2d 1430, 1438 (Fed.Cir.) (finding the prosecution history not only relevant for prosecution history estoppel but also to "ascertain the true meaning of what the inventor intended to convey in the claims"), *cert. denied*, 488 U.S. 986, 109 S.Ct. 542, 102 L.Ed.2d 572 (1988). Here, the prosecution history of the '560 patent further emphasizes the focus of the infringement analysis on the locking means of the patent-at-issue. In fact, the file wrapper contains the following statement by the patent examiner: "The prior art cited herein does not show or make obvious the control sytem [sic] claimed by applicant namely a first and

second control means which *when locked together* control both longitudinal and lateral cyclic pitch *and when decoupled* the second one controls collective pitch and the tail rotor." '560 Prosecution History, at 18 (emphasis added). Thus, as this citation demonstrates, the examiner disclosed the nonobviousness of the '560 patent with the prior art by reference to the selectivity, by means of a locking mechanism, among the dual two-axis controllers disclosed by the claims of the '560 patent.[11] For purposes of this infringement analysis, therefore, this Court applies the examiner's statement of nonobviousness to confirm this Court's reading of claim one of the '560 patent, as requiring a locking means for selectively engaging and disengaging the two respective control means in a helicopter control mechanism, as the focus of the instant infringement analysis. Thus, in order to prove infringement, this reading of the '560 patent requires evidence (at the least) of a similar locking device or equivalent to prove commonality of function between the patent-in-suit and the accused controllers, not to mention the requirement of commonality of structure for the means-plus-function claims.

### 3. Claim Interpretation—Specification and Drawings

■ Typically, the specification and drawings aid claim interpretation only as far as ascertaining the meaning of the claims. *Tol–O–Matic, Inc. v. Proma Produkt–Und Marketing Gesellschaft m.b.H.,* 945 F.2d 1546, 1550 (Fed.Cir.1991); *Rel–Reeves, Inc. v. United States,* 209 Ct.Cl. 595, 612, 534 F.2d 274, 282 (1976). *See Sjolund v. Musland,* 847 F.2d 1573, 1582 (Fed.Cir.1988) (ruling that "limitations from the specification are not to be read into the claims"). Where the inventor (or the inventor's patent attorney) chooses to describe the claims of a patent in means-plus-function language, however, the specification gains a new role of setting the boundaries for the scope of the claims. *See Pennwalt Corp. v. Durand–Wayland, Inc.,* 833 F.2d 931, 934 (Fed.Cir.1987) (emphasizing that, in addition to the requirement of commonality of function, means-plus-function claims give rise to the requirement of commonality of "structure" as disclosed by the specification). Therefore, as the '560 patent contains means-plus-function claims, this Court studies the specification of the '560 patent with additional interest.

The specification of the '560 patent provides the following general description of the operation of the controller disclosed by the patent-in-suit:

> The present invention provides a unique helicopter control system which enables the helicopter pilot to control all flight functions with the use of a single lever, and consequently a single hand.

---

11. On page 19 of the file wrapper for the '560 patent, the examiner lists the prior art patents reviewed to ascertain the nonobviousness of the '560 patent. This list contains nine references, but the Pentecost patent *appears nowhere* on the list. Based on this omission, as described above, this Court reviewed the examiner's nonobviousness determination and, when viewed in light of the Pentecost patent, deemed the claims of the '560 patent obvious and invalid. While this Court finds no fault with the examiner's findings as recited in the file wrapper, this Court expresses great displeasure over the plaintiff's apparent failure to apprise the examiner of the Pentecost reference, despite the fact that the plaintiff had precedent knowledge of the prior art. For example, at deposition, the following exchange took place:

> Q. When did you become aware of Mr. Pentecost's helicopter?
> A. In reading the American Helicopter Magazine issues, which I had a personal sub-

scription to starting in 1951. He was featured in articles in that monthly magazine, periodically, after 1951 when I saw them.

> Q. So you were aware of his work prior to the date of your invention?
> A. Yes, I was.

Messerschmidt Deposition, at B202. Based on this admission alone, were the evidence not so clear of the invalidity of the patent-in-suit, this Court would seriously consider whether this omission by plaintiff constituted a fraud on the PTO, or "inequitable conduct." *See* 37 C.F.R. § 1.56(a) (1982) ("A duty of candor and good faith toward the Patent and Trademark Office rests on the inventor, * * * to disclose to the Office information they are aware of which is material to the examination of the application."); *id.* ("Such information is material where there is a substantial likelihood that a reasonable examiner would consider it important in deciding whether to allow the application to issue as a patent.").

Briefly, the present invention provides a helicopter control system which combines the four primary helicopter controls within a single integral control unit capable of being actuated independently or in unison with any other control. This makes it possible for the pilot to perform several remote functions simultaneously.

U.S. Patent 4,134,560, column 1, line 54 through column 1, line 63. This description, however, falsely describes the selectivity of the locking means upon the two respective control means as "capable of being actuated independently" and "simultaneous." Indeed, as the defendant points out, the '560 patent discloses a controller which precludes two of the four conventional helicopter control functions at any instant in time. In order to access the four helicopter controls, or two of the helicopter controls with one control means and another two with the other control means, a pilot needs to repeatedly engage and disengage the locking means of the '560 patent for complete helicopter control. This dual, mechanical selectivity contrasts dramatically from the automatic function as well as structure of the accused computer-aided controllers. The specification of the '560 patent illustrates this point:

The control unit includes a handle which can be adjusted to a desired position for operator comfort at a ball joint. The end of the handle terminates at a throttle twist-grip. The handle is attached to a vertical shaft or lever which is slidable or telescopic within a cylindrical tube. A locking device carried on the tube can be engaged to move the handle shaft and tube in unison to control cyclic pitch. A manually operated lever at the twist-grip can be actuated to disengage the locking device so that shaft can move independently of the tube. Vertical movement of the shaft through the tube controls collective pitch. Rotation of the shaft controls the tail rotor to counteract the torque effects of the main rotor. The control tube and shaft are connected through conventional mechanical linkages such as ball and socket joints and gimbals to the tail rotor and rotor head assembly.

U.S. Patent 4,134,560, column 1, line 63 to column 2, line 11. Distinguishable from the narrative description above, the specification further describes the technical structure of the invention as follows:

As mentioned above, the control stick of the present invention consists of a vertical hollow control tube 5 and a control shaft or lever 4 which is disposed within tube 5 and is movable relative to tube 5. At its upper end, shaft 4 forms opposite horizontal handles 48 and 48A which respectively terminate at throttle grips 1 and 1a. For convenience, description of only one of the handles will be set forth, it being understood that the control system can be provided with single or multiple handles to accommodate control from either the right or left side. Engine throttle is controlled by rotating the grip 1 attached to shaft 4. Grip 1 operates a flexible cable 9 which is connected to the engine throttle control. A control lever 2 is secured on handle 48 adjacent to grip 1 and can be actuated without moving the hand from the grip. A flexible cable 35 connects the lever 2 to locking device 3, having friction calipers 36 or detents which oppositely engage shaft 4 to secure shaft 4 and tube 5 for unitary operation.

U.S. Patent 4,134,560, column 3, line 13 through column 3, line 31. Furthermore, by reference to the following drawing, the function of the locking device may be better ascertained:

U.S. Patent 4,134,560, figure 1 (figure shown in part). Thus, by reference to the above citations to the specification and drawings of the '560 patent, this Court discovers the true *function* of the invention which, in turn, discloses the fundamental element (or limitation) of this patent. Specifically, the specification recites this function: "[w]hen lever 2 is depressed, locking device 3 is disengaged *allowing* control tube 5 and control lever 4 to move independently for yaw and altitude control * * *." '560 Patent, column 3, line 31 through column 3, line 34 (emphasis added). Thus, when lever 2 remains locked (or not depressed), tube 5 and control level 4 allow cyclic pitch manipulation (pitch and roll). Contrastingly, it would follow that the engaging and disengaging of the locking device would result in *disallowing* the respective opposite function; for example, when the locking device is engaged, the pilot cannot affect manipulation of heave and yaw. As a result, the patent-at-issue does not provide for the *simultaneous* function of the four helicopter controls as suggested by the plaintiff. Thus, this Court reads the specification as well as the drawings to disclose a controller which, by means of a locking device, effectively precludes two of the four conventional helicopter controls at any one time. Therefore, the '560 patent claims no four-axis controller but a dual application controller with a locking means to allow dual two-axis controllers to perform as one.

For the foregoing reasons, this Court finds the claim interpretation cited above not only in complete conformity with the claims, prosecution history, specification, and drawings of the '560 patent but also mirroring the defendant's reading of the scope of the patent-in-suit. Thus, for purposes of the instant infringement analysis, the '560 patent extends only to four-axis helicopter controllers which possess two control means, and a locking means for engaging and disengaging the two control means, whereby the two control means allow manipulation of pitch and roll when locked and allow manipulation of heave and yaw when unlocked.

### B. Infringement/Claim Construction

■ In the above claim interpretation analysis, this Court considers the first of the two-part infringement analysis, ascertaining the meaning of the claims in the '560 patent. Proceeding to the second area of analysis, this Court now considers whether the claims of the '560 patent read

on the accused structures and thus infringe. *Minnesota Mining & Mfg. Co. v. Johnson & Johnson Orthopaedics, Inc.,* 976 F.2d 1559, 1570 (Fed.Cir.1992); *Caterpillar Tractor Co. v. Berco, S.P.A.,* 714 F.2d 1110, 1114 (Fed.Cir.1983). Patent infringement occurs under one of two legal theories: either literal infringement, *Ball & Socket Fastener Co. v. Kraetzer,* 150 U.S. 111, 117, 14 S.Ct. 48, 50, 37 L.Ed. 1019 (1893), or infringement under the doctrine of equivalence, *Graver Tank & Mfg. Co. v. Linde Air Prods. Co.,* 339 U.S. 605, 607–08, 70 S.Ct. 854, 855–56, 94 L.Ed. 1097 (1950). To establish infringement under either theory, the patent owner maintains the burden of proving infringement by a preponderance of the evidence. *Lee v. Dayton–Hudson Corp.,* 838 F.2d 1186, 1187 (Fed.Cir.1988); *Hughes Aircraft Co. v. United States,* 717 F.2d 1351, 1361 (Fed. Cir.1983). Moreover, to meet this burden, the "All Elements Rule" requires that each and every element set forth in a claim appear in the accused embodiment either exactly, in the case of literal infringement, or by a substantial equivalent, in the case of infringement under the doctrine of equivalents. *Pennwalt Corp. v. Durand–Wayland, Inc.,* 833 F.2d 931, 949 (Fed.Cir. 1987), *cert. denied,* 485 U.S. 961, 108 S.Ct. 1226, 99 L.Ed.2d 426 (1988); *Lemelson v. United States,* 752 F.2d 1538, 1551 (Fed. Cir.1985). In the instant proceeding, because the parties' disagreements stem not from the terms of the claims but from the applications of the claims to the accused devices, this Court decides the instant dispute upon the motions, strictly as a matter of law upon summary judgment.

However, dissimilar to claim interpretation which involves a question of law, claim construction is a question of fact, *Minnesota Mining,* 976 F.2d at 1570; *Standard Oil Co. v. American Cyanamid Co.,* 774 F.2d 448, 452 (Fed.Cir.1985). Nevertheless, claim construction is amenable to summary judgment because a disagreement over claim comparisons to an accused device does not necessarily create a *genuine* issue of fact. *Intellicall, Inc. v. Phonometrics, Inc.,* 952 F.2d 1384, 1387 (Fed. Cir.1992). Yet, as an initial matter, the defendant claims that the plaintiff has not even met the burden of proof to establish a prima facie showing of infringement and, thus, that this Court need not make further infringement determinations in this summary judgment proceeding. *Avia Group Int'l, Inc. v. L.A. Gear Cal., Inc.,* 853 F.2d 1557, 1565 (Fed.Cir.1988). Indeed, the plaintiff's claims of patent infringement rely upon either nonrelated or irrelevant sources: first, the plaintiff asserts infringement based upon newspaper and magazine articles describing both proposed four-axis helicopter control systems or computer-aided four-axis control systems; and second, the plaintiff claims infringement based solely upon plaintiff's opinion about the meaning and application of the various phrases and provisions of claims one through five of the '560 patent. As for the newspaper and magazine articles, references which fail to raise specific issues of material fact are insufficient to preclude the granting of summary judgment, *Johnston v. Ivac Corp.,* 885 F.2d 1574, 1577 (Fed.Cir.1989); *D.L. Auld Co. v. Chroma Graphics Corp.,* 714 F.2d 1144, 1150–51 (Fed.Cir.1983), *cert. denied,* 474 U.S. 825, 106 S.Ct. 83, 88 L.Ed.2d 68 (1985), and as for plaintiff's opinions of infringement, "mere allegations by declaration or otherwise do not raise issues of fact needed to defeat a motion for summary judgment," *Litton Indus. Prods., Inc. v. Solid State Sys. Corp.,* 755 F.2d 158, 164 (Fed.Cir. 1985); *see Townsend Eng'g Co. v. HiTec Co.,* 829 F.2d 1086, 1089 (Fed.Cir.1987) ("The * * * affidavit largely consists of [the plaintiff's] opinion about the meaning and application of various phrases and provisions of claim 5, and does not create factual disputes that precluded the grant of summary judgment."). As a result, this Court finds that plaintiff fails to satisfy the requisite burden of proof for his motion for summary judgment, and resultingly, this Court finds sufficient grounds to deny plaintiff's motion based on the lack of sufficient evidence alone. *See Avia Group,* 853 F.2d at 1565 ("A patent owner must, of course, present sufficient evidence to make a *prima facie* case.").

Nevertheless, assuming *arguendo*, that the plaintiff's allegations in fact satisfy the burden of proof for the instant proceeding, this Court entertains the following infringement analysis.

### 1. Means–Plus–Function Claims

■ As an initial matter, before moving to the infringement analysis, this Court takes notice of the nature of the claims in the '560 patent. Specifically, the plaintiff utilizes the means-plus-function form of claim drafting in setting forth the claims of the patent-in-suit. By the plaintiff's utilization of this drafting technique, this Court must view the claims at issue in light of 35 U.S.C. § 112, ¶ 6. *In re Mulder*, 716 F.2d 1542, 1549 (Fed.Cir.1983). Paragraph six of section 112 provides:

> An element in a claim for a combination may be expressed as a means or step for performing a specified function without the recital of structure, material, or acts in support thereof, and such claim shall be construed to cover the corresponding structure, material, or acts described in the specification and equivalents thereof.

35 U.S.C. § 112, ¶ 6. Thus, because a means-plus-function claim encompasses almost infinite infringement possibilities, the 1952 Patent Act adopted section 112, paragraph 6 which limits "means for" claiming to "the corresponding structure, material, or acts described in the specification and equivalents thereof." *See* MERGES, at 707 (citing P.J. Federico, *Commentary on the New Patent Act*, 35 U.S.C.A. pt. 1, at pp. 24–25 (1954)). Thus, pursuant to the Act, "[w]hile the use of means-plus-function language in a claim is clearly permissible by reason of section 112(6), a means clause does not cover every means for performing the specified function." *Laitram Corp. v. Rexnord, Inc.*, 939 F.2d 1533, 1536 (Fed. Cir.1991).

■ In *Pennwalt Corp. v. Durand–Wayland, Inc.* 833 F.2d 931 (Fed.Cir.1987), the Federal Circuit related the predominate pattern of claim construction for a means-plus-function claim. Primarily, the court distinguished the analyses of commonality of function and commonality of structure.

*Id.* at 934 (citing *Palumbo v. Don–Joy Co.*, 762 F.2d 969, 975 (Fed.Cir.1985); *D.M.I., Inc. v. Deere & Co.*, 755 F.2d 1570, 1575 (Fed.Cir.1985); *Radio Steel & Mfg. Co. v. MTD Prods., Inc.*, 731 F.2d 840, 848 (Fed. Cir.1984)). Commonality of function regards whether an accused device comprises each and every element of the patent, for literal infringement, or a substantial equivalent thereof, for infringement under the doctrine of equivalents. Also, "[i]f the required function is not performed *exactly* in the accused device, it must be bourn in mind that section 112, paragraph 6, equivalency is not involved." *Id.* In other words, without commonality of function, the analysis ends and commonality of structure plays no role. Yet, upon a finding of common function, and if the claims utilize the means-plus-function form of claim drafting, then a second level of analysis applies before declaring infringement. *See De Graffenried v. United States*, 20 Cl.Ct. 458, 478–79 (1990) ("But when, as here, a claim defines a device by calling for a series of 'means' for performing specified functions (e.g., uses 'means plus function' language), mere performance of those functions is not enough to produce literal infringement."). Specifically, upon finding common function, a court then turns to commonality of structure. *See In re Meyer*, 688 F.2d 789, 796 (C.C.P.A.1982) ("[C]laims * * * drafted in means plus function format are to be examined in light of the 'corresponding structure, material, or acts described in the specification and equivalents thereof.'") (quoting 35 U.S.C. § 112, ¶ 6). Thus, after finding functional commonality, for the literal infringement analysis, *Pennwalt* provides the following guideline: "To determine whether a claim limitation is met literally, where expressed as a means for performing a stated function, the court must compare the accused structure with the disclosed structure, and *must find equivalent structure as well as identity of claimed function* for that structure." *Pennwalt*, 833 F.2d at 934 (emphasis omitted, emphasis added). Similarly, for the infringement analysis under the doctrine of equivalents, the same guideline applies, except commonality of structure extends to "equivalents

thereof" pursuant to the section 112, paragraph six analysis, and commonality of function extends to "equivalents thereof" pursuant to the doctrine of equivalents. *See generally Valmont Indus., Inc. v. Reinke Mfg. Co.*, 983 F.2d 1039, 1042 (Fed. Cir.1993) ("Equivalency under section 112, however, differs from the doctrine of equivalents."); *Pennwalt*, 833 F.2d at 934 ("Section 112, paragraph 6, plays no role in determining whether an equivalent function is performed by the accused device under the doctrine of equivalents.").

In the case at bar, the plaintiff completely ignores (or implicitly rejects) the above described approach to the infringement of. means-plus-function claims. Thus, as "it is part of the ultimate burden of proof of the patent owner to establish, with respect to a claim limitation in means-plus-function form, that the structure in the accused device which performs that function is the same as or an equivalent of the structure disclosed in the specification," *Pennwalt*, 833 F.2d at 934, this defect illustrates the failure of the plaintiff to carry the burden of proof. Essentially, the plaintiff attempts to argue the same interpretation of the law as that of the Pennwalt Corporation in *Pennwalt*, or that commonality of function presumes commonality of structure. The Federal Circuit, however, explicitly rejected that approach: "In essence, Pennwalt erroneously argues that, if an accused structure performs the function required by the claim, it is per se structurally equivalent. That view entirely eliminates the section 112, paragraph 6, restriction and has been rejected in the above-cited precedent of this court." *Id.* Thus, pursuant to *Pennwalt*, a means-plus-function claim "rules out the possibility that any and every means which performs the function specified in the claim *literally* satisfies that limitation. While encompassing equivalents of those disclosed in the specification, the provision, nevertheless, acts as a restriction on the literal satisfaction of a claim limitation." *Id.* Resultingly, as in the case at bar, the utilization of means-plus-function claims requires consideration of commonality of function, and then only

if present, consideration of commonality of structure.

As a result, in the following infringement analyses, the plaintiff's assertions of infringement of the claims of the '560 patent remain constrained, pursuant to 35 U.S.C. § 112, ¶ 6, to the corresponding structure of the helicopter controller described in the specification of the '560 patent and equivalents thereof.

## 2. Literal Infringement

 To demonstrate literal infringement, pursuant to the All Elements Rule, the plaintiff would need to prove that each and every element of one of the claims of the '560 patent exists in one or more of the four-axis helicopter control systems developed under the direction of defendant. *Hormone Research Found., Inc. v. Genentech, Inc.*, 904 F.2d 1558, 1562 (Fed.Cir. 1990), *cert. dismissed*, 499 U.S. 955, 111 S.Ct. 1434, 113 L.Ed.2d 485 (1991); *B.E. Wallace Prods. Corp. v. United States*, 26 Cl.Ct. 490, 505 (1992). In the instant case, the plaintiff initially seemed to allege solely infringement under the doctrine of equivalents in the Motion for Summary Judgment, but the defendant later intimated in the Response that a more direct form of infringement had occurred. Indeed, so to assist this Court in making the requisite comparison of elements disclosed in the claims of the patent-at-issue with the accused controllers, the plaintiff submits claim charts to show the literal infringement of one or more claims of the '560 patent. Specifically, the plaintiff provides claim charts for the ADOCS, ARTI, and Comanche controllers. *See* Plaintiff's Reply, at A–11 through –14; A–35 through –36; A–58 through –63. In these assertions of infringement, however, the plaintiff either misstates or mistakes the facts as well as the law.

Factually, the plaintiff simply fails to prove that the accused controllers infringe any claim of the '560 patent pursuant to the All Elements Rule. In the preceding sections on claim interpretation, this Court ascertained the meaning and boundaries of the patent-in-suit. Pursuant thereto, for literal infringement, the accused helicopter

control systems must contain, at a minimum, as disclosed in claim 1 of the '560 patent: a helicopter controller consisting of two control means, comprising (1) a first control means pivotally mounted for pivotal movement and (2) a second control means movable relative to said first control means for collective pitch and (3) a locking means, for selectively engaging (for two of the four axis) and disengaging (for the other two of the four axis) the two respective control means, in a collective helicopter control mechanism. Under the All Elements Rule, the omission of any element avoids infringement. *Strumskis v. United States*, 200 Ct.Cl. 668, 676, 474 F.2d 623, 627, *cert. denied*, 414 U.S. 1067, 94 S.Ct. 576, 38 L.Ed.2d 472 (1973). Applying this law to the facts of this case, while the plaintiff presents plausible "equivalents" for elements one and two of claim one in the accused controllers, the plaintiff presents absolutely no evidence of element three (specifically, a locking device) in any of the accused devices. Indeed, no means appears in any of the accused controllers for selectively engaging *or disengaging* one control function for pitch and roll and another control function for heave and yaw: instead, the accused controllers allow simultaneous function of pitch, roll, heave, and yaw. As such, this Court focuses the following literal infringement analysis upon the presence or absence of a "locking means" in any of the accused controllers.

Again, however, this Court reiterates that, although the plaintiff improperly presents no evidence of corresponding structure pursuant to the means-plus-function nature of the claims, the plaintiff asserts commonality of function and literal infringement. Despite this fatal error, however, this Court nevertheless finds that none of the accused controllers contain all of the elements of the only independent claim of the '560 patent. As referenced above, the plaintiff attempts to utilize the means-plus-function claims of the '560 patent to incorporate a wider range of equivalents so as to prove infringement by the accused controllers. In doing so, the plaintiff confuses functional and structural equivalents. To understand the allegations, this Court looks to the specific claims of the plaintiff.

As this Court interprets the plaintiff's allegations, the plaintiff's claims of literal infringement rely on the claim charts to the ADOCS, ARTI, and Comanche controllers. To find an absence of literal infringement, however, this Court need only find the omission of one element in the accused controllers in comparison to the patent-in-suit. As such, this Court focuses solely on the plaintiff's claims of functional commonalities to the third element of claim one (the locking means) of the '560 patent. Thus, for this element of claim one, the plaintiff proffers a claim chart purportedly showing functional commonality with the ADOCS controller. With reference to the third element of claim one, the claim charts for the ADOCS controller read:

| U.S. Patent No. 4,134,560 | ADOCS<br>Lear Siegler, Inc.<br>and<br>Measurement Sys.,<br>Inc.<br>Controllers |
|---|---|
| Claim 1 | Elements Present: |
| * * * * | |
| (c) locking means for selectively engaging or disengaging said first and second control means | (c) Yes. A–34. |
| whereby said first and second control means can be locked in unitary engagement and said first and second control means moved in one pivotal direction to change the cyclic pitch in the longitudinal axis and moved in the other | Yes. A–34. |

U.S. Patent No. 4,134,560

ADOCS
Lear Siegler, Inc.
and
Measurement Sys.,
Inc.
Controllers

| Claim 1 | Elements Present: |
|---|---|
| pivotal direction to change the cyclic pitch in the lateral helicopter axis and | |
| whereby said first and second levers can be disengaged and | Yes. A–15. |
| said second control means can be moved relative to said first control means to control collective pitch and rotated to operate the tail rotor control. | Yes. A–27, A–30. |

Plaintiff's Response, at A–11, A–13 (claim charts combined). As cited above, the plaintiff recites four pages of reference material to support the claim of literal infringement by the ADOCS controller, specifically A–15, A–27, A–30, and A–34. As demonstrated below, however, neither reference contains either a locking device or an equivalent thereof.

The plaintiff recites A–34 as a reference for a source of functional commonality for the locking means of the '560 patent. However, A–34 describes a pilot-operated switch for the selection of secondary controller functions, such as flight modes (*i.e.*, bob-up, hover, transition, or cruise) and control techniques (*i.e.*, automatic trim and stabilization). ADOCS Study, at 68. Although the plaintiff claims that this switch operates like the locking means of the '560 patent, the switch controls entirely separate functions from the four primary helicopter controls and thus possesses no relation to the locking means of the '560 patent. As an alternative source of functional commonality, the plaintiff also cites the "operative connection" of a master on/off switch. Although the plaintiff's claim charts lack any reference to this argument, the plaintiff outlined this position in the Plaintiff's Statement of Genuine Issues. Plaintiff's Statement of Genuine Issues, at 2–3. Therein, the plaintiff states the obvious:

8. Helicopter controller circuits in the ADOCS program were controlled by a master on/off switch, which functions as a locking means, and had to be disengaged from the off position before *any* control changes could be made.

9. Helicopter controllers used in the ARTI program were controlled by a master on/off switch, which functioned as a locking means, and had to be disengaged from the off position before *any* control changes could be made.

10. Helicopter controllers used in the LH (now Comanche) program were controlled by a master on/off switch, which functioned as a locking means, and had to be disengaged from the off position before *any* control changes could be made.

*Id.* These statements are not only common sensical (*e.g.*, before you drive a car, you insert the key) but irrelevant. Of course, the "on/off switch * * *" had to be disengaged from the off position before any control changes could be made," but this function has absolutely nothing to do with enabling or disenabling the selective control of either pitch or roll with one controller mechanism and heave and yaw with another. Thus, the master on/off switch also contrasts with the function of the locking means of the patent-in-suit. Next, the plaintiff references A–15, which provides a general summary of the ADOCS controller, A–27, which recites the function of the ADOCS four-axis controller, and A–30, which discloses a diagram thereof, but all of these ancillary references lack any recitation to or display of a controller with a locking mechanism. Therefore, based on the absence of any locking means in the ADOCS controller, or even a mechanism of equivalent function (pursuant to the doctrine of equivalents), this Court finds no literal infringement of the patent-in-suit by the ADOCS controller.

The plaintiff also alleges infringement (although unclear if asserting literal infringement or infringement under the doctrine of equivalents) of the '560 patent by the ARTI controller. Apparently, the ARTI controller developed from research completed on the ADOCS controller, which later developed into the LHX/LH/Comanche controller. To show infringement by this controller, the plaintiff merely presents a press release describing the LHX-model ARTI controller developed by McDonnell Douglas. *See* Plaintiff's Response, at A–64 through –65. The controller model described in the press release, however, lost the LH competition and was never developed. Furthermore, except for this single reference, the plaintiff's assertions of infringement by the LHX-model controller rely entirely upon the ADOCS references (described above). As this Court has found no literal infringement by the ADOCS controller as based on those references, the same analysis applies here. Moreover, as the plaintiff conceded at deposition that if the ADOCS controller does not infringe the '560 patent, none of the accused controllers infringe, Messerschmidt Deposition, at B184, this Court concludes that no aspect of the ARTI controller infringed (either literally or under the doctrine of equivalents) the patent-in-suit.

The plaintiff also alleges infringement (again unclear if literal infringement or infringement under the doctrine of equivalents) of the '560 patent by the Comanche controller, or the controller of the successful LHX/LH competitor. Developed by Boeing and Sikorsky Aircraft (the First Team), the Comanche controller represents one of the most state-of-the-art devices available for helicopter controllers. Ironically, the controller nevertheless does not even use the four-axis design so acclaimed by the plaintiff. Thus, in contrast to the ADOCS controller, which at least paralleled certain parts of the design (albeit not function) of the invention disclosed in the '560 patent, the Comanche controller utilizes no such similar design or function. Indeed, the plaintiff's claim chart for this controller contains no other reference than again back to the references cited in the claim chart to the ADOCS controller. As to the critical element of a locking means, the plaintiff's claim chart for the Comanche controller reads:

U.S. Patent No. 4,134,560 Boeing/Sikorsky RAH–66 Comanche Controllers

Claim 1 Elements Present:

 * * * *

(c) locking means for selectively engaging or disengaging said first and second control means — (c) Yes. A–34 equivalent.

whereby said first and second control means can be locked in unitary engagement and said first and second control means moved in one pivotal direction to change the cyclic pitch in the longitudinal axis and moved in the other pivotal direction to change the cyclic pitch in the lateral helicopter axis and — Yes. A–34 equivalent.

whereby said first and second levers can be disengaged and — Yes. A–34 equivalent.

said control means can be moved relative to said first control means to control collective pitch and rotated to operate the tail rotor control. — Yes. A–27 equivalent.

Plaintiff's Response, at A–35 (citation omitted). Thus, the above noted references to page A–34 and A–27 all refer to the plaintiff's same basis of infringement as for the

ADOCS controller. Again, therefore, the plaintiff's only reference for demonstrating commonality of function for the locking means of the '560 patent comprises the mode select switch. Thus, just as this Court found that switch as well as the master on/off switch as dissimilar in function from the locking means of the '560 patent (either literally or equivalently), the lack of proof of infringement here becomes even more pronounced. Indeed, as the plaintiff conceded at deposition, "if the controller used in the ADOCS were found not to infringe * * *, then none of these other controllers would infringe either * * *." Messerschmidt Deposition, at B184. As a result, for the same reasons stated in the previous section on the ADOCS controller, this Court finds no infringement of the '560 patent by the Comanche controller.

■ Therefore, as the plaintiff presents this Court with no factual basis for infringement of possibly the most distinguishing characteristic of the '560 patent, or a locking device, in either the ADOCS, ARTI, or Comanche controllers, this Court finds that the plaintiff fails to meet the burden of proof for literal infringement (or indeed even for infringement under the doctrine of equivalents) pursuant to the All Elements Rule. As such, the plaintiff presents no factual foundation for literal infringement.

■ Legally, or in contrast to the above factual analysis of commonality of function (or in this case, the lack thereof), the plaintiff similarly fails to recognize that the scope of infringement in a means-plus-function claim encompasses not all means for performing a certain function but only those means disclosed in the specification and the equivalents thereof. *Pennwalt Corp. v. Durand–Wayland, Inc.*, 833 F.2d 931, 934 (Fed.Cir.1987). For example, the plaintiff suggests: "There is no requirement in the claims that the locking means be a separate manual operation which prevents or permits use of more than one control axis. The requirement of the claim is that the locking means be selective, and this can be accomplished manually or automatically." Plaintiff's Statement of Genuine Issues, at 1. Although this statement could prove valid under ordinary claims, a means-plus-function claim must be interpreted in light of the specification. Nevertheless, relying on *Strumskis v. United States*, 200 Ct.Cl. 668, 675, 474 F.2d 623, 627 ("This court has consistently maintained that the metes and bounds of an invention are defined by the claims of a patent and not its drawings or specifications."), *cert. denied*, 414 U.S. 1067, 94 S.C. 576, 38 L.Ed.2d 472 (1973), the plaintiff argues that the specification plays no role in construing the claims of the '560 patent on the accused controllers. The plaintiff fails to realize, however, that the patent claim in *Strumskis* was not drafted in the means-plus-function language. *Compare Decca Ltd. v. United States*, 190 Ct.Cl. 454, 460–62, 420 F.2d 1010, 1014–15 (construing the means-plus-function claims in light of the specification), *cert. denied*, 400 U.S. 865, 91 S.Ct. 102, 27 L.Ed.2d 104 (1970) *with E.I. Du Pont de Nemours & Co. v. Phillips Petroleum Co.*, 849 F.2d 1430, 1433 (Fed.Cir.) (using the specification only to interpret, but not to construe, the claims), *cert. denied*, 488 U.S. 986, 109 S.Ct. 542, 102 L.Ed.2d 572 (1988). Of course, because the plaintiff has failed to present this Court with sufficient factual grounds of infringement, consideration of the structure of the '560 patent need not occur. For, if no commonality of function exists, this Court never even need consider the specifications of the '560 patent other than for patent interpretation. *See Johnston v. IVAC Corp.*, 885 F.2d 1574, 1580 (Fed.Cir.1989) ("Section 112 ¶ 6 can never provide a basis for finding that a means-plus-function claim element is met literally where the function part of the element is not literally met in an accused device."). Therefore, in the absence of functional similarity between the elements of a claim and the accused devices, literal infringement of a means-plus-function claim cannot exist. Thus, as the accused controllers contrast in function with the controller disclosed by the claims of the '560 patent, particularly in the lack of a locking device, the plaintiff likewise presents no legal foundation for literal infringement.

Consequently, because the ADOCS, ARTI, and Comanche controllers do not embody each and every element of any claim of the patent-in-suit, pursuant to the All Elements Rule and in light of the means-plus-function limitation of 35 U.S.C. § 112, ¶ 6, this Court finds no literal infringement of the '560 patent.

### 3. Infringement under the Doctrine of Equivalents

Initially an equitable remedy, infringement under the doctrine of equivalents inhibits copying of prior art inventions by the introduction of insubstantial changes to the original invention. *Charles Greiner & Co. v. Mari–Med Mfg., Inc.*, 962 F.2d 1031, 1035–36 (Fed.Cir.1992). In contrast to Supreme Court cases which attribute origination of the doctrine of equivalents to *Winans v. Denmead*, 56 U.S. (15 How.) 330, 14 L.Ed. 717 (1854), *see Graver Tank & Mfg. Co. v. Linde Air Prods. Co.*, 339 U.S. 605, 608, 70 S.Ct. 854, 856, 94 L.Ed. 1097 (1950), Professor Wegner traces nonobviousness back to the "doctrine of mechanical equivalents" as recited by the English scholar, George T. Curtis. *See* Harold C. Wegner, *Equitable Equivalents: Weighing the Equities to Determine Patent Infringement in Biotechnology and Other Emerging Technologies*, 18 Rutgers Computer & Tech. L.J. 1, 4 n. 9, 24 n. 75 (1992) (citing George T. Curtis, A Treatise on the Law of Patents for Useful Inventions in the United States of America § 223 (1st ed. 1849)). Indeed, the genesis of the doctrine of equivalents traces to trial opinions written by members of the Supreme Court in their capacities as judges over circuit court cases, particularly to the opinions of Justices Story and Washington. Wegner, at 23–24, 24 n. 75. As early as 1841, in *Odiorne v. Winkley*, 18 F.Cas. 581, 582 (No. 10,432) (C.C.D.Mass.1814), Circuit Justice Story declared: "Mere colorable differences, or slight improvements, cannot shake the right of the original inventor," and in *Gray v. James*, 10 F.Cas. 1015, 1016 (No. 5718) (C.C.D.Pa.1817), Circuit Justice Washington recites the familiar standard: "[W]here the [accused infringing and patented] machines are substantially the same, and operate in the same manner, to pro-duce the same result, they must be in principle the same." *See generally Greiner*, 962 F.2d at 1036 (considering the origins of the doctrine of equivalents).

The seminal case for the doctrine of equivalents, *Graver Tank & Mfg. Co. v. Linde Air Products Co.*, 339 U.S. 605, 70 S.Ct. 854, 94 L.Ed. 1097 (1950), however, constituted the first Supreme Court decision to comprehensively adopt the doctrine of equivalents. Recognizing the purpose behind the doctrine, the Court noted:

> [C]ourts have * * * recognized that to permit imitation of a patented invention which does not copy every literal detail would be to convert the protection of the patent grant into a hollow and useless thing. Such a limitation would leave room for—indeed encourage—*the unscrupulous copyist to make unimportant and insubstantial changes and substitutions in the patent which, though adding nothing, would be enough to take the copied matter outside the claim, and hence outside the reach of the law.* * * *
>
> The doctrine of equivalents evolved in response to this experience.

*Id.* at 607–08, 70 S.Ct. at 856 (emphasis added). The modern doctrine of equivalents has developed through a series of Supreme Court cases, including *Winans v. Denmead*, 56 U.S. (15 How.) 330, 14 L.Ed. 714 (1854), *Machine Co. v. Murphy*, 97 U.S. (7 Otto) 120, 24 L.Ed. 935 (1877), and *Sanitary Refrigerator Co. v. Winters*, 280 U.S. 30, 50 S.Ct. 9, 74 L.Ed. 147 (1929). The standard recited in *Graver Tank*, essentially combined the standards of these earlier decisions into a definite standard:

> 'To temper unsparing logic and prevent an infringer from stealing the benefit of an invention' a patentee may invoke th[e] doctrine [of equivalents] to proceed against the producer of a device 'if it performs substantially the same function in substantially the same way to obtain the same result.' The theory on which it is founded is that 'if two devices do the same work in substantially the same way, and accomplish substantially the

same result, they are the same, even though they differ in name, form or shape.'

*Graver Tank*, 339 U.S. at 608, 70 S.Ct. at 856 (citations omitted, footnote omitted). Termed the "tripartite test" of equivalency, the *Graver Tank* standard [12] for application of the doctrine of equivalents requires establishing the three elements of function/way/result. *Malta v. Schulmerich Carillons, Inc.*, 952 F.2d 1320, 1324 (Fed. Cir.1991), *cert. denied*, —— U.S. ——, 112 S.Ct. 2942, 119 L.Ed.2d 566 (1992); *Slimfold Mfg. Co. v. Kinkead Indus., Inc.*, 932 F.2d 1453, 1457 (Fed.Cir.1991). Nevertheless, since the 1950 decision in *Graver Tank*, the Federal Circuit has continued to modify application of the doctrine of equivalents, particularly regarding whether to apply a simple equity standard or the All Elements Rule in applying the tripartite test. *Compare Loctite Corp. v. Ultraseal Ltd.*, 781 F.2d 861, 871 (Fed.Cir.1985) (applying strictly an equity standard) *with Lemelson v. United States*, 752 F.2d 1538, 1551 (Fed.Cir.1985) (applying the All Elements Rule).

Preceded by a panel decision which expressly adopted application of the All Elements Rule, *Perkin–Elmer Corp. v. Westinghouse Elec. Corp.*, 822 F.2d 1528, 1532 (Fed.Cir.1987), the most important modification to *Graver Tank* appeared in *Pennwalt Corp. v. Durand–Wayland, Inc.*, 833 F.2d 931 (Fed.Cir.1987) (*en banc*), *cert. denied*, 485 U.S. 961, 108 S.Ct. 1226, 99 L.Ed.2d 426 (1988). In *Pennwalt*, the patentee of a machine-based fruit sorter brought a patent infringement suit against the manufacturer of a computer-aided fruit sorting machine. When the patentee argued that the accused infringer had merely substituted a computer for a mechanical function, the court turned to the tripartite test of *Graver Tank*. Yet, in contrast to the broad analytical license of a function/way/result analysis based on equity, *Pennwalt* adopted an element-by-element refinement to the traditional test.[13] The Federal Circuit ruled: "[I]n applying the doctrine of equivalents, each limitation must be viewed in the context of the entire claim," and "each element of a claim is material and essential, and that in order for a court to find infringement, the plaintiff must show the presence of every element

**12.** In applying this standard, the Court recited certain guidelines in making the equivalency determination:

What constitutes equivalency must be determined against the context of the patent, the prior art, and the particular circumstances of the case. Equivalence, in the patent law, is not the prisoner of a formula and is not an absolute to be considered in a vacuum. It does not require complete identity for every purpose and in every respect. In determining equivalents, things equal to the same thing may not be equal to each other and, by the same token, things for most purposes different may sometimes be equivalents. Consideration must be given to the purpose for which an ingredient is used in a patent, the qualities it has when combined with the other ingredients, and the function which it is intended to perform. *An important factor is whether persons reasonably skill in the art would have known of the interchangeability of an ingredient not contained in the patent with one that was.*

*Id.* at 609, 70 S.Ct. at 856–57 (emphasis added).

**13.** In his dissent, Judge Bennett best describes the effect of adding the All Elements Rule to the *Graver Tank* standard:

The majority facially retains the historical test set forth in *Graver Tank & Mfg. Co. v. Linde Air Prods. Co.*, 339 U.S. 605, 70 S.Ct. 854, 94 L.Ed. 1097, 85 USPQ 328 (1950), for infringement under the doctrine of equivalents by stating that infringement in such instances may be found if an accused device performs substantially the same overall function or work, in substantially the same way, to obtain substantially the same overall result as the claimed invention. But in practical effect, the majority has eviscerated the underlying rationale of the *Graver Tank* test by requiring, under the doctrine of equivalents, an exact equivalent for each element of the claimed invention. *Graver Tank*, 339 U.S. at 608, 70 S.Ct. at 856, 85 USPQ at 330. The majority in fact commends the district court for undertaking the proper doctrine of equivalents determination, which the majority describes as an element-by-element comparison of the accused devise and the patent-in-suit. However, the purported "element-by-element comparison" was never the extent of the doctrine of equivalents analysis under our here-ignored precedents which also required that the analysis be undertaken in light of the entirety of the accused device and entirety of the patent-in-suit.

*Id.* at 940 (footnote omitted).

or its substantial equivalent in the accused device," further stating that "[t]o be a 'substantial equivalent,' the element substituted in the accused device for the element set forth in the claim must not be such as would substantially change the way in which the function of the claimed invention is performed." *Id.* at 935 (quoting *Perkin–Elmer Corp. v. Westinghouse Elec. Corp.*, 822 F.2d 1528, 1533 (Fed.Cir.1987)). Thus, *Pennwalt* instituted application of the All Elements Rule to the tripartite test of *Graver Tank* when considering infringement under the doctrine of equivalents.

The next modification to restrict *Graver Tank*, and to refine *Pennwalt*, appeared in the panel decision of *Corning Glass Works v. Sumitomo Elec. U.S.A., Inc.*, 868 F.2d 1251 (Fed.Cir.1989). In *Corning Glass*, the patent dispute arose over the development of optical waveguide fiber, a pioneer invention in the field of fiberoptics. *Id.* at 1253. While reinforcing the application of the All Elements Rule per *Pennwalt* to the tripartite test of *Graver Tank*, the panel in *Corning Glass* recited another modification of the All Elements Rule. *Id.* at 1259. Instead of considering "elements," the court proffered a better term as "limitations" as follows:

> "Element" may be used to mean a single limitation, but it has also been used to mean a series of limitations which, taken together, make up a component of the claimed invention. In the All Elements rule, "element" is used in the sense of a *limitation* of a claim. * * * An equivalent must be found for every limitation of the claim somewhere in an accused device, but not necessarily in a corresponding component, although that is generally the case.

*Id.* (citations omitted, footnote omitted). Subsequent and pursuant to *Corning Glass*, another panel of the Federal Circuit has recommended renaming the All Elements Rule to the "All Limitations Rule." *See Johnston v. IVAC Corp.*, 885 F.2d 1574, 1577 n. 3 (Fed.Cir.1989) ("Sometimes referred to as the All Elements Rule. A more precise name would be the All Limitations Rule.") (citations omitted); *see also*

*Becton Dickinson & Co. v. C.R. Bard, Inc.*, 922 F.2d 792, 796 (1990) ("To establish infringement of a patent, every *limitation* set forth in a claim must be found in an accused product or process exactly or by a substantial equivalent.") (emphasis added); *Intellicall, Inc. v. Phonometrics, Inc.*, 952 F.2d 1384, 1389 (Fed.Cir.1992) ("As this court has *repeatedly* stated, infringement requires that *every limitation* of a claim be met literally or by a substantial equivalent.").

Finally, other recent panel decisions have further sought to limit application of the doctrine of equivalents based on its equitable origins. In *Charles Griener & Co. v. Mari–Med Mfg.*, 962 F.2d 1031, 1036 (Fed. Cir.1992), the panel noted how "the doctrine retained its traditional equitable limits," and in *London v. Carson Pirie Scott & Co.*, 946 F.2d 1534, 1538 (Fed.Cir.1991), another panel warned that "if the public comes to believe * * * that the doctrine of equivalents is simply the second prong of every infringement charge, * * * then claims will cease to serve their intended purpose." *See also American Home Prods. Corp. v. Johnson & Johnson*, No. 92–1090, 1992 WL 280382, at *3, 1992 U.S.App. LEXIS 22941, at *7 (Fed.Cir. Sept. 10, 1992) (unpublished) ("But the doctrine of equivalents is not an automatic second prong to every infringement charge. It is an equitable remedy available only upon a suitable showing."). Thus, in contrast to the *Corning Glass* limitation upon the *Graver Tank* approach to the doctrine of equivalents, these recent panel decisions suggest the replacement of the All Elements Rule of *Pennwalt* with a purely equitable standard, where the doctrine of equivalents and the tripartite test of *Graver Tank* serve as the exception and not the rule. *See London*, 946 F.2d at 1538 ("Application of the doctrine of equivalents is the exception, however, not the rule, for if the public comes to believe (or fear) that the language of patent claims can never be relied on, and that the doctrine of equivalents is simply the second prong of every infringement charge, * * * then claims will cease to serve their intended purpose.").

Having recognized the applicable law and recent trends to revise the application of that law, this Court recognizes that it must apply the precedents of the Federal Circuit until the court decides to change those standards by an *en banc* decision. *South Corp. v. United States*, 690 F.2d 1368, 1370 (Fed.Cir.1982). This Court, therefore, considers the instant dispute by applying solely the tripartite test of *Graver Tank*, with the *Pennwalt* limitation of applying the All Elements Rule. Nevertheless, despite the legal standard applied, as in the plaintiff's assertions of literal infringement, the plaintiff likewise misstates or mistakes the facts as well as the law in alleging infringement under the doctrine of equivalents.

Factually, as inferred in the preceding section, the plaintiff fails to prove that the accused controllers perform the same function as the invention disclosed in the patent-in-suit. Likewise, for infringement under the doctrine of equivalents, the accused control systems must not only contain the same minimum elements as for literal infringement, or equivalents thereof, but must also contain the structure disclosed by the specification or equivalents to the means-plus-function claims of the '560 patent. Again, for the same reason that this Court finds no literal infringement, that is, the failure by the plaintiff to show the presence of a mechanical locking means in the accused controllers, this Court likewise finds no factual basis to support a claim of infringement for "equivalent function" pursuant to the doctrine of equivalents.

As recited in the factual section of this opinion, the plaintiff nevertheless presents assertions of infringement based on the tripartite function/way/result test of *Graver Tank* to show infringement under the doctrine of equivalents. First, the plaintiff argues that, because the accused controllers "function" as four-axis controllers, that they must infringe the '560 patent. Citing a design study by AVRAD-COM on the ADOCS controller, the plaintiff rationalizes:

[The design study] describe[s] and illustrate[s] how the ADOCS controls operate as follows: 'All 4–axis controllers are a base-pivot type for pitch and roll motion. Fore-aft force produces a longitudinal control input and right-left force a lateral control input. Yaw control is obtained by twisting about the grip centerline and vertical control through application of pure up and down forces.' This also describes the claimed operation of the '560 patent therefore infringement occurs.

Proposed Findings of Uncontroverted Fact (Plaintiff's), at 4–5. Then, in his Statement of Genuine Issues, the plaintiff makes the following conclusive statement:

There is no requirement in the claims that the locking means be a separate manual operation which prevents or permits use of more than one control axis. The requirement of the claim is that the locking means be selective, and this can be accomplished manually or automatically. In constructive reduction to practice, the '560 patent is a four axis control at all times.

Plaintiff's Statement of Genuine Issues, at 1. The plaintiff's statements conflict, however, with the claims of the '560 patent. Because the locking means indeed constitutes an element of each claim of the patent-in-suit, there is a requirement of a locking means in any embodiment for which plaintiff claims infringement. Consequently, absent this particular element, any accused device falls outside the scope of the '560 patent in terms of common function. Second, the plaintiff argues that the mode select switch or the master on/off switch function in a similar "way" as the controller disclosed in the '560 patent. However, for the same reasons recited in this Court's consideration of literal infringement, neither the mode control switch of the ADOCS controller nor the master on/off switch of the ADOCS, ARTI, or LHX/LH/Comanche controller constitute functionally similar or "equivalent" devices for the locking means of the '560 patent. Third, and finally, the plaintiff argues that the "result" of the controller at issue involves the manipulation of the four conventional helicopter controls, regardless of the structural means therefor. Again,

however, this line of argument completely ignores the means-plus-function nature of the claims of the '560 patent. Indeed, even assuming, *arguendo*, that such functional commonality existed, the plaintiff has presented absolutely no evidence to contradict the dissimilarity of structure between the controller disclosed by the '560 patent and the accused controllers.

As recited in the preceding section on paragraph six of section 112, for literal infringement of the instant means-plus-function claims, or infringement under the doctrine of equivalents, the plaintiff must show structural commonality for the accused controllers in the specification of the patent-in-suit or equivalents thereof. As the plaintiff presents no evidence in this regard, this Court finds that the plaintiff has utterly failed the burden of proof for infringement under the doctrine of equivalents. Nonetheless, the defendant proffers persuasive expert testimony which clearly differentiates the claimed invention from the accused controllers. As described below, this Court adopts the conclusions of these experts as to functional as well as structural differentiation. *See Moeller v. Ionetics, Inc.*, 794 F.2d 653, 657 (Fed.Cir. 1986) ("Although use of experts is generally a matter of discretion with the trial judge, that discretion is not unlimited. In a patent case involving complex scientific principles, it is particularly helpful to see how those skilled in the art would interpret the claim.") (citation omitted); *McGill Inc. v. John Zink Co.*, 736 F.2d 666, 675 (Fed. Cir.) ("In addition to tools of claim construction such as file history, patent specification, and other claims in the patent, testimony by expert witnesses may be used to construe claims."), *cert. denied*, 469 U.S. 1037, 105 S.Ct. 514, 83 L.Ed.2d 404 (1984).

▮ To distinguish the structure (as well as the function) of the accused controllers from the patent-in-suit, the defendant presents this Court with the testimony of seven experts in the art. As shown below, these experts uniformly agree that the accused controllers contrast not only in function with the '560 patent, by the lack of a locking means which results in selective

helicopter control (as opposed to simultaneous control), but also in structure, whereas the patent-in-suit discloses a mechanical-based structure but the accused controllers all rely on computer-aided designs.

To differentiate function, Mr. Robert L. Tomaine, who holds a Bachelor of Science degree in Aerospace Engineering and a Masters of Science degree in Mechanical Engineering and has worked for Boeing Vertol and the United States Army since 1967, perhaps best presented the functional differences between the patent-at-issue and the controllers at issue, including those of the ADOCS, ARTI, and LHX/LH/Co-manche programs. Tomaine Affidavit, at 3. Specifically, Mr. Tomaine described how the accused controllers utilized "fly-by-wire" (or "fly-through") systems. *Id.* Mr. Tomaine explained:

These helicopter control systems are fly-by-wire systems in which the pilot applies pressure and/or displacement to the control stick to effect a change in the control of the helicopter's axes. Very simply, the pressure and/or displacement that the pilot exerts on the control stick is changed to an electrical signal that is sent to a computer which shapes the signal according to preprogrammed helicopter control laws. This produces an output signal which is transmitted to an actuator to effect the required control change. These control systems also employ sensors which measure selected factors such as the helicopter's velocity, altitude or the wind speed and generate electrical signals that act through servo loops in conjunction with a computer to produce additional control changes. In none of the control systems used in these programs was there a lock which had to be disengaged before the pilot could make a control change to either collective pitch or yaw as required by the claims of the Messerschmidt patent. The computers which act upon the signals generated by the pilot's control changes and the helicopter's sensors do not function in substantially the same manner that the locking means in the Messerschmidt controller functions, nor do these computers

produce substantially the same result as that locking means. In the accused helicopter control systems used in the ADOCs, ARTI, LH and Comanche programs, the pilot could always make changes to the collective pitch and yaw merely by applying pressure and/or displacement to the control stick. There was no lock that must first be disengaged. *Id.* at 3–4. Next, Mr. Nicholas D. Lappos, who holds a Bachelor of Aerospace Engineering degree and has been employed by Sikorsky Aircraft since 1973, likewise cited the functional differences of a controller design which inhibits and allows simultaneous control of all four axes at any certain time during flight. Lappos Affidavit, at 3. Mr. Lappos emphasized these dissimilar functions by specifying the different means of helicopter control. Mr. Lappos explained: "The helicopter control systems used by Sikorsky * * * is sometimes referred to as a 'fly through' control arrangement. With it, the pilot can at all times assume full control through normal movement of the flight controls, without the need to apply or remove any lock or restraint." *Id.* at 4–5. In contrast, Mr. Lappos noted: "[T]he locking means used in Messerschmidt's controller does not permit movement of the yaw controls and thus precludes control in this axis." *Id.* at 3. Thus, Mr. Lappos emphasized the functional difference in simultaneous control by the accused controllers and mere selective control by the invention disclosed by the patent-in-suit. Further, Mr. Joseph R. Maciolek, who holds a Bachelor of Science degree in Aeronautical Engineering and a Masters of Science degree in Mathematical Engineering and has worked for Sikorsky Aircraft since 1959, also highlighted the functional dissimilarities. Maciolek Affidavit, at 3. Mr. Maciolek explained that, in contrast to a "fly through" (or fly-by-wire) philosophy which enables instantaneous control of all axes on the helicopter controller, the invention disclosed by the '560 patent not only inhibits simultaneous control but even fails to solve the problem posed by the art (*i.e.*, cross-coupling). *See id.* at 4 ("To use the Messerschmidt controller to produce lateral cyclic and yaw control inputs at the same time requires the locking means to be disengaged. Moving the Messerschmidt controller with one hand to make these control inputs, while the locking means is disengaged, will result in heavily cross-coupled control inputs."). As such, in distinguishing the functionality of the systems, Mr. Maciolek presents perhaps one of the best attestations of dissimilar function, or that one type of controller performs the function intended and the other fails to perform the intended purpose.

To differentiate structure, Mr. Steven I. Glusman, who holds a Bachelor of Science degree in Mechanical Engineering and has been employed by the Helicopter Division of Boeing since 1981, extolled the singularity of computer-aided four-axis controllers. Glusman Affidavit, at 4–5. Mr. Glusman explained that cross-coupling constituted the fundamental reason why helicopter designers initially avoided four-axis controllers, and in contrast to the mechanical-based friction devices employed by the Pentecost patent and TAGS controller, and by the plaintiff, Mr. Glusman emphasized the impracticality of a controller which locks any of the four helicopter controls. *Id.* at 4. Mr. Glusman described the problem of mechanical-based controllers as follows:

A lock of the type described in the Messerschmidt patent specification and claims is dangerous and should never be in a helicopter control system as it creates an unacceptable risk to the helicopter operator. In a control system with such a lock, there is always a risk that the lock will fail while it is in the engaged position so that it cannot be disengaged by the operator. For example, in the specific control system depicted in the Messerschmidt patent drawings, if the cable 35, which connects lever 2 to locking caliper 36, were to break while the locking caliper is engaged, the first and second controls could not be decoupled by the operator. Under these circumstances, the operator could not make any changes to either the collective pitch or the tail rotor (yaw) and would lose control over two of the four axes which

must be controlled in the helicopter. Such a risk is totally unacceptable in any modern helicopter control system.

*Id.* at 4–5. Pointing then to the successful computer-aided solutions to cross-coupling in four-axis controllers, Mr. Glusman noted: "The control systems used and tested in these [ADOCS, ARTI, and LHX/LH/Comanche] programs always permitted the helicopter operator to directly input a control change into the collective pitch and the tail rotor (yaw) without first disengaging any type of a lock." *Id.* at 4. In sum, Mr. Glusman emphasized the dissimilar function (simultaneous versus selective control) as well as structure (mechanical-based versus computer-aided) of the controllers at issue. Furthermore, Mr. Kenneth H. Landis, who holds a Bachelor of Science degree in Aeronautical Engineering and has been employed for twenty-seven years by the Helicopter Division of Boeing, also confirmed the structural differences between the mechanical-based controller disclosed in the '560 patent and the computer-aided design of the ADOCS, ARTI, and LHX/LH/Comanche controllers. Landis Affidavit, at 4. Finally, Mr. Stephen S. Osder, who holds a Bachelor of Science and Masters of Science degree in Electrical Engineering and has worked in the field of flight controllers for 30 years and with McDonnell Douglas Helicopter since 1985, demonstrated the dissimilar structure by contrasting the controllers of the ARTI and LH programs from the controller disclosed in the '560 patent. Osder Affidavit, at 3. Thus, Mr. Osder distinguished the control selectivity of the controller disclosed in the patent-in-suit from the computer-aided controllers, as utilized by the ARTI and LH programs, which enable simultaneous control of all four axes at all times. *Id.* Mr. Osder explained:

> When the computer assisted control modes associated with these helicopter programs, such as altitude and velocity hold, are selected by a pilot, the pilot's control of the collective and yaw axes is not locked out as it is when Messerschmidt's lock is engaged. The pilot can at all times make a control change in the collective and yaw axes without first disengaging any type of lock.

*Id.* at 3–4. Thus, as Mr. Osder insinuates, the differences in function among the controllers at issue demonstrate and emphasize the differences in structure. Only the computer-aided controllers allow simultaneous control whereas only the mechanical controllers allow mere selective control.

In some cases, moreover, some of the accused controllers did not even contain the four-axis design so acclaimed by the plaintiff as the overall basis for infringement. Indeed, Mr. John Harvey Emery, who holds a Bachelor of Science degree in Aerospace Engineering and a Masters of Science degree in Mechanical Engineering and, except for one year, has worked for Bell Helicopter since 1962, testified that Bell had not even used a four-axis controller on either the ARTI or LH programs. Emery Affidavit, at 2–3. Mr. Emery explained the two controllers utilized by Bell as follows:

> [For the ARTI program,] Bell used a 2–axis controller for longitudinal and lateral cyclic pitch, a separate single axis controller for collective pitch, and foot pedals for yaw control. This arrangement is known as a 2 + 1 + 1 configuration. The 2–axis controller was located on the pilot's right side while the single axis controller was located to the pilot's left. * * * With this arrangement, the pilot had to use both hands and his feet to operate the helicopter. * * * [O]ne of Bell's aircraft, used in the ARTI program, was equipped with and flew with a 4–axis side-arm controller. * * * [However] the electrical connectors for all four axes were never hooked up. Instead, only two of the four axes were connected, so that the controller functioned as a 2–axis controller. Plans to eventually utilize all four axes were never carried out.
> * * * [For the LH program, Bell used] the 2 + 1 + 1 configuration primarily. Bell also examined a 3 + 1 configuration in which a 3–axis sidestick controller was used for longitudinal and lateral cyclic pitch and yaw control, and a single axis controller was used for collective pitch

control. The 3–axis controller was on the pilot's right side, while the single axis (collective pitch) controller was on the pilot's left. With this configuration, the pilot had to use both hands to operate the helicopter.

*Id.* at 2–3. Mr. Emery thus concluded that, as Bell utilized either 2 + 1 + 1 or 3 + 1 configurations, the controllers of the ARTI program and the LH program (at least, for Bell's contribution to the Superteam) contrasted even from the type of controller claimed by the plaintiff for infringement.

██ As the above cited experts demonstrate, the function as well as the structure of the accused controllers contrast dramatically from the controller disclosed by the claims of the '560 patent. Thus, based on the foregoing factual analysis, this Court finds no basis for a finding of infringement under the doctrine of equivalents. Thus, this Court finds that neither the United States nor contractors thereof attempted to copy the plaintiff's controller by the introduction of insubstantial changes into the design of the helicopter control systems for the ADOCS, ARTI, or LHX/LH/Comanche controllers or any of the other accused controllers or patents recited by the plaintiff.

██ Legally, the plaintiff recites the same erroneous understanding of infringement under the doctrine of equivalents as for literal infringement when considering claims drafted in means-plus-function language. While the Federal Circuit has stated that the transfer of each element of a mechanical invention into a computer may result in infringement, pursuant to the *Graver Tank* tripartite standard, such infringement nevertheless requires commonality of function and, if utilizing means-plus-function claims, commonality of structure. *See Pennwalt Corp. v. Durand–Wayland, Inc.,* 833 F.2d 931, 935 (Fed.Cir. 1987) ("If Pennwalt was correct that the accused devices differ only in substituting a computer for hard-wired circuitry, it might have a stronger position for arguing that the accused devices infringe the claims. The claim limitations, however, require the performance of certain specified functions."), *cert. denied,* 485 U.S. 961, 108 S.Ct. 1226, 99 L.Ed.2d 426 (1988). On the one hand, as illustrated in the literal infringement analysis, the plaintiff failed to show the existence of each and every element of any claim of the '560 patent in the accused controllers; for, neither the ADOCS, ARTI, or the LHX/LH/Comanche controller possess a means for inhibiting (*i.e.,* locking out) four-axis control. Furthermore, under the instant analysis of infringement under the doctrine of equivalents, the plaintiff has likewise failed to demonstrate any "substantial equivalents" for this locking device. "To be a 'substantial equivalent,' the element substituted in the accused device for the element set forth in the claim must not be such as would substantially change the way in which the function of the claimed invention is performed." *Id.* (quoting *Perkin–Elmer Corp. v. Westinghouse Elec. Corp.,* 822 F.2d 1528, 1533 (Fed.Cir.1987)). Clearly, the mode select switch and the master on/off switch of the accused controllers "change the way in which the function" of the controller disclosed in the '560 patent performs. On the other hand, while lack of equivalent function ends the infringement analysis, the plaintiff can nevertheless demonstrate no equivalent structure. The claims of the '560 patent rely by statute on the mechanical-based structure of the '560 patent pursuant to the means-plus-function language and, as a result, contrast facially from the computer-aided design of the accused controllers. *See* 35 U.S.C. § 112, ¶ 6. As a result, from either perspective, the plaintiff presents no legal foundation for infringement under the doctrine of equivalents. Because the accused controllers do not embody each and every element of any claim of the patent-in-suit or an equivalent thereof, pursuant to the All Elements Rule and in light of the means-plus-function limitation of 35 U.S.C. § 112, ¶ 6, this Court finds no infringement of the '560 patent under the doctrine of equivalents.

In final summary then of this Court's infringement determination, this Court finds that neither the accused controllers, nor the patents on which they rely, infringe

either literally or under the doctrine of equivalents the plaintiff's patent-in-suit.

## CONCLUSION

For the reasons given above, this Court declares claims one, two, and three of the '560 patent invalid for anticipation pursuant to 35 U.S.C. § 102 and, furthermore, finds all of the claims of the patent-in-suit invalid for obviousness pursuant to 35 U.S.C. § 103 and for indefiniteness pursuant to 35 U.S.C. § 112, ¶ 2. In the alternative, this Court finds that the '560 patent has not been infringed, literally or under the doctrine of equivalents, either by the United States or by contractors at its direction pursuant to 28 U.S.C. § 1498. Therefore, this Court denies the plaintiff's motion for summary judgment, and accordingly, grants the defendant's cross-motion for summary judgment. The clerk is directed to dismiss the plaintiff's complaint and order judgment for the defendant.

Each party is to bear its own costs.